IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 21-1080

UNITED STATES OF AMERICA,
APPELLEE

v.

WILLIAM FACTEAU,
DEFENDANT-APPELLANT

No. 21-1082

UNITED STATES OF AMERICA,
APPELLEE

v.

PATRICK FABIAN,
DEFENDANT-APPELLANT

ON APPEAL FROM A JUDGMENT IN A CRIMINAL CASE,
ENTERED IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BRIEF FOR THE UNITED STATES
(CORRECTED)

NATHANIEL R. MENDELL
ACTING UNITED STATES ATTORNEY

RANDALL E. KROMM
ASSISTANT U.S. ATTORNEY
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
SUITE 9200
BOSTON, MASSACHUSETTS 02210
(617) 748-3381

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................... iv

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF THE CASE..................................................................2

      A.     Procedural History.................................................................2

      B.     Federal regulation of medical devices..................................4

           1.     The medical device premarket review process ...........4

           2.     The significance of "intended use" ............................8

           3.     Prosecutions for adulteration and misbranding .......11

      C.     Statement of Facts ...............................................................13

SUMMARY OF ARGUMENT ...............................................................29

ARGUMENT ........................................................................................32

I.     PROSECUTION OF THE DEFENDANTS DID NOT VIOLATE
      THEIR RIGHT TO DUE PROCESS .............................................32

      A.     Legal framework and standard of review............................32

      B.     Defendants fail to establish unconstitutional vagueness or
           any other violation of due process .....................................34

           1.     The defendants fail to establish vagueness in the
                  text of the FDCA or 21 C.F.R. §801.4.......................34

           2.     Defendants fail to show a history of inconsistent
                  judicial interpretation .................................................37

i

3.     Defendants' claims of an unfair change in the agency's interpretation of its regulations and in its theory of prosecution are without merit....................................41

4.     FDA's revised regulation on "intended use" supports the government's position ...........................................46

II.    THE PROSECUTION DID NOT VIOLATE THE FIRST AMENDMENT ........................................................................48

A.    Standard of review.................................................................49

B.    The use of marketing speech as evidence in this case does not implicate the First Amendment........................................50

C.    Facteau's claim that FDA's "safe harbor" guidance violate the First Amendment fails on plain error review ................58

1.    Guidance and arguments presented below................................59

2.    Facteau's unpreserved argument is waived ..............................62

3.    Facteau fails to establish a clear or obvious error....................62

4.    Facteau cannot show prejudice ................................................66

III.   FABIAN'S SUFFICIENCY CLAIMS ARE UNAVAILING ....................69

A.    Clarifying the crime charged and proved............................69

B.    Standard of review.................................................................71

C.    The government was not required to introduce marketing statements for each shipment ..............................................72

D.    The government was not required to prove that Fabian had a role in Acclarent's failure to obtain regulatory approvals................75

IV.     FABIAN IDENTIFIES NO ERROR IN THE DISTRICT COURT'S
         "INTENDED USE" INSTRUCTION ..........................................................77

         A.     Procedural history..............................................................77

         B.     Standard of review.............................................................79

         C.     Fabian's instructional challenges are unavailing ................................79

V.      FABIAN'S CHALLENGE TO HIS FINE, IF NOT WAIVED, FAILS
         TO SHOW PLAIN ERROR ...........................................................81

         A.     Procedural history..............................................................81

         B.     Fabian has waived his Eighth Amendment claim ...............................83

         C.     Fabian cannot demonstrate plain error ...........................................84

VI.     THE ARGUMENTS OF *AMICI CURIAE* DO NOT SUPPORT
         REVERSAL.......................................................................87

         A.     First Amendment arguments .................................................87

         B.     Due Process ...................................................................91

         C.     Policy Considerations ........................................................93

CONCLUSION...............................................................................95

CERTIFICATE OF COMPLIANCE.........................................................96

CERTIFICATE OF SERVICE ..............................................................97

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Action on Smoking and Health v. Harris*,
    655 F.2d 236 (D.C. Cir. 1980)...........................................................38

*Allergan, Inc. v. Athena Cosmetics, Inc.*,
    738 F.3d 1350 (Fed. Cir. 2013) ................................................. 38-39

*Amarin Pharma., Inc. v. United States Food & Drug Administration*,
    119 F. Supp. 3d 196 (S.D.N.Y. 2015) ........................................ 50, 58

*Bailey v. Morales*,
    190 F.3d 320 (5th Cir. 1999) ....................................................... 36-37

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    140 S. Ct. 2335 (2020)...................................................................67

*Buckman Co. v. Plaintiff's Legal Committee*,
    531 U.S. 341 (2001)............................................................... 5-6, 11

*Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*,
    447 U.S. 557 (1980)................................................................. 53-54

*Cook v. Gates*,
    528 F.3d 42 (1st Cir. 2008)............................................................51

*Coskery v. Berryhill*,
    892 F.3d 1 (1st Cir. 2018)..............................................................47

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)........................................................... 32, 34, 42

*Flytenow, Inc. v. Fed. Aviation Admin.*,
    808 F.3d 882 (D.C. Cir. 2015)........................................................51

*James v. United States*,
    550 U.S. 192 (2007).......................................................................37

*Johnson v. United States*,
    576 U.S. 591 (2015) ................................................................ 37, 41

iv

*Kaiser v. Johnson & Johnson*,
   947 F.3d 996 (7th Cir. 2020) ...............................................................8

*Keepers, Inc. v. City of Milford*,
   807 F.3d 24 (2d Cir. 2015) ................................................................34

*Masso-Torrelas v. Municipality of Toa Alta*,
   845 F.3d 461 (1st Cir. 2017)..............................................................49

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996)........................................................................ 4-6

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
   460 U.S. 575 (1983)...........................................................................64

*Nat'l Ass'n of Manufacturers v. Taylor*,
   582 F.3d 1 (D.C. Cir. 2009) ..............................................................35

*Nature Food Centres, Inc. v. United States*,
   310 F.2d 67 (1st Cir. 1962)..................................................... 39, 73-74

*Nicopure Labs, LLC v. Food & Drug Admin.*,
   944 F.3d 267 (D.C. Cir. 2019)...........................................................52

*Penobscot Poultry Co. v. United States*,
   244 F.2d 94 (1st Cir. 1957)...............................................................70

*Puerto Rico Telephone, Inc. v. San Juan Cable LLC*,
   874 F.3d 767 (1st Cir. 2017)..............................................................36

*Richenberg v. Perry*,
   97 F.3d 256 (8th Cir. 1996) ..............................................................51

*Simon & Shuster, Inc. v. Members of New York State Crime Victim's Bd.*,
   502 U.S. 105 (1991)...........................................................................64

*Sorrell v. IMS Health*,
   564 U.S. 552 (2011)..................................................................... 63-64

*State of Rhode Island v. Narragansett Indian Tribe*,
   19 F.3d 685 (1st Cir. 1994)...............................................................90

v

*Thomasson v. Perry*,
　　80 F.3d 915 (4th Cir. 1996) ..................................................................51

*U.S. Ex. Rel. Polansky v. Pfizer, Inc.*,
　　822 F.3d 613 (2d Cir. 2016) ......................................................... 52, 57

*United States v. 789 Cases, More or Less, of Latex Surgeon's Gloves, and Article of Device*,
　　799 F. Supp. 1275 (D.P.R. 1992) .........................................................39

*United States v. Ackell*,
　　907 F.3d 67 (1st Cir. 2018)..................................................................49

*United States v. Aguasvivas-Castillo*,
　　668 F.3d 7 (1st Cir. 2012)............................................................... 83-86

*United States v. Amawi*,
　　695 F.3d 457 (6th Cir. 2012) ...............................................................51

*United States v. An Article of Device*,
　　731 F.2d 1253 (7th Cir. 1984) ...................................................... 39, 43

*United States v. Article . . . Consisting of 216 Cartoned Bottles, More or Less, Sudden Change*,
　　409 F.2d 734 (2d Cir. 1969) ................................................................38

*United States v. Articles of Drug for Veterinary Use*,
　　50 F.3d 497 (8th Cir. 1995) ...................................................... 40, 73-74

*United States v. Bajakajian*,
　　524 U.S. 321 (1998)...................................................... 81, 84-85

*United States v. Cannon*,
　　750 F.3d 492 (5th Cir. 2014) ...............................................................51

*United States v. Caputo*,
　　456 F. Supp. 2d 970 (N.D. Ill. 2006),
　　*aff'd in part, vacated in part, remanded,* 517 F.3d 935 (7th Cir. 2008) ............39

*United States v. Caputo*,
　　517 F.3d 935 (7th Cir. 2008) ............................................... 35, 39, 45

*United States v. Caronia,*
    703 F.3d 149 (2d Cir. 2012) ........................................................... *passim*

*United States v. Carpenter,*
    941 F.3d 1 (1st Cir. 2019)................................................................ 85-86

*United States v. Charriez-Rolon,*
    923 F.3d 45 (1st Cir.), *cert. denied*, 140 S. Ct. 292 (2019)................................71

*United States v. Chin,*
    15 F.4th 536, 545 (1st Cir. 2021)........................................................ 70-71, 74

*United States v. Cianci,*
    378 F.3d 71 (1st Cir. 2004)............................................................... 88-89

*United States* v. *Cole,*
    84 F. Supp. 3d 1159 (D. Or. 2015) ....................................................52

*United States v. Cruz-Ramos,*
    987 F.3d 27 (1st Cir. 2021)...............................................................84

*United States v. Cruz-Rivera,*
    14 F.4th 32, 54 (1st Cir. 2021)...........................................................79

*United States v. Dotterweich,*
    320 U.S. 277 (1943)..................................................................... 12, 70, 76

*United States v. Duran,*
    596 F.3d 1283 (11th Cir. 2010) .......................................................... 34-35, 37

*United States v. Freitas,*
    904 F.3d 11 (1st Cir. 2018)............................................................... 71, 75

*United States v. Gonzalez,*
    981 F.3d 11 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 1710 (2021)....................49

*United States v. Grullon,*
    996 F.3d 21 (1st Cir. 2021)............................................................... 63, 80, 85

*United States v. Heldeman,*
    402 F.3d 220 (1st Cir. 2005)............................................................. 85-86

vii

*United States v. Hohensee*,
   243 F.2d 367 (3d Cir. 1957) ................................................................35

*United States v. Hussein*,
   351 F.3d 9 (1st Cir. 2003) ...................................................................33

*United States v. Jose*,
   499 F.3d 105 (1st Cir. 2007) ...............................................................86

*United States v. Kaziu*,
   559 Fed. App'x 32 (2d Cir. 2014) ............................................... 51, 58

*United States v. Lachman*,
   387 F.3d 42 (1st Cir. 2004) .......................................................... 33, 36

*United States* v. *Lane Labs-USA, Inc.,*
   324 F. Supp. 2d 547 (D.N.J. 2004) ......................................................52

*United States v. LeBeau*,
   654 Fed. App'x. 826 (7th Cir. 2016) ...................................................51

*United States* v. *Livdahl,*
   459 F. Supp. 2d 1255 (S.D. Fla. 2005) ................................................52

*United States v. Mayendia-Blanco*,
   905 F.3d 26 (1st Cir. 2018) .................................................................81

*United States v. McCullock*,
   991 F.3d 313 (1st Cir. 2021) ...............................................................84

*United States v. Morosco*,
   822 F.3d 1 (1st Cir. 2016) ....................................................... 32-33, 37

*United States v. Pabon*,
   819 F.3d 26 (1st Cir. 2016) ......................................................... 62, 84

*United States v. Padilla-Galarza*,
   889 F.3d 60 (1st Cir. 2021) ........................................................ 89, 92

*United States v. Park*,
   421 U.S. 658 (1975) ............................................................................76

*United States v. Perez-Rodriguez*,
  13 F.4th 1, 16 (1st Cir. 2021)...............................................................79

*United States v. Playboy Entertainment Group, Inc.*,
  529 U.S. 803 (2000)................................................................................63

*United States v. Powell*,
  469 U.S. 57 (1984)........................................................................... 88-89

*United States v. Prigmore*,
  243 F.3d 1 (1st Cir. 2001)........................................................................4

*United States* v. *Regenerative Sciences,* LLC,
  878 F. Supp. 2d 248 (D.D.C. 2012), *aff'd,* 741 F.3d 1314 (D.C. Cir. 2014) .....52

*United States v. Saad*,
  888 F.3d 561 (1st Cir. 2018)..................................................................68

*United States v. Sandoval*,
  6 F.4th 63, 93 (1st Cir. 2021)........................................................ 62, 79

*United States v. Sepúlveda-Hernández*,
  752 F.3d 22 (1st Cir. 2014).............................................................. 83-85

*United States v. Smith*,
  967 F.3d 1196 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2538 (2021) ..............51

*United States v. Southern Union Co.*,
  630 F.3d 17 (1st Cir. 2010)....................................................................45

*United States v. Stepanets*,
  989 F.3d 88 (1st Cir.), *cert. denied*, 2021 WL 4508918 (Oct. 4, 2021)...... 70, 76

*United States v. Stewart Carrasquillo*,
  997 F.3d 408 (1st Cir. 2021)..................................................................56

*United States v. Storage Spaces Designated Nos.* "8" & "49",
  777 F.2d 1363 (9th Cir. 1985) ...............................................................38

*United States v. Sullivan*,
  332 U.S. 689 (1948)..................................................................................4

*United States v. Travia*,
180 F. Supp. 2d 115 (D.D.C. 2001) .............................................................. 39, 43

*United States v. Torres Monje*,
989 F.3d 25 (1st Cir. 2021) .............................................................................71

*United States v. Universal Mgmt. Servs. Corp.*,
191 F.3d 750 (6th Cir. 1999) ..........................................................................12

*United States v. Vascular Solutions*,
181 F. Supp.3d 342 (W.D. Tex. 2016) ...................................................... 39, 44

*United States v. Weadick*,
15 F.4th 1 (1st Cir. 2021)...................................................................... 66, 68, 83

*United States v. Wolf*,
691 Fed App'x 438 (9th Cir. 2017) .................................................................51

*United States v. Zhen Zhou Wu*,
711 F.3d 1 (1st Cir. 2013)................................................................................33

*V.E. Irons, Inc. v. United States*,
244 F.2d 34 (1st Cir. 1957)..................................................................... 35, 38, 80

*Virginia v. Black*,
538 U.S. 343 (2003).........................................................................................64

*Wag More Dogs, Ltd. Liability Corp. v. Cozart*,
680 F.3d 359 (4th Cir. 2012) .................................................................... 34, 36

*Washington Legal Foundation v. Henney*,
202 F.3d 331 (D.C. Cir. 2000).................................................................. 46, 63

*Whitaker v. Thompson*,
353 F.3d 947 (D.C. Cir. 2004)................................................................... 51-52

*White v. Department of Justice*,
328 F.3d 1361 (4th Cir. 2003) ................................................................. 33, 93

*Williams v. Brewer*,
442 F.2d 657 (8th Cir. 1971) ................................................................... 33, 93

*Wine and Spirits v. Rhode Island*,
   418 F.3d 36 (1st Cir. 2005).......................................................................... 57, 89-90

*Wisconsin v. Mitchell*,
   508 U.S. 476 (1993)..........................................................................................50

## <u>STATUTES</u>

15 U.S.C. §78j(b) ......................................................................................................2

15 U.S.C. §78ff(a) ....................................................................................................2

18 U.S.C. §371 .........................................................................................................2

18 U.S.C. §3231 ........................................................................................................1

18 U.S.C. §1343 .......................................................................................................2

18 U.S.C. §1349 .......................................................................................................2

18 U.S.C. §3571(b)(5).............................................................................................82

21 U.S.C. §321(h)(1)................................................................................................5

21 U.S.C. §321(h)(1)(B)-(C) ..................................................................................8

21 U.S.C. §321(g)(1)(B)-(C) ..................................................................................8

21 U.S.C. §331 .......................................................................................................11

21 U.S.C. §331(a) .................................................................................2-3, 11, 69-72, 76

21 U.S.C. §333(a)(1).........................................................................................2-3, 12

21 U.S.C. §333(a)(2).........................................................................................2-3, 12

21 U.S.C. §351(f)(1)(B).....................................................................................3, 12, 69

21 U.S.C. §352(f) .....................................................................................................3

21 U.S.C. §352(o) .............................................................................................3, 12, 70

21 U.S.C. §360(k) ...................................................................................................12

21 U.S.C. §360c(a)(1)(A) ........................................................................6

21 U.S.C. §360c(a)(1)(B) ........................................................................6

21 U.S.C. §360c(a)(1)(C) ........................................................................5

21 U.S.C. §360c(f)(1) ..............................................................................6

21 U.S.C. §360c(i)(1)(A) .................................................................. 8, 34

21 U.S.C. §360c(f)(1)(A)(ii) ...................................................................6

21 U.S.C. §396 ......................................................................................11

28 U.S.C. §1291 ......................................................................................1

28 U.S.C. §3742(a) ..................................................................................1

## R<small>EGULATIONS</small>

21 C.F.R. §201.128 ..................................................................................9

21 C.F.R. §801.4 ..................................................................9-10, 34-35

21 C.F.R. §807.81(a) ...............................................................................9

21 C.F.R. §807.81(a)(3)(iii) ....................................................................9

21 C.F.R. §807.87(e) ...............................................................................7

21 C.F.R. §807.87(h) ...............................................................................6

21 C.F.R. §807.87(l) ................................................................................7

21 C.F.R. §807.87(m) ..............................................................................7

21 C.F.R. §807.92(a) ...............................................................................6

21 C.F.R. §§807.92(a)(3-5) .....................................................................7

21 C.F.R. §807.100(a) .............................................................................7

21 C.F.R. §807.100(b) .............................................................................8

17 Fed. Reg. 6818 ...................................................................................9

41 Fed. Reg. 6896-97 (Feb. 13, 1976) ...................................................9

80 Fed. Reg. 55756 (Sept. 25, 2015) .....................................................10

82 Fed. Reg. 2193 (Jan. 9, 2017) ...........................................................10

83 Fed. Reg. 11639 (Mar. 16, 2018)......................................................10

85 Fed. Reg. 59718 (Sept. 23, 2020) .....................................................10

86 Fed. Reg. 41388 .................................................................................43

86 Fed. Reg. 41399 .................................................................................46

86 Fed. Reg. 41401 (Aug. 2, 2021)........................................................10

### Sentencing Guidelines

USSG §5E1.2(c)(3) (2014) (Fine Table) ................................................81

USSG §5E1.2(h)(1) (2018) .....................................................................81

### Other Authorities

Memorandum: Public Health Interests and First Amendment Considerations Regarding Unapproved Uses of Approved or Cleared Medical Products (January 2017), available at https://www.regulations.gov/document?D=FDA-2016-N-1149-0040...................................................................................54

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction because the indictment charged the defendants, Patrick Fabian and William Facteau, with an offense against the United States. 18 U.S.C. §3231. The Judgments in a Criminal Case were docketed on January 20, 2021, [D.537, 538],[1] and the defendants filed timely notices of appeal on January 28, 2021. [D.542, 545]. This Court has jurisdiction over the defendants' appeals pursuant to 28 U.S.C. §1291 and §3742(a).

## STATEMENT OF ISSUES

1.     Prosecution of the defendants did not violate their right to due process.

2.     Prosecution of the defendants did not violate the First Amendment.

3.     Fabian's sufficiency claims are unavailing.

4.     Fabian establishes no error in the district court's "intended use" instruction.

5.     Fabian's challenge to his fine, if not waived, fails to show plain error.

6.     The briefs of *amici curiae* offer no support for reversal here.

---

[1] Citations are as follows. The citation "[D._]" refers to a docket entry. The citations "[PFBr._]," "[PFAdd._]," "[WFBr._]," and "[WFAdd._]," refer to the briefs and addenda of Fabian and Facteau. The citation "[JA:_]" refers to the joint appendix. Trial transcripts, which appear only in part in the joint appendix, are cited by trial day and page. Exhibits that do not appear in the joint appendix are cited as "[Exh._]. The government's addendum is cited as "[G.Add._]."

## STATEMENT OF THE CASE

### A.    Procedural History.

On April 4, 2015, a grand jury issued an 18-count indictment against Facteau and Fabian stemming from their roles in distributing an implantable medical device for delivering a steroid drug to the sinuses without receiving approval for this use from the Food and Drug Administration ("FDA").  [*See* JA:30-62].  The indictment alleged that the defendants—the Chief Executive Officer and Vice President of Sales, respectively, at Acclarent, Inc. ("Acclarent")—participated in a scheme to sell the device, called the Relieva Stratus Microflow Spacer ("Stratus"), pursuant to a streamlined FDA process in which Acclarent falsely represented it would not be used for drug delivery.  [JA:30-37].  The two profited handsomely when Acclarent was acquired by a subsidiary of Johnson & Johnson in 2010: Fabian made approximately $4 million and Facteau $30 million.  [JA:44-46, 49].  Yet they continued to sell Stratus for drug delivery without approval for that use.  [JA:47-49].

The indictment charged conspiracy, in violation of 18 U.S.C. §371 (Count One); three counts of fraud in connection with the purchase and sale of securities, in violation of 15 U.S.C. §§78j(b) & 78ff(a) (Counts Two through Four); four counts of wire fraud and attempted wire fraud, in violation of 18 U.S.C. §§1343, 1349 (Counts Five through Eight); five counts of distribution of an adulterated device, with intent to defraud or mislead, in violation of 21 U.S.C. §§331(a), 333(a)(1-2),

2

and 351(f)(1)(B) (Counts Nine through T); and five counts of distribution of a misbranded device, with intent to defraud or mislead, in violation of 21 U.S.C. §§331(a), 333(a)(1-2), 352(a), 352(f), and 352(o) (Counts 14 through 18).  [JA:50-62].  The indictment alleged that Stratus was misbranded for three reasons: (1) its labeling was false and misleading; (2) it lacked adequate directions for use; and (3) Acclarent provided no premarket notification for the device.  [JA:60].

The case was tried to a jury over 30 days beginning on June 6, 2016 and ending on July 20, 2016.  [JA:16A-21].  Both defendants were acquitted of the conspiracy and wire fraud counts.  [JA:21; D.432].  Both were convicted of the misdemeanor forms of adulteration and misbranding but acquitted of having acted with intent to defraud or mislead.  [JA:21; D.432].  As to misbranding, the jury found that the defendants sold the device without premarket notification to FDA.  [JA:21; D.432].

After denying their post-trial motions for judgments of acquittal or a new trial, [D.516 (PFAdd.6-67; WFAdd.6-67[2])], the district court sentenced Facteau and Fabian to time served, with no supervision.  [D.535, 536].  The district court imposed a fine of $1 million on Facteau and a fine of $500,000 on Fabian.  [D.535, 536].

---

[2] For simplicity, the government cites to Fabian's addendum hereafter when referencing to the district court's memorandum and order denying the motions, but the page numbers are the same for both.

3

**B.** __Federal regulation of medical devices__.

**1.    The medical device premarket review process.**

The Federal Food, Drug, and Cosmetic Act ("FDCA") was enacted in 1938 to "protect consumers from dangerous products" by regulating the distribution of covered articles "from the moment of their introduction into interstate commerce all the way to the moment of their delivery to the ultimate consumer." *United States v. Sullivan*, 332 U.S. 689, 696 (1948). In original form, the FDCA subjected new drugs to government review before they could be sold but contained no comparable requirements for new medical devices. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). The omission was remedied by the Medical Device Amendments of 1976 ("MDA"), which sought "to provide for the safety and effectiveness of medical devices for human use" by establishing a premarket review system for such devices. *Id.* at 474 (quoting 90 Stat. 539), 476-80. The MDA "made the FDA responsible for ensuring the safety and effectiveness of medical devices distributed to the American public." *United States v. Prigmore*, 243 F.3d 1, 4 (1st Cir. 2001).

Under the MDA, devices[3] are classified into three categories "based on the risk that they pose to the public." *Medtronic*, 518 U.S. at 476. Class III devices,

---

[3] The term "device" means "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent or other similar or related article, including any component, part, or accessory, which is . . . (B) intended for use in the diagnosis of

defined as those that are not classified as class I or class II and "present[] a potential unreasonable risk of illness or injury" or which are "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health," must generally complete the "premarket approval" or PMA process. *Id.* at 477 (quoting 21 U.S.C. §360c(a)(1)(C)). This process "is a rigorous one"; manufacturers must "submit detailed information regarding the safety and efficacy of their devices," *id*., for FDA's "thorough review." *Buckman Co. v. Plaintiff's Legal Comm.*, 531 U.S. 341, 344 (2001). The PMA process is also "ordinarily quite time consuming," given the information required[4] and the nature of FDA's review, which "requires an 'average of 1,200 hours [for] each submission.'" *Id.* at 344-45 (quoting *Medtronic*, 518 U.S. at 477)). Class I and Class II devices, by contrast, must comply with other statutory

---

disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals; or (C) intended to affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes. The term 'device' does not include software functions excluded pursuant to section 360j(o) of this title." 21 U.S.C. §321(h)(1).

[4] An applicant must provide comprehensive information about the device's safety and effectiveness, its components and principles of operation, and its manufacturing process. *Buckman*, 531 U.S. at 344.

and regulatory controls but not the PMA requirements.  *Medtronic*, 518 U.S. at 477;

*see* 21 U.S.C. §360c(a)(1)(A, B).

As a general matter, "[a]ny device intended for human use which was not

introduced or delivered for introduction into interstate commerce for commercial

distribution before May 28, 1976, is classified in [C]lass III." 21 U.S.C. §360c(f)(1).

But a manufacturer of a new device may avoid the PMA process by establishing that

the device is "substantially equivalent" to one already classified in Class I or II.  21

U.S.C. §360c(f)(1)(A)(ii); *see Medtronic*, 518 U.S. at 477-78; *Buckman*, 531 U.S. at

345-46.  This route, "known as a '§510(k)' process, after the number of the section

in the original [MDA]," imposes less burdensome application requirements and

entails a significantly less time-consuming review by FDA.[5]  *Medtronic*, 518 U.S. at

478-79 (noting that review of 510(k) submissions can require as little as 20 hours).

To obtain clearance under §510(k), a manufacturer must file a premarket

notification submission that includes, among other things, a "510(k) Statement" or

"510(k) Summary" document containing "sufficient detail to provide an

understanding of the basis for a determination of substantial equivalence." 21 C.F.R.

§807.87(h); 21 C.F.R. §807.92(a).   The "510(k) Summary" must include "an

---

[5]  Perhaps unsurprisingly given these advantages, "the §510(k) premarket notification process [has] bec[o]me the means by which most new medical devices" are cleared to be marketed.  *Id*. at 479.

identification of the legally marketed device to which the submitter claims equivalence"; "[a] description of the device that is the subject of the premarket notification submission," including information on "how the device functions" and "device design, material used, and physical properties"; and "[a] statement of the intended use of the device" under consideration, "including a general description of the diseases or conditions that the device will diagnose, treat, prevent, cure, or mitigate." 21 C.F.R. §§807.92(a)(3-5). The premarket notification must also include "[p]roposed labels, labeling, and advertisements sufficient to describe the device, its intended use, and the directions for its use." 21 C.F.R. §807.87(e). In addition, it must include "[a] statement that the submitter believes, to the best of his or her knowledge, that all data and information submitted in the premarket notification are truthful and accurate and that no material fact has been omitted." 21 C.F.R. §807.87(l).

Upon review of such a submission, FDA may "[i]ssue an order declaring the device to be substantially equivalent to a legally marketed predicate device," thus clearing it to be marketed; may issue an order finding the device is not substantially equivalent to a legally marketed device; may request further information; or may take other action. 21 C.F.R. §807.100(a); *see also* 21 C.F.R. §807.87(m).

7

## 2. The significance of "intended use."

The concept of "intended use" plays a central role in the FDCA's process for reviewing new drugs and devices. Intended use is an element in the definition of "device" (as well as "drug") and thus helps define the scope of FDA's jurisdiction over devices (and drugs). 21 U.S.C. §321(h)(1)(B)-(C) (device definition); *see also* 21 U.S.C. §321(g)(1)(B)-(C) (drug definition). The concept is also central to the 510(k) process—a device can only be "substantially equivalent" to a predicate if it has the "same intended use" as that predicate. 21 U.S.C. §360c(i)(1)(A); *see Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1004 (7th Cir. 2020) ("To be substantially equivalent, [a] device must have 'the same intended use as the predicate device' and either (1) have 'the same technological characteristics' as the predicate device *or* (2) be 'as safe and effective' as the predicate and 'not raise different questions of safety and effectiveness.'") (quoting 21 U.S.C. §360c(i)(1)(A)) (emphasis in *Kaiser*). If a device has a different intended use than the predicate, then it cannot be substantially equivalent for 510(k) clearance. *See* 21 C.F.R. §807.100(b) (identifying the criteria used by FDA to "determine that a device is substantially equivalent to a predicate device"). Moreover, "[a] major change or modification in the intended use of [a] device" that has already been cleared triggers the obligation to submit a new 510(k) notification "at least 90 days before [the manufacturer] proposes to begin the

8

introduction or delivery for introduction into interstate commerce for commercial distribution of [the modified] device." 21 C.F.R. §807.81(a) & (a)(3)(ii).

FDA's regulation explaining the meaning of the statutory phrase "intended use" and prescribing how intended use is to be determined was originally promulgated in 1952[6] and—until earlier this year—had remained substantively unaltered (although its place in the Code changed).[7] At the time of trial (and of defense briefing), that regulation provided as follows:

> The words intended uses or words of similar import . . . refer to the objective intent of the persons legally responsible for the labeling of devices. The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. This objective intent may, for example, by shown by labeling claims, advertising matter or oral or written statements by such persons or their representatives. It may be shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised. The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer. If, for example, a packer, distributor, or seller intends an article for different uses than those intended by the person from whom he received the devices, such packer, distributor, or seller is required to supply adequate labeling in accordance with the new

---

[6] *See* 17 Fed. Reg. 6818, 6820 (1952).

[7] Since a 1976 relocation of the device regulations, a device-specific definition of "intended use" has been codified at 21 C.F.R. §801.4. *See* 41 Fed. Reg. 6896-97 (Feb. 13, 1976). A separate, but substantively identical, definition applicable to drugs appears at 21 C.F.R. §201.128.

> intended uses. But if a manufacturer knows, or has
> knowledge of facts that would give him notice that a
> device introduced into interstate commerce by him is to be
> used for conditions, purposes, or uses other than the ones
> for which he offers it, he is required to provide adequate
> labeling for such a device which accords with such other
> uses to which the article is put.

21 C.F.R. §801.4 (2020) (quoted by the district court at [PFAdd.13]).

In 2015, FDA proposed a revision that would have deleted the last sentence of the original regulation to clarify that a manufacturer's knowledge of unapproved uses of an approved product could not itself create a new intended use. *See* 80 Fed. Reg. 55756, 55764-65 (Sept. 25, 2015). Although FDA issued a final rule in 2017, which maintained that deletion but added additional clarifying language, 82 Fed. Reg. 2193, 2217 (Jan. 9, 2017), that final rule did not go into effect, *see* 83 Fed. Reg. 11639, 11640 (Mar. 16, 2018). FDA proposed a revised rule in 2020, again with the last sentence of the original rule deleted, but including different clarifying language. *See* 85 Fed. Reg. 59718, 59729 (Sept. 23, 2020). In August 2021, the FDA adopted that revision to the "intended use" regulations which became effective on September 1, 2021. *See* 86 Fed. Reg. 41401 (Aug. 2, 2021) [G.Add.32-51]. The principal substantive change from the original version was the deletion of the last sentence and the inclusion of an express statement that "a firm would not be regarded as intending an unapproved new use for a[n approved or cleared] device . . . based

10

solely on that firm's knowledge that such device was being prescribed or used by health care providers for such use."[8]  [G.Add.52].

While "intended use" plays an important role in the FDCA approval/clearance process, it does not limit what physicians may do with approved/cleared devices. *See* 21 U.S.C. §396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").  Such "'off-label' usage of medical devices (use of a device for some other purpose than that for which it has been approved[/cleared] by the FDA) is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine." *Buckman*, 531 U.S. at 350.

### 3. Prosecutions for adulteration and misbranding.

The FDCA empowers FDA to respond to violations by seeking injunctive relief and civil penalties. *Id.* at 349.  The FDCA also imposes criminal penalties for certain violations. *Id.*; *see* 21 U.S.C. §331.  As relevant here, the FDCA's criminal provisions prohibit a person from performing or causing "[t]he introduction or delivery for introduction into interstate commerce of any . . . device . . . that is

---

[8] This August 2021 revision also made other changes to the language of the intended use regulation which are addressed below.  [G.Add.52].

11

adulterated or misbranded." 21 U.S.C. §331(a). A device is "adulterated" if, among many other things, "it is required to receive premarket approval . . . from the FDA but moves in commerce even though it did not receive this PMA." *United States v. Universal Mgmt. Servs. Corp.*, 191 F.3d 750, 754 (6th Cir. 1999) (citing 21 U.S.C. §351(f)(1)(B)). A device is deemed "misbranded" if, among other things, "a notice or other information respecting it was not provided as required by . . . section 360(k) of [the FDCA]." 21 U.S.C. §352(o). The "notice" is the requirement that, at least 90 days prior to introducing a device, a manufacturer must submit a report to the FDA setting forth the device classification and explaining what actions the person has taken to comply with premarket approval requirements. 21 U.S.C. §360(k). As set forth above, a device is subject to these filing requirements if marketed for an intended use for which it has not been cleared (or approved via the PMA process).

The penalty provision of the statute authorizes conviction for a misdemeanor form of the offense, punishable by a sentence of not more than one year, without a showing of intent. 21 U.S.C. §333(a)(1); *United States v. Dotterweich*, 320 U.S. 277, 281 (1943). A defendant who commits a misbranding or adulteration offense "with the intent to defraud or mislead" may be convicted of a felony offense and imprisoned for up to three years. 21 U.S.C. §333(a)(2).

C.    **Statement of Facts**.

Acclarent was founded in June 2004 by Josh Makower as a company engaged in developing and commercializing medical devices for use by ear, nose, and throat ("ENT") doctors.  [4:140; 8:59-60].  Facteau, one of the earliest employees of the company, was Acclarent's Chief Executive Officer ("CEO") from November 2004 to December 2011.  [8:58; 21:220].  Fabian was Vice President of Sales at Acclarent from August 2007 to November 2011.  [3:126; 21:220].

Acclarent had initial success in developing and marketing products for treating chronic sinusitis using balloon sinuplasty ("BSP").  [8:60-61].  In BSP, small balloons are inserted into the openings or "ostia" of infected sinuses and inflated under high pressure to widen the openings, promoting drainage and lessening the odds of reinfection.[9]  [3:34, 215; 5:45-46; 6:81].  As early as 2004, however, Acclarent researchers were exploring an implantable medical device to treat sinusitis in the ethmoid sinuses—a small pair of sinuses situated between the eyes, [3:46]—through the delivery of steroids or other drugs.  [JA:2718-25].  The ethmoid sinuses (also called "ethmoids"), unlike the three other human sinuses (the frontal, maxillary, and sphenoid sinuses), lack defined ostia and have a honeycomb

---

[9] BSP was promoted by Acclarent as a less-invasive alternative to endoscopic sinus surgery, in which sinus tissue and bone are removed.  [*See* JA:5014-16].

13

structure for which Acclarent's BSP products provided no benefit.  [6:83; 8:62-63; 12:22; 15:31].  Direct steroid delivery to the ethmoids, moreover, was a long-time goal of ENT doctors, who believed it could restore function without surgery and without the problems associated with oral or inhaled steroids.[10]  [3:40; 18:184-85].

By 2005, development of a device for steroid delivery to the ethmoids was a topic of regular discussion at meetings of Acclarent's Scientific Advisory Board ("SAB"), which was led by Facteau and had as its members several prominent ENT doctors.  [7:161-64].  The SAB discussions included consideration of how a device could be designed to release or "elute" the steroid Kenalog-40 into the ethmoid sinus over time.  [7:164-65, 167-68].  By January of 2006, the idea had crystalized into a formal project specification, which Facteau approved, to develop, gain regulatory approval for, and market a device to be inserted in the ethmoid sinuses for steroid delivery.  [JA:3449-51; 7:174-79].  The specification included detailed design parameters and stated that the device had to be able "to deliver 100 mcg/day of Kenalog 40 for a duration of 14 days."  [JA:3450].  The document set September 2006 as a goal for the design completion and initial regulatory filings.  [JA:3451]

---

[10] Oral steroids are associated with several side-effects, [6:112-13; 18:185], while inhaled steroids may not reach the affected area and require patient compliance.  [3:40; 6:107-08].  To avoid these problems, some surgeons tried other means to deliver steroids, such as soaking a small sponge in a steroid and placing it in the sinus.  [6:108-09; 7:179-80; 18:218-19].

The device Acclarent's team created to fulfill this specification—code-named "Condor" during development and marketed as Stratus—consisted of a small balloon with hundreds of small, laser-drilled holes.  [3:49; 7:196-97].  The size of the holes was precisely gauged to the molecular size of Kenalog-40, also known as triamcinolone ("TA")—a steroid frequently used in the treatment of sinusitis—so that the drug would elute (release) over a period of approximately 14 days.  [3:188; 4:154; 7:164].  Stratus was installed using a trocar, which is a tube with a sharpened end that creates a hole in the ethmoid bulla through which the device could be inserted.  [3:49; 6:94-96].  Two small wings on the device would deploy once it was inserted to keep it in place.  [3:73].  The device would then be filled with Kenalog through an attached tube and one-way valve and the tube would be snipped off.  [6:96-97].  After 14 days, the empty device would be removed.  [3:77; 6:97].

Although Stratus was designed expressly to deliver Kenalog-40, Acclarent—with Facteau's knowledge and approval—adopted a two-step strategy for gaining regulatory approval/clearance from the FDA that was intended to conceal that purpose.  [7:184, 190; G.Add.1-2].  First, Acclarent would have Stratus cleared in 2006 by FDA under the 510(k) process by representing that Stratus would be filled only with saline.  [7:184; 15:106-07; G.Add.1-2].  Acclarent would then go back to FDA for a second 510(k) clearance for its use with Kenalog.  [7:184].  This approach was adopted although the shared view of Acclarent's SAB at the time was that using

15

the device with saline would have no therapeutic benefit. [7:166-88]. The goal was to complete the second step and obtain the drug approval by the time the product officially launched.[11] [7:186].

Pursuant to this plan, Acclarent in August 2006 filed a 510(k) notification for what it described as an "ethmoid sinus spacer" that would "maintain an opening to the ethmoid sinus within the first 14 days following surgery" and "help[] to prevent obstruction." [JA:4724]. The submission represented that the perforated membrane of the device's balloon was for "saline moistening," [JA:4736], and the "Principles of Operation" and "Instructions for Use" described filling the device with saline with a syringe through the attached catheter. [JA:4739, 4764]. The Instructions for Use also stated that the device "may be left in place for up to 14 days" and that "[t]he perforated membrane allows saline to moisten the area around the Ethmoid Sinus Spacer." [JA:4764]. The submission identified as the predicate device the Rains Frontal Sinus Stent, a small tube-shaped rubber object inserted into the frontal sinus ostia to keep them open following sinus surgery. [JA:4755-56]. FDA cleared the "ethmoid sinus spacer" in September 2006. [8:75; JA:4695-96].

---

[11] Wendy Oakes, a member of the Condor team in 2005 and 2006, testified that the two-step clearance strategy was based on a strategy used with heart stents, which were initially marketed solely as physical devices and later marketed with medical coatings. [7:184-86]. Oakes acknowledged, however, that the two cases were not similar, because the stents without medication had a commercial and medical value. [7:184-86, 189].

16

Although Acclarent stated in its 510(k) notification that its representations were true and accurate, [JA:4735], Stratus was incapable of operating as its submission stated. Given the size of the holes in Stratus membrane, saline (which is much less viscous than Kenalog) would run out immediately—within seconds, or, at most, a few minutes—it would not last the 14 days the instructions suggested. [3:61, 90; 9:59; 10:28, 61]. The device would never inflate to maintain an opening, as the submission's language and illustrations suggested, nor would any saline remain to "moisten" the area after insertion. [3:62-63; 7:206; 18:186]. Stratus also could not operate like the Rains stent that was cited as the predicate device, since it had no opening through which fluid could drain. [8:209-12].

Acclarent attempted the second step of its strategy in April 2007, asking FDA for permission to broaden the "indications for use" for Stratus to say that it could be used to "irrigate the sinus space for diagnostic and therapeutic procedures" and the "instructions for use" to say that a user could inject saline "or other therapeutic agent." [15:141-42; JA:4701-02, 4706]. FDA denied the request in May 2007. [7:207; JA:4698]. FDA found that the proposed changes would represent a significant change or modification to the cleared device. [JA:4698]. FDA's letter also indicated that, with the proposed modification, the device could be considered a "combination product," subject to review by both FDA's Center for Devices and

Radiological Health, which had handled the review of Stratus to this point, and its Center for Drug Evaluation and Research. [JA:4698; 19:27-28].

Acclarent's management recognized the problems FDA's decision presented for commercializing Stratus, noting in internal communications the difficulty it would face in marketing it to ENT doctors for an uncleared use and the problems users would encounter in getting reimbursement from insurers. [*See* 12:109-10, 116; G.Add.5-6; JA:3599]. Nonetheless, while continuing to state the goal of obtaining clearance for steroid use, [12:16], Acclarent pressed forward with plans to bring Stratus to market. On September 11, 2007, Facteau and Fabian attended a presentation by the "Condor" team for the "ETHMOID drug delivery product" proposing commercial release in the third or fourth quarter of 2008. [12:41-47, 49; JA:3570-75, 3588]. The team stated that the desired regulatory approval was a "drug delivery indication with Kenalog," [12:53; JA:3588], but noted as a "key risk" that FDA would not grant it. [12:58; JA:3595]. The proposal was approved. [12:61].

Through the fall and winter of 2007 and into 2008, as it became clear that a drug approval would require additional studies, Acclarent's internal communications turned to the possibility of a "limited launch" with only the saline clearance, although it was noted that this would "mean taking some regulatory risk." [*See* 12:61-79]. By December 2007, with FDA confirmation that a formal FDA-approved study (an "investigational device exemption" or "IDE") would be

18

necessary, Fabian was being contacted about the "potential challenges" of "sell[ing] this device with a saline indication." [12:93-96; JA:3676]. In March 2008—while Acclarent was still in negotiations with FDA about the design of the IDE[12]—Facteau approved a proposal to start selling Stratus at the Acclarent-sponsored Sinus Forum in July 2008.[13] [JA:3920-23; G.Add.7].

Sinus Forum took place over three days in July 2008 and all of Acclarent's senior management, including Fabian and Facteau, attended. [3:44-45; 9:18; JA:3920-23]. At Facteau's direction, Sinus Forum featured a segment in which two doctors—Dr. Michael Friedman and a Dr. Doug Hoisington—demonstrated via live video feeds use of Stratus on actual patients, accompanied by discussion panels. [3:45; 8:6-7; JA:3922]. This was followed by a panel discussion on localized drug

---

[12] The study design was not formally submitted until May 2008 and not approved until August 2008. [16:35-36, 54-55; Exhs.2552, 2592].

[13] Since early January 2008, Acclarent had been distributing Stratus to a limited number of ENT doctors in what was described as a market preference test to get "feedback" on its usefulness. [8:199; 12:142-43]. For this purpose, the devices were often given to the doctors for free. [13:39, 48-49]. The device was described in these presentations as a "drug delivery device" and it was suggested that approval for use with Kenalog would be coming soon. [8:202-03].

delivery.  [8:31; JA:3922].  There was also a live demonstration of BSP by Dr. Frederick Kuhn in which he also used Stratus.[14]  [8:8; JA:3923].

In their live demonstrations, the doctors used Stratus with Kenalog and explained how the holes would allow the medication to diffuse slowly over time.  [3-49; *see also* 8:8-10].  Presenters acknowledged that FDA had cleared the device for use with saline, [3:51], but did not recommend that it be used that way.  Indeed, one doctor demonstrated on a table, as part of his presentation, that when the device was filled with water or saline it simply squirted out and the Stratus did not inflate.  [3:61].  The doctor explained that the holes were designed so Kenalog would not come out so quickly.  [3-62].  When attendees questioned the use of the device with a substance other than the saline referenced in the instructions and labeling that were submitted in support of FDA's 510(k) substantial equivalence determination, the presenters emphasized that physicians may use devices for off-label purposes.  [3:51].  The doctors represented Stratus to be easy to use and less invasive and painful than other methods.  [3:163-65].

Around the time of Sinus Forum, Acclarent began a limited commercial release of Stratus.  [4:146; 11:22-23].  During the limited release—and continuing

---

[14] Dr. Hoisington and Dr. Kuhn were members of Acclarent's SAB, as were Drs. William Bolger, Peter Catalano, Howard Levine, and Ray Weiss who participated in the panel discussions.  [7:161; 8:23; 21:131; JA:3922-23].

20

through the full commercial release that followed—doctors who expressed interest were required to attend training sessions run by Acclarent personnel and using Acclarent materials. [5:61-62, 88-89; 6:88-89]. At these trainings, doctors practiced installing Stratus in anatomically correct plastic heads or cadaver heads. [5:68; 6:90; 9:46-47]. The trainings suggested that Stratus would be used with Kenalog and demonstrated the filling of the device with Kenalog-40 or with coffee creamer, which in color resembles the steroid. [3:66; 5:66; 9:50, 198]. While the presenters noted that it was cleared for saline, [6:101], they made no claim that the device would have any medical value if used with saline. [9:49]. Doctors were encouraged to schedule patients for Stratus and to place orders before attending the trainings. [5:67-68]. The limited launch was successful—over $400,000 worth of the devices were sold during this period. [13:107].

Stratus's full commercial launch coincided with the 2008 annual meeting of the American Academy of Otolaryngologists and American Rhinologic Society ("AAO/ARS" or "AAO"). [7:208-09, 218]. This was a large professional meeting of ENT surgeons that included an area where manufacturers had booths and could answer questions about their products. [5:52-53; 7:208-09]. FDA staff also attended AAO meetings. [5:54; 7:211-12]. At the 2008 meeting, SAB member Dr. Kuhn gave a presentation with a slide show that described Stratus as a "drug eluting balloon catheter like spacer." [3-170; *see* 18:184-85]. The slide noted that Stratus

21

was FDA-approved for saline, but that institutional review boards ("IRB") had approved it for use with TA.[15]  [3:171].  The slide show stated that it had been used in 13 patients with "no major complications."  [3:171-72].

Acclarent also had a booth with two sides, one for United States conferees and the other targeted to international participants.  [5:55].  A Stratus demonstration discussing the use of Kenalog was located on the international side.  [5:59].  Sales representatives staffing the United States side were instructed that, if someone asked any detailed questions about Stratus, they should be directed to the international side. [5:60; 7:222-23].  Representatives on the U.S. side were told by Acclarent they could only discuss the cleared use and show Stratus's features.  [5:55-57].

Following its commercial release, Acclarent's sales division, under the direction of Fabian, threw its weight behind selling Stratus.  In design and execution, the purpose of the sales effort was to induce ENT surgeons to buy Stratus for delivery of steroids.  As part of their hiring process, Acclarent sales employees underwent an intensive training program which included two weeks of reviewing materials and two weeks of on-site training.  [4:136-37, 149; 7:81].  New hires had to not only be able to describe Acclarent's products, but also to describe the procedure for using them and be able to assist the surgeons in doing so in the operating room.  [4:137-

---

[15] An IRB is a group of experts convened to research and monitor research involving human subjects to ensure their rights are protected.  [3:94].

38; 7:81; 8:131].  Facteau spoke at some of these trainings and Fabian was generally present throughout.  [4:137, 139, 149; 7:83; 9:111].  Stratus was described as an innovative method for drug delivery and trainees learned that it was designed for and would be used with Kenalog-40.  [4:145, 153-54; 10:25, 60].  Trainees were not trained to sell the product for use with saline or provided any information suggesting that its use with saline would have a medical value.  [4:156, 197-98; 7:87; 8:208; 10:29, 64-65].  The trainings also conveyed that selling Stratus was a high priority.[16] [10:30].

Although the new hires were taught to say that Stratus was cleared by FDA for use with saline, they were instructed to quickly go on to tell the doctors and other medical professionals that it was cleared for use with Kenalog in Europe and to use "probing questions" to turn the conversation to using Stratus to deliver the steroid.[17] [4:199-200; 9:37; 10:35, 65-66].  This message was underscored with role-play activities in which trainees practiced getting a skeptical doctor—in at least one

---

[16] Stratus's importance was underscored with financial incentives, including, in 2009, a special bonus program for obtaining new Stratus customers.  [JA:4408].

[17] The sales force was trained that conversations about off-label use were generally okay if the doctor was the first to ask about it.  [4:193; 10:35; *see* 6:239].  To make this happen, sales representatives were trained to ask questions about their use of steroids, experience with targeted drug delivery, and the like to get a conversation going.  [4:200; 5:79; 9:45].  Representatives were also instructed to direct doctors to other doctors already using Stratus with Kenalog-40.  [5:84].

instance played by Fabian himself—to discuss use of Stratus with Kenalog. [4:179-86; 9:119-20]. The emphasis on turning sales conversations to the use of Stratus with a steroid was captured in a joke that went around one new-hire training about wearing a pin to sales calls that said, "Ask me about Kenalog-40." [4:193].

The message that Stratus's value lay in delivering Kenalog-40 to the ethmoid sinuses was reinforced in marketing materials that Acclarent prepared for Stratus, [*see, e.g*., JA:3902-06 (Physician Discussion Guide discussing how to answer doctor questions in ways that touted benefits of use with Kenalog-40)], or shared from successful salespeople. One such salesperson was Jason Elmore, who developed a PowerPoint slide presentation called "FESS by the Numbers." [5:151-52]. This slide show, which was widely shared and recommended, including by Fabian, expressly described Stratus's benefit as lying in its ability to elute Kenalog. [5:158-59; 7:115; 9:107-09; 10:124]. Another presentation by sales representative Kevin Convery making similar claims was also widely shared, including at a national sales meeting where Facteau and Fabian were present. [9:30-35, 71-72]. The expectation that Stratus would be used with Kenalog was also reflected in a training that told sales representatives how to prepare Kenalog for use.[18] [8:131-32; 9:54-55]. That

---

[18] Kenalog needed to be at room temperature and was in a suspension that had to be shaken before it was put into the Stratus. [9:54-55]. Trainees were also told the amount of Kenalog the Stratus would hold. [4:173-75].

Stratus was no mere spacer was further reflected in its high price: where an ordinary rubber stent or spacer cost only $200, two Stratus devices cost up to $2,000. [4:114-15, 170-71; 7:180; 8:206; JA:4631].

The information Acclarent provided its sales force also made extravagant and unsupported claims about the therapeutic effect of inserting a Kenalog-infused Stratus. Marketing materials touted high effectiveness in treating chronic ethmoid disease and stated use of a Stratus could prevent or even "melt away" polyps that appeared in some patients. [8:124; 9:98; 10:39, 76, 110]. But Acclarent had completed no large-scale studies showing the effectiveness of Stratus.[19] Acclarent's sales training and materials also failed to acknowledge adverse outcomes, which doctors needed to be aware of to decide whether use of Stratus was appropriate. [3:173; 6:34-35; 7:46; 8:146]. These included instances in which the Stratus's wings broke off, where patients had experienced significant pain, and where individuals who did not had active sinus infections at the time the device was implanted later

---

[19] Acclarent undertook two studies of Stratus—the first, smaller one known as the "Spacer" study and a second, called "DELIVER", as an IDE—and proposed a third. [17:99-102]. The studies lacked adequate controls, however, and were unable to establish that using Stratus with Kenalog had a medical benefit. [7:224; 13:153; 18:200-01; 19:31; 19:89-90]. In fact, some studies, including one performed by Acclarent, cast doubt on whether separate treatment of the ethmoid sinuses was necessary, because treatment of other sinuses could result in improvement in the ethmoids. [22:162-63].

turned out to have them. [16:55-60, 83; 19:52]. In addition, pitches like Elmore's and Steele's encouraged the use of six or more Stratus devices in one patient, although there was no evidence this was safe.[20] [7:117-19; JA:4547].

The message that Stratus was a device for Kenalog delivery was heard loud and clear by the salespeople and by the surgeons to whom they were selling. None of the salespeople who testified at trial sold Stratus for use with saline, nor did they believe that they could have, because it would have served no medical purpose. [4:179, 198; 5:98-99; 7:87, 105-106; 8:208; 10:31-33, 66; 11:28-29]. The salespeople also uniformly stated that they did not know of a doctor who bought Stratus from them or any other sales representative who used it with saline. [5:98-99; 7:87-88; 10:31, 67; 11:26-27]. The doctors the government called similarly testified that the message they received was that Stratus was designed to elute Kenalog-40, not saline. [3:40; 8:124, 134; 15:31-32; 18:184-85].

Through 2008 and 2009, Acclarent made millions on sales of Stratus as a drug delivery platform, notwithstanding that it was only cleared as a spacer that eluted saline. [21:220]. In discussions with FDA that continued throughout this time

---

[20] Stratus's designer performed dosing calculations in December 2008 and recommended using no more than two Stratus at a time. [13:123-24; G.Add.9]. FDA witness Dr. Theresa Michelle testified that, if Stratus eluted the drug evenly, the daily dose from two would exceed the recommended daily dose of Nasacort, a steroid spray. [19:36]. Moreover, a significant additional amount of Kenalog was released when the tube for filling Stratus was clipped off. [19:37].

26

regarding clinical studies to support its use with Kenalog, Acclarent acknowledged that many doctors were already doing so off-label. [16:93]. But Acclarent never disclosed to FDA that the device did not function properly if used as cleared under the 2006 510(k). [15:146]. To the contrary, Acclarent made additional 510(k) filings seeking, among other things, clearance for Stratus to be used in all sinuses; clearance of a modified design addressing wing detachments; and clearance of a larger Stratus for the frontal sinuses, all of which continued to represent—falsely— that the device functioned as a spacer that eluted saline over time.[21] [16:31, 71-72].

In December 2009, it was announced that Acclarent was being acquired by Ethicon, a subsidiary of Johnson & Johnson. [5:185-86]. The deal closed in early 2010 and, not long after, in March 2010, the sales force was told that Stratus would be a "catalog-only" product. [5:188-89]. As such, it would remain available, but representatives were to "cease all promotion of Stratus in the United States." [5:190]. This was understood to be because Johnson & Johnson was concerned with off-label promotion. [5:190]. Following this, Acclarent no longer required its sales representatives to meet a quota for selling Stratus. [5:192-94]. Sales representatives

---

[21] The false representation that the device would function with saline was supported by other false documentation. For example, one 510(k) referenced a "letter to file" stating that the "membrane permeability" of Stratus had "modified to increase the distribution of saline." [16:22-23; G.Add.4]. But the device would not operate with saline, so this could not have been true.

also received a training by a Johnson & Johnson representative stating that products could only be promoted and advertised for FDA-cleared uses.[22]  [5:200].

Despite this, Fabian and Facteau continued to push Stratus sales.  Their messages reflected a view that Stratus sales were driving sales of other products, which had become "flat" after the change in Stratus marketing.  [5:209-12; 9:141-44; 10:149-50, 158].  In March 2010, Fabian circulated a group of "best practices" shared by regional managers, several which centered on increasing Stratus sales, with comments complimenting each of them on their efforts.  [5:146-49; G.Add.17-19].  Fabian sent a version of the "best practices" email to Facteau with a message about "doing all we can do to drive additional revenue" and Facteau responded "[g]ood stuff."  [5:150-51; G.Add.12].  Fabian also encouraged the use of a sales pitch by representative Timothy Steele framing Stratus as the "final step" in a sinus procedure using other Acclarent products.  [6:17-23, 33; 7:126-27].  The pitch was for Stratus used with Kenalog.  [7:127].  Acclarent's new hire training also continued to include pitches for Stratus—at one in 2010, sales representative Convery gave a presentation that encouraged representatives to sell all Acclarent products, including

---

[22] Sales representatives testified that presentations stating that devices could only be sold for their cleared intended use had been given by Acclarent's regulatory staff prior to the acquisition too.  [5:119-22; 9:83-84; 10:115].  But these statements, which were inconsistent with the training for selling Stratus, were not followed. [5:126; 9:87-88; 10:116-17].

Status.  [7:93-94].  Presentations like Convery's, Elmore's, and Steele's continued to be shared well into 2011.  [7:111-22; 10:39; 11:90-92; JA:4545].

Although discussions between Acclarent and FDA continued, Acclarent never submitted an approvable set of studies to support Stratus's use with Kenalog and never received approval to sell it as a drug delivery device.  [19-91-92].  Stratus was withdrawn from the market in May 2013.  [20:94-95].

## SUMMARY OF ARGUMENT

On appeal, Facteau and Fabian challenge their FDCA convictions on several grounds and Fabian also challenges his fine.  Defendants' first two arguments amount to a kind of pincer attack: defendants argue on due process grounds that the government could only use external marketing statements to prove intended use and then argue on First Amendment grounds that the government for the most part could not use those statements either, because they are protected speech.  Their attack fails, as neither argument has merit.  Nor do the other claims Fabian advances.

The defendants argue the prosecution violated their right to due process, but the term "intended use" in the FDCA and the CFR is not unconstitutionally vague and the defendants have not shown they lacked fair notice that proof of intended use could include consideration of evidence other than external marketing statements. To the contrary, the evidence relied on and the theory of prosecution were consistent

with past practices and the defendants' conduct was well within the prohibition established by the plain language of the statute and regulation.

Facteau's claims of a First Amendment violation, which Fabian joins, are also unavailing. Settled law holds that a jury may consider speech as evidence of intent without implicating the First Amendment, and the government's case and the district court's jury instructions confirm that is what happened here. This was also not a case that relied solely or even substantially on truthful, non-misleading commercial speech to show intent. Facteau mounts a second First Amendment argument alleging content-based discrimination in FDA guidance documents stating that certain communications will not be considered evidence of intent. This claim is unpreserved, however, and Facteau fails to show an obvious error or prejudice.

Fabian also mounts two narrow challenges to the sufficiency of the evidence, but both are premised on misunderstandings of law. Fabian contends that the government failed to introduce marketing claims as to each Stratus shipment, but the adulteration and misbranding convictions relied on Acclarent's distribution of Stratus for drug delivery without FDA approval, not the marketing statements made for each sale. Fabian also argues that there was insufficient evidence to connect him to the lack of FDA approval, but this unpreserved argument fails. The government was not required to show that he made the devices adulterated or misbranded—only that he caused them to be distributed, which was amply proved and is not challenged.

30

Fabian's claim that the district court erred in declining to give his requested instruction on intended use was not preserved and establishes no error, since this instruction was legally incorrect. He identifies no other error in the instructions.

Fabian's final claim is that his $500,000 fine was unconstitutionally excessive, but the argument was not preserved and, if not waived, fails. The fine was only half the statutory maximum and raises no Eighth Amendment concerns.

In their briefs, *amici curiae* seek to support defendants' due process and First Amendment claims and advance policy arguments against the existing regulatory scheme. Their arguments add little to those advanced, unsuccessfully, by the defendants and do not provide any basis for reversal on the facts of this case.

## ARGUMENT

### I. PROSECUTION OF THE DEFENDANTS DID NOT VIOLATE THEIR RIGHT TO DUE PROCESS.

#### (Fabian argument I; Facteau argument I)

Fabian and Facteau contend that alleged inconsistencies in the federal courts' and FDA's construction of "intended use" in the FDCA and FDA's regulations show that the term is unconstitutionally vague and that their prosecution violated due process.  [PFBr.34-50; WFBr.23-45].  Their characterization of their claim as one of vagueness is dubious—the bulk of their arguments do not contend that "intended use" provides an unintelligible standard of conduct, but only that courts and the agency have differed as to the *evidence* admissible to prove an intended use.  But their arguments are unavailing in any event.

#### A.    Legal framework and standard of review.

Constitutional vagueness doctrine vindicates the "fundamental principle . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *F.C.C. v. Fox Television Stations, Inc*., 567 U.S. 239, 253 (2012).  The principle is transgressed where "the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Id*. (internal quotation marks omitted); *accord United*

32

*States v. Morosco*, 822 F.3d 1, 5 (1st Cir. 2016) ("[A] law is unconstitutionally vague if it fails to give ordinary people fair notice of what is forbidden, or if it fails to give the designated enforcers (police, prosecutors, judges, and juries) explicit standards (thus creating a risk of arbitrary enforcement).").

"The mere fact that a statute or regulation requires interpretation does not render it unconstitutionally vague." *United States v. Lachman*, 387 F.3d 42, 56 (1st Cir. 2004). Nor is a statute "necessarily void for vagueness simply because it may be ambiguous or open to two constructions." *Williams v. Brewer*, 442 F.2d 657, 660 (8th Cir. 1971); *accord White v. Department of Justice*, 328 F.3d 1361, 1368 (4th Cir. 2003) ("An alternate possible interpretation of the statutory text does not by itself establish vagueness.") (internal quotation marks omitted). A defendant must show that the law "either prohibits or requires the performance of an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of application." *United States v. Hussein*, 351 F.3d 9, 14 (1st Cir. 2003).

A preserved claim that a prosecution under a statute is unconstitutionally vague in violation of the Due Process Clause is subject to *de novo* review. *United States v. Zhen Zhou Wu*, 711 F.3d 1, 11-12 (1st Cir. 2013).

33

**B.    Defendants fail to establish unconstitutional vagueness or <u>any other violation of due process</u>.**

**1.    The defendants fail to establish vagueness in the text of the FDCA or 21 C.F.R. §801.4.**

Reflecting the vagueness doctrine's focus on the clarity of "the statute or regulation" underlying a prosecution, *Fox Television*, 567 U.S. at 253, "the first step in determining whether a statute [or regulation] provides fair warning is to begin with the language of the statute [or regulation] itself," *United States v. Duran*, 596 F.3d 1283, 1291 (11th Cir. 2010); *accord Keepers, Inc. v. City of Milford*, 807 F.3d 24, 37 (2d Cir. 2015) (similar) ("[A] court evaluating a challenge [to an ordinance] for vagueness must begin with the text of the ordinance itself.") (internal quotation marks omitted).

Here, despite committing 38 pages to due process claims, neither defendant advances an argument that FDCA's *text* fails to provide fair notice.  Nor would such an argument have force.  The requirement that a device have the "same intended use" as a predicate to be "substantially equivalent" to that predicate, *see* 21 U.S.C. §360c(i)(1)(A), involves no arcane or technical language and has a common-sense meaning.  *See Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012) (in evaluating vagueness, courts "must ask whether the government's policy is set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with") (internal quotation marks omitted).

34

Their claim therefore fails. *Duran*, 596 F.3d at 1291 ("Where the language alone sets forth plainly perceived boundaries, no further inquiry is necessary.").

The defendants also fail to meaningfully engage precedent rejecting vagueness challenges to the FDCA, other than to dismissively state that it does not address intended use. [WFBr.42]. But this is incorrect. In *V.E. Irons, Inc. v. United States*, this Court summarily rejected a vagueness challenge to the FDCA in an appeal in which application of the term "intended use" was squarely at issue. 244 F.2d 34, 44-45 (1st Cir. 1957). More recently, the Seventh Circuit concluded that the concept of a "major change . . . in the intended use" set forth in FDCA's device regulations provided a sufficient "metric for decision" to overcome a vagueness challenge. *United States v. Caputo*, 517 F.3d 935, 941 (7th Cir. 2008). Having declined to explain why these decisions are wrong,[23] the defendants give this Court no reason to find that the statute is unconstitutionally vague.

Defendants' challenge to the regulation addressing "intended use" in 21 C.F.R. §801.4 is equally devoid of any developed textual argument. The defendants

---

[23] Other comparable provisions of the FDCA have also easily been upheld against vagueness challenges. *See, e.g.*, *United States v. Hohensee*, 243 F.2d 367, 370 (3d Cir. 1957) (requirement that label "bears adequate directions for use" was not unconstitutionally vague). More generally, it is well established that "an intent standard is not per se vague even in a statute regulating speech." *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 26 (D.C. Cir. 2009).

disagree with the district court's construction of the regulation,[24] but "the fact that [a] law may be susceptible to differing constructions by the judiciary . . . does not create a vagueness problem" if "the text of the law is plain." *Bailey v. Morales*, 190 F.3d 320, 326 (5th Cir. 1999). Like the statute, the regulation is written in non-technical language and defendants do not explain why it would be beyond the comprehension of a person of ordinary intelligence based on its plain meaning and common sense.[25] *See Wag More Dogs*, 680 F.3d at 371. Nor, indeed, do defendants appear to even be arguing that the regulation's terms prevented them from understanding what "intended use" means—their concern instead seems to be that the court misread what it said about the type of evidence that may prove "intended use." [WFBr.33-36]. Vagueness doctrine, however, is aimed at ensuring that

---

[24] Facteau's textual objection appears only fleetingly in one sentence of his brief and in a conclusory footnote. [WFBr.25-26 & 44 n.26]. He has therefore waived the issue. *Puerto Rico Telephone, Inc. v. San Juan Cable LLC*, 874 F.3d 767, 770 (1st Cir. 2017) (noting that this Court "ha[s] repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived") (citation omitted). Fabian's textual argument is only marginally more developed and appears in his challenge to the district court's jury instruction. [PFBr.51-52].

[25] Any claim that such straightforward language could present vagueness concerns would face a particularly uphill climb given the context. As this Court pointed out in *Lachman*, some need for interpretation is expected in regulations "addressed to sophisticated businessmen and corporations which . . . necessarily consult counsel in planning their activities." 387 F.3d at 56-57.

citizens have "fair notice of what is forbidden," *Morosco*, 822 F.3d at 5, not that they know what evidence may be marshalled against them.

The defendants' failure to establish that the text of the statute and regulation present serious problems of interpretation distinguishes this case from *Johnson v. United States*, 576 U.S. 591 (2015), and its progeny. [PFBr.41-49; WF.Br.23-24]. As *Johnson* explains, the Court's conclusion that the residual clause of the Armed Career Criminal Act's definition of "violent felony" was impermissibly vague had its roots in highly problematic statutory language, which tied the concept of "serious potential risk of injury to another" to "a confusing list of examples." 576 U.S. at 593, 603; *see also James v. United States*, 550 U.S. 192, 230 n.7 (2007) (Scalia, J., dissenting). Having failed to establish a comparable textual deficiency, defendants' claim is unavailing. *Duran*, 596 F.3d at 1291; *Bailey*, 190 F.3d at 326.

### 2. Defendants fail to show a history of inconsistent judicial interpretation.

Defendants contend their vagueness claim finds support in inconsistent judicial decisions regarding the scope of evidence to be considered to determine intended use. [WFBr.31-32; PFBr.36-37]; *see also Johnson*, 576 U.S. at 598 (noting that "the failure of persistent efforts . . . to establish a standard" can support a finding of vagueness) (internal quotation marks omitted). Assuming arguendo that

37

inconsistent interpretations of evidence rules, rather than criminal conduct, could ever support a due process claim, they fail to show that any such inconsistency exists.

As the district court noted, [WFAdd.40], this Court long ago held in *V.E. Irons* that a factfinder may "look to all relevant sources in order to ascertain what is the 'intended use' of a drug." 244 F.2d at 44. Other appellate courts have followed suit in using broad terms to describe the evidence that may be considered to establish an "intended use."[26] While the "relevant sources" in *V.E. Irons* were promotional statements to the public, *id.* at 44-45, the Court did not suggest that the concept of "all relevant sources" was limited to such representations. Nor have other courts using similarly broad language.

In the decades since, this Court and others have issued decisions endorsing the use of a range of evidence beyond public promotional statements to establish an intended use. Among other things, courts have recognized as potentially relevant

---

[26] *See Action on Smoking & Health v. Harris*, 655 F.2d 236, 239 (D.C. Cir. 1980) (intended use can be determined based on product's "label, accompanying labeling, promotional claims, advertising, and *any other relevant source*") (emphasis added); *accord Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1357 (Fed. Cir. 2013) (same) (quoting *United States v. Storage Spaces Designated Nos. "8" & "49"*, 777 F.2d 1363, 1366 (9th Cir. 1985)); *United States v. Article . . . Consisting of 216 Cartoned Bottles, More or Less, Sudden Change*, 409 F.2d 734, 739 (2d Cir. 1969) (same).

38

the defendant's own use of the product[27]; the circumstances under which a product

is sold[28]; a product's design features[29]; the nature of a product's ingredients[30];

training statements made to resellers[31]; facts and circumstances surrounding the

manufacture and actual use of a product;[32] and internal communications reflecting

how the product would be used.[33]

---

[27] *United States v. An Article of Device*, 731 F.2d 1253, 1257-58 (7th Cir. 1984) (inventor chiropractor's use of device as diagnostic tool in his own practice showed that this was its intended use).

[28] *United States v. Travia*, 180 F. Supp. 2d 115, 118-19 (D.D.C. 2001) (fact that balloons of nitrous oxide were sold in parking lot at rock concert supported conclusion they were intended as drugs).

[29] *United States v. Caputo*, 456 F. Supp. 2d 970, 973 (N.D. Ill. 2006) (design features of larger device supported finding of intended use different from use approved for smaller, cleared device), *aff'd in part*, *vacated in part*, *remanded*, 517 F.3d 935 (7th Cir. 2008).

[30] *Nature Food Ctrs., Inc. v. United States*, 310 F.2d 67, 70 (1st Cir. 1962) (noting that it was "scarcely realistic" that a manufacturer was "offering such esoteric products as Isolencine, Methionine and Tryptophane" only as dietary supplements).

[31] *Allergan, Inc.*, 738 F.3d at 1356-58.

[32] *United States v. 789 Cases, More or Less, of Latex Surgeon's Gloves, & Article of Device*, 799 F. Supp. 1275, 1294 (D.P.R. 1992) (considering, among other things, that gloves were stored with other items that were clearly medical devices to find that the gloves were devices subject to the FDCA).

[33] *United States v. Vascular Sols.*, 181 F. Supp.3d 342, 344, 347 (W.D. Tex. 2016).

The cases cited by defendants in their briefs are not to the contrary.  While the decisions focus on marketing materials as the basis for determining intended use in the circumstances presented, not one holds that *only* this type of evidence may be considered.  *United States v. Articles of Drug for Veterinary Use*, 50 F.3d 497 (8th Cir. 1995)—which Facteau cites as taking this position, [WFBr.32 n.17]—in fact did not.  The case held only that undistributed product literature was insufficiently tied to the marketed articles for the district court to decide the intended use issue in favor of the government as a matter of law.  *See* 50 F.3d at 501.  The court expressed no doubt that it was appropriate for these documents to go to the jury to aid it in deciding whether the article was an animal drug.  *Id.* at 500-01.

Nor is the fact that the district court at times expressed uncertainty in the resolution of questions surrounding this issue, particularly in the context of crafting jury instructions, proof of vagueness.  [PFBr.24-26, 46; WFBr.28, 41].  The trial in this case was lengthy and strenuously defended, and the record reflects the district court's active engagement in seeking to accommodate and address the defendants' concerns, including those surrounding the proper evidentiary basis for intended use.  That the court was open about its struggle to reconcile the parties' positions is proof of the court's conscientiousness, not the statute's vagueness.

Given defendants' inability to identify *any* case squarely dissenting from the view that evidence beyond promotional materials may be considered, they cannot

show the kind of "pervasive disagreement about the nature of the inquiry" that led the Supreme Court in *Johnson* to find the ACCA residual clause unconstitutional. [*See* PFBr.44 (quoting *Johnson*, 576 U.S. at 597)].  Nor, for the same reason, can they support their claim of an unfair change in judicial interpretation depriving them of fair notice.  [WFBr.31-41].

> ### 3.    Defendants' claims of an unfair change in the agency's interpretation of its regulations and in its theory of prosecution are without merit.

Defendants alternatively contend that their right to due process was violated because FDA has taken different positions over time regarding the meaning of "intended use" and the legal rationale for its prosecution of off-label use cases, depriving them of fair notice that their activities could be criminal.  [PFBr.36-41, 47; WFBr.29-36, 39-40].  These arguments are groundless.

Defendants' claims of agency confusion and unfair surprise center in large part on a single document: an October 2002 letter by FDA's then-Chief Counsel Daniel E. Troy to Applied Digital Systems ("ADS") addressing the company's request for a determination that its implantable transponder device was not a "medical device" if marketed only as a means to transmit identifying information. [*See* JA:256-62].  The Chief Counsel agreed in the letter that it would not be a medical device, relying on the purportedly "well settled" view "that intended use is

determined with reference to marketing claims."[34]  [JA:258].  The letter also cited

cases and legislative history that, it asserted, supported this view.  [JA:258-59].

Defendants contend that this letter shows agency confusion, [PFBr.36-37], or

the government's unfair adoption, after the letter, of a new position at their trial,

[WFBr.31-33], but these arguments fail for multiple reasons.  First, as the district

court found (and defendants do not contest), a letter of this kind does not represent

a binding statement of the agency's position and has no precedential force beyond

the circumstances of the case.  [PFAdd.41 n.136 (quoting 21 C.F.R. §10.95(k)].

Given its lack of authoritative force, it is difficult to see how the letter, no matter

what its contents, could be said to prove an agency "hopelessly at odds with itself,"

[PFBr.38], or that, by taking a different position from the letter, the government

executed a change in position raising due process concerns, [WFBr.31-33].

*Compare Fox Television*, 567 U.S. at 254-55 (lack of fair notice shown where station

was found in violation of indecency law based on purportedly offensive content that

was permitted under formal policy guidance then in effect).

Second, the letter's assertion that precedent supported (or that the agency had

endorsed) the view that marketing claims were essential to an intended use was

---

[34] The letter stated that a version of the device ADS wished to market and use to provide medical and health related information, however, would be a medical device.  [JA:257, 262].

wrong when made, as shown by pre-2002 decisions like *An Article of a Device* and *Travia*, cited above, where intended use was found without such evidence. *See* 731 F.2d at 1259; 180 F. Supp. 2d at 118-19; *see also* 86 Fed. Reg. at 41388 (noting that "FDA has steadfastly maintained for decades that, in determining a product's intended use, the Agency may look to any relevant source, including a variety of direct and circumstantial evidence") (citing and quoting from prior rulemakings, court decisions, litigation briefs, and other FDA documents).  Unsurprisingly, defendants identify no precedent to suggest that a target of enforcement can claim unfair surprise rising to a due process violation based on a non-binding statement to another party that is contrary to both established judicial precedent and other, more authoritative agency pronouncements.[35]

Third, even by its terms the letter does not endorse defendants' position that *only* marketing claims can be considered.  [PFBr.36; WFBr.31-32].  While the letter asserts that the intended use is determined "with reference to marketing claims," the case parentheticals suggest no more than that marketing claims must be *part* of the

---

[35] The defendants have not argued that they or Acclarent sought or received any comparable determination from FDA.  Nor have they argued that they actually knew about and relied on statements in the ADS letter.

government's evidence.[36]  [JA:258-59].  Here, of course, there was ample evidence from which the jury could have found that Acclarent made marketing claims regarding the use of Stratus with Kenalog at least as early as the 2008 Sinus Forum, so a requirement that an intended use must be supported by *some* evidence of marketing claims—if such a requirement had existed—was met.

The defendants also cite other sources as evidence of confusion, including a statement by a government lawyer regarding "objective" and "subjective" intent during the appeal in *United States v. Caronia*, 703 F.3d 149 (2d Cir. 2012), [PFBr.38], and FDA proposed rulemaking and guidance documents, [WFBr.26-27], but these citations add little to their argument.  Requiring "objective" rather than "subjective" evidence of intent does not preclude the consideration of internal company documents as objective manifestations of intent, as the district court found. [PFAdd.42-43].  And defendants fail to explain how any purported uncertainty relating to, for example, the circumstances under which scientific studies can be distributed, [WFBr.27], could create ambiguity as to the legality of the conduct here.

---

[36] Reading the letter to say that *only* marketing claims may be considered would be even more patently contrary to judicial precedent, including *Vascular Solutions*, decided after the ADS letter but before the relevant events in this case. 181 F. Supp. 3d at 346-47 (expressly rejecting argument that evidence of objective intent can be proved only by communications "published to the marketplace").

Moreover, defendants' arguments based on agency conduct fail to address the fact that Acclarent was on actual notice of FDA's position regarding Stratus no later than May 2007, when FDA disapproved its letter request to clear the device for use with Kenalog. [JA:4698]. In that letter, FDA expressly stated that marketing Stratus for use with Kenalog would represent a major modification of the device that would require additional filings, including a clinical study, and further review. [JA:4698]. The receipt of actual notice of what an agency deems impermissible, before the events that give rise to liability, defeats a later claim of unfair surprise.[37] *United States v. S. Union Co.*, 630 F.3d 17, 31 (1st Cir. 2010); *accord Caputo*, 517 F.3d at 941 (where FDA provided actual notice that marketing of medical device was contrary to law but defendants continued anyway, "they took a risk and could not then say 'we didn't know' or 'the regulation left us scratching our heads"). For all these reasons, defendants claim of unfair surprise must fail.

Facteau separately contends that there was an unfair "pivot" in the government's theory of prosecution in cases like this one in the wake of the Second Circuit's decision in *Caronia*, 703 F.3d 149. [WFBr.31-36, 41-42]. According to Facteau, the government reacted to *Caronia* by abandoning a prior focus targeting off-label promotion and adopting a new strategy premised on a novel expansion of

---

[37] Given this notice, Facteau's suggestion that Acclarent's actions were "deemed acceptable at the time of commission" is simply false. [WFBr.37].

the definition of intended use.  [WFBr.33-36].  This change, he says, led to his being

charged on a theory he could not anticipate.  [WFBr.31-38].  But no such "post-

*Caronia* . . . pivot," [WFBr.41], occurred.

In 2000, FDA clarified its position, acknowledged by the D.C. Circuit, that

the FDCA does not give it the authority to prohibit a manufacturer's promotional

speech regarding an unapproved use of an approved medical product, but it does

authorize FDA "to use . . . promotional conduct as *evidence* in a misbranding or

'intended use' enforcement action."  *Wash. Legal Found. v. Henney*, 202 F.3d 331,

336 (D.C. Cir. 2000) (emphasis in original).  As stated below, that theory has been

upheld many times since 2000 and is the one on which this case was tried.

Defendants thus cannot plausibly claim to have been unfairly surprised.  In addition,

and as already explained above, the proposition that FDA may consider evidence

beyond promotional speech to establish an "intended use" has been asserted by the

agency and accepted by the courts for decades.  *See supra*, pp.37-41.  Defendants'

claim of a due process violation based on this ground therefore must fail.

### 4.     FDA's revised regulation on "intended use" supports the government's position.

Although issued after the defendants' briefs were filed, FDA's revised

regulation on intended use represents a clarifying rule which may be applied to cases

on appeal.  [*See* G.Add.48 (stating that rule "clarifies but does not change FDA's

interpretation and application of existing intended use regulations for medical products")]; *Coskery v. Berryhill*, 892 F.3d 1, 4-5 (1st Cir. 2018) (noting that, while substantive rules apply on appeal only if they so state, clarifying rules generally may be applied on appeal). To the extent this Court chooses to consider it, the revised regulation supports the government's position.

As noted above, the most visible change made by the revised regulation is to omit the last sentence of the prior regulation, which stated that a manufacturer of an approved medical product could become responsible for providing new labeling if it knew about or was on notice of a product's unapproved uses by consumers. [*See* G.Add.52]. The revision also adds a phrase to an existing sentence clarifying that "a firm would not be regarded as intending an unapproved use based solely on that firm's knowledge that such a device was being prescribed or used by health care providers for such use." [G.Add.52]. Although these changes were not finalized when this case was tried, the parties were aware of FDA's 2015 proposal, which is reflected in the district court's instruction. [*See* 27:147 ("Merely distributing a device with knowledge that it will be used for use other than the use cleared or approved by the FDA is not fraudulent or illegal."); 27:149 ("Mere knowledge that doctors are using a device for purposes other than its labeled use does not give rise to a new intended use.")]. Thus, this modification makes no change to the standard under which this case was tried and does not undermine the verdict.

47

Two other clarifying changes conform the revised regulation to FDA's longstanding interpretation and support the government's position in this case. First, the revised regulation clarifies that the "design or composition of [an] article" may show intended use. [G.Add.52]. Second, it clarifies that "intended use" refers to the "objective intent of the persons legally responsible for the labeling of an article *(or their representatives)*." [G.Add.52 (emphasis added)]. Evidence of both kinds was introduced in this case and the revised regulation confirms that it was properly admitted and considered.

## II. THE PROSECUTION DID NOT VIOLATE THE FIRST AMENDMENT.

### (Facteau argument II)

Facteau, joined by Fabian, [PFBr.33 n.8], contends that the prosecution of this case violates the First Amendment because: (1) the case imposes a *de facto* prohibition on truthful promotional speech of the kind the Second Circuit found impermissible in *Caronia*, 703 F.3d 149; and (2) FDA guidance documents creating "safe harbors" for certain manufacturer-supported activities that will not be treated as evidence of intent demonstrate unconstitutional content or viewpoint discrimination undermining the regulatory scheme. [WFBr.45-62]. Only the first of these arguments is preserved and neither has merit.

48

**A.** <u>**Standard of review**</u>.

A preserved claim of a First Amendment violation is subject to *de novo* review. *United States v. Ackell*, 907 F.3d 67, 71 (1st Cir. 2018). A First Amendment claim "not squarely and timely raised in the trial court . . . ordinarily is deemed unpreserved for purposes of appellate review," however, *Masso-Torrelas v. Mun. of Toa Alta*, 845 F.3d 461, 466 (1st Cir. 2017) (internal quotation marks omitted), and arguments "made for the first time on appeal" are "review[ed] for plain error." *United States v. Gonzalez*, 981 F.3d 11, 21 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 1710 (2021). "To prevail under plain-error review, an appellant must show (1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 22.

Facteau's argument that this prosecution violated the First Amendment because it criminalized truthful promotional speech was raised in the defendants' post-trial motion for judgments of acquittal, [D.484, pp.3-6] (and in their motion to dismiss, [*see* D.185, pp.10-20]), and thus preserved. Facteau's argument that FDA's issuance of guidance documents identifying "safe harbors" for information sharing violates the First Amendment as impermissible content- or viewpoint-based regulation, however, was not raised in the district court, as discussed below. That argument is therefore reviewable only for plain error.

49

**B.    The use of marketing speech as evidence in this case does not implicate the First Amendment.**

Facteau contends that this prosecution violates the First Amendment because it amounts to a *de facto*, and impermissible, prosecution of "off-label promotional speech *as the prohibited act*."    [WFBr.50 (emphasis in original)].    Facteau analogizes this case to *Caronia*, in which a divided Second Circuit panel overturned a misbranding conviction on First Amendment grounds where the government's arguments and district court's instructions suggested that "FDCA's misbranding provisions . . . prohibit and criminalize off-label promotion."  703 F.3d at 161-64, 166-69.  The district court properly rejected this argument, relying on the settled principle that the use of speech as evidence does not implicate the First Amendment and finding that the circumstances that spawned *Caronia* and (and *Amarin Pharma., Inc. v. U.S. Food & Drug Admin.*, 119 F. Supp. 3d 196 (S.D.N.Y. 2015), which applied its reasoning) were not present here.  [PFAdd.33-37].

That speech generally may be used as evidence without running afoul of the First Amendment is well settled.  The Supreme Court said so expressly in *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."), and this Court and others have applied the principle in a range of

contexts.[38]  Every appellate court to consider the issue, moreover, has held that the

government may use a manufacturer's representations as evidence of a medical

product's "intended use" in litigation under the FDCA.  *See Whitaker v. Thompson*,

353 F.3d 947, 953 (D.C. Cir. 2004) (finding it "constitutionally permissible for the

FDA to use speech, in the form of labeling, to infer intent for purposes of

determining that [the defendant's] proposed sale of saw palmetto extract would

constitute the forbidden sale of an unapproved drug"); *accord United States v.*

*LeBeau*, 654 Fed. App'x. 826, 830-31 (7th Cir. 2016) (government properly used

defendants' statements "to show how he intended consumers to use his product, and

---

[38] *See Cook v. Gates*, 528 F.3d 42, 63 (1st Cir. 2008) (finding no First Amendment violation where military used member's declaration as evidence of statutory violation); *United States v. Kaziu*, 559 Fed. App'x 32, 35 (2d Cir. 2014) (finding no First Amendment violation where defendant's speech used to prove terrorism charge); *Thomasson v. Perry*, 80 F.3d 915, 931 (4th Cir. 1996) (no violation where military used defendant's speech as evidence of statutory violation); *United States v. Cannon*, 750 F.3d 492, 508 (5th Cir. 2014) (speech-based evidence properly used to support finding a crime was motivated by racial hatred); *United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) (no violation when juries consider speech as potential evidence of conspiracy); *Richenberg v. Perry*, 97 F.3d 256, 263 (8th Cir. 1996) (holding no First Amendment violation to use speech as evidence of statutory violation); *United States v. Wolf*, 691 Fed App'x 438, 439 (9th Cir. 2017) (First Amendment not infringed where statements were used as evidence for defendant's state of mind); *United States v. Smith*, 967 F.3d 1196, 1205 (11th Cir. 2020) (holding no First Amendment violation to use music video as evidence of crime), *cert. denied*, 141 S. Ct. 2538 (2021); *Flytenow, Inc. v. Fed. Aviation Admin.*, 808 F.3d 882, 894 (D.C. Cir. 2015) (no First Amendment violation to use pilots' speech as evidence they are "offering services that exceed[] the limits of their certifications").

thus whether the product is a 'drug'"); *U.S. ex. rel. Polansky v. Pfizer, Inc.* *("Pfizer")*, 822 F.3d 613, 615 n.2 (2d Cir. 2016) (government may "prove misbranding on a theory that promotional speech provides evidence that a drug is intended for a use that is not included on the drug's FDA-approved label"); *see also* *Nicopure Labs, LLC v. Food & Drug Admin.*, 944 F.3d 267, 283-84 (D.C. Cir. 2019) (reaffirming and applying *Whitaker* to uphold FDA's use of marketing speech as evidence to prove product type under the Tobacco Control Act).[39]

*Caronia* did not call this principle into question. *See* 703 F.3d at 161 & n.8. The defendant in the case, Alfred Caronia, was convicted of conspiracy to distribute a misbranded drug based on statements he and others made regarding the off-label use of a drug called Xyrem.[40]    *Id.* at 155-58.    In concluding that the prosecution

---

[39] *See also United States* v. *Cole,* 84 F. Supp. 3d 1159, 1166 (D. Or. 2015); *United States* v. *Regenerative Scis.,* LLC, 878 F. Supp. 2d 248, 255–56 (D.D.C. 2012), *aff'd,* 741 F.3d 1314 (D.C. Cir. 2014); *United States* v. *Livdahl,* 459 F. Supp. 2d 1255, 1268 (S.D. Fla. 2005); *United States* v. *Lane Labs-USA, Inc.,* 324 F. Supp. 2d 547, 579–80 (D.N.J. 2004).

[40] Xyrem was approved by FDA for two forms of narcolepsy and its safety and effectiveness were not established for those under 16. 703 F.3d at 155. The statements charged in the indictment suggested that it also could be used to treat other sleep disorders and other conditions including chronic fatigue and chronic pain and that it could be used in younger populations. *Id.* at 156.

raised First Amendment concerns, the *Caronia* majority[41] focused on the government's summation and rebuttal and the district court's jury instructions. *Id.* at 158-62 & n.6. The court found that the government's arguments "identified Caronia's speech alone as the proscribed conduct." *Id.* at 162. The panel majority also found that the trial court's instructions "left the jury to understand that Caronia's speech was itself the proscribed conduct" and also "flatly stated to the jury that pharmaceutical representatives are prohibited from engaging in off-label promotion." *Id.* This, "together with the government's summation[,] would have led the jury to believe that Caronia's promotional speech was, by itself, determinative of his guilt." *Id.* The court additionally noted that Caronia's statements were not alleged to be false or misleading. *Id.* at 165 n.10.

Having found that the case to be effectively a conviction based on truthful off-label promotion alone, the *Caronia* majority held that it implicated protected First Amendment interests. *See id*. at 162-69. Applying the commercial speech test set forth in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*, 447 U.S. 557 (1980), the court concluded that using the FDCA to criminalize truthful, non-misleading promotional statements regarding an off-label use would

---

[41] One judge on the panel filed a dissenting opinion. *See* 703 F.3d at 169-82 (Livingston, J., dissenting).

violate the First Amendment because, although the government had a "substantial interest" in preserving the effectiveness and integrity of the drug approval process, a prohibition on truthful off-label promotion would not "directly advance" that interest and was not "narrowly drawn" to achieve it. *Caronia*, 166-69.

The government does not concede that the majority opinion in *Caronia* is correct either in finding that the case before it implicated the First Amendment or in applying *Central Hudson*; indeed the majority opinion was accompanied by a thoughtful and thorough dissent disputing both points. *See* 703 F.3d at 169-81 (Livingston, J., dissenting). This Court, however, has no need to reach either question because this case is distinguishable from *Caronia* in every relevant respect, including the legal theory presented to the jury under the court's instructions and the scope of the evidence offered at trial.[42]

Here, the district court's instructions repeatedly emphasized that truthful, non-misleading speech was not criminal, even if it concerned an unapproved use, and

---

[42] Given the fundamental differences between *Caronia* and this case, a full recitation of the government's position regarding application of *Central Hudson* to the FDCA is beyond the scope of this appeal. Nonetheless, should the Court wish to have more information regarding the government's position on that issue, an overview of the government's position appears in the August 2, 2021 Federal Register notice which is included in the addendum. [G.Add.42-43]. A more thorough discussion appears in a 2017 FDA memorandum. *See* Memorandum: Public Health Interests and First Amendment Considerations Regarding Unapproved Uses of Approved or Cleared Medical Products (January 2017), available at *https://www.regulations.gov/document?D=FDA-2016-N-1149-0040*.

that the defendants could not be convicted based solely on such speech. [*See* 27:147 ("The FDCA does not prohibit or criminalize truthful, non-misleading off-label promotion. You may not convict the defendant of a crime based solely on truthful, non-misleading statements promoting [an] FDA-cleared or approved device, even if the use being promoted is not a cleared or approved use."); 27:148 ("The indictment in this case does not charge any defendant with the crime of promoting a device off-label, because that itself is not a crime.")]. Rather, such speech could only be considered as evidence of the intended use. [*See* 27:148 ("Although you may not convict a defendant of a crime based solely on truthful, non-misleading statements regarding off-label use, even truthful statements about an off-label use can be considered as evidence."), ("Truthful, non-misleading speech cannot be a criminal act in and of itself, but it can be evidence and therefore used by you to determine whether the government has proved each element of each offense beyond a reasonable doubt, including the element of intent.").

That speech alone could not be the basis for the crime was reinforced by the court's instructions on the elements of the crimes of which the defendants were convicted. The court's instructions on what it meant for a device to be "adulterated" or to be "misbranded" based on failure to file a premarket notification (the theory the jury found had been proved) made no reference to speech at all. [*See* 27:164-65 ("A medical device is adulterated if it is . . . required to have but does not have an

FDA-approved pre-market approval of "PMA" application for [a] particular intended use and is not otherwise exempt from such approval); 27:167 ("[A] medical device is also misbranded if the manufacturer introduces the device into interstate commerce for an intended use that is significantly different from the use covered by its 510(k) clearance and without submitting a new premarket notification to the FDA regarding the different intended use.")]. "As [this Court] ha[s] often observed, juries are presumed to follow such instructions." *United States v. Stewart Carrasquillo*, 997 F.3d 408, 423 (1st Cir. 2021) (internal quotation marks omitted).

The government's evidence in this case, moreover, did not focus on promotional speech as the sole basis for finding that Stratus was adulterated or misbranded. To the contrary, the government introduced a wide range of other evidence as proof of the intended use, including:

- evidence that Acclarent's initial purpose in developing the device that became Stratus was as a means of drug delivery. [JA:3449-51];

- evidence that Stratus's design, including the size of the micropores, made it suitable only for drug delivery and not for use as a spacer with saline, [3:188; 4:154; 7:164];

- evidence that Acclarent knew before launching Stratus that it had no medical value as a spacer with saline, [7:166-88];

- evidence that Acclarent's strategy for gaining regulatory approval was fraudulent, because the device could not work as described in the clearance documents, [3:61-65, 90; 7:206; 18:186];

- evidence that the marketing campaign Fabian oversaw was designed to encourage use of Stratus as a drug delivery device and not for its cleared use, [*see supra*, pp.22-25]; and

- evidence that doctors used Stratus exclusively as a drug delivery device and not for the cleared intended use, [*e.g.*, 5:98-99; 7:87-88; 10:31, 67].

The government also presented evidence from which the jury could find that many of Acclarent's marketing claims were false and misleading, including:

- stating that the patients would experience better outcomes using Stratus although there was no evidence of this, [8:124; 9:98; 10:39, 76];

- stating without proof that doctors could safely use four, six, or more devices in one patient, [7:117-1; JA:4547];

- touting few or no adverse outcomes with Stratus although a substantial number had occurred, [3:79-80; 9:131; 16:55-60, 83; 19:52].

Such false and misleading claims enjoy no First Amendment protection. *Wine & Spirits v. Rhode Island*, 418 F.3d 36, 49 (1st Cir. 2005) ("The commercial speech doctrine protects the communication of truthful information to customers about a proposed commercial transaction.").

Given these differences, *Caronia* provides no basis for this Court to depart here from the settled principle that off-label promotion may permissibly be used as evidence of intent without implicating the First Amendment. The Second Circuit itself has since reaffirmed this principle in the context of FDCA litigation. *See Pfizer*, 822 F.3d at 615 n.2 ("*Caronia* left open the government's ability to prove misbranding on a theory that promotional speech provides evidence that a drug is

57

intended for a use that is not included on the drug's FDA-approved label."). And *Caronia* has not been construed, even in the Second Circuit, to require a First Amendment analysis for evidentiary uses of speech outside of the narrow context where jury instructions allow speech itself to become "the proscribed conduct." *United States v. Kaziu*, 559 Fed. App'x. 32, 35-36 (2d Cir. 2014) (unpublished) (declining to follow *Caronia* where instructions made clear that speech was only to be considered as evidence of intent).

*Caronia* also does not bar the use of truthful speech as evidence of intent in a case where meaningful evidence arising from other sources is present, as was true here. This was acknowledged in *Amarin*, which explained that, where "a misbranding prosecution . . . [is] based on promotional actions other than truthful speech[,] . . . . statements promoting off-label use might be admissible . . . to shed light on the intent behind these actions or to present the scheme in full context." 119 F. Supp. 3d at 228. Because this case raises no First Amendment concerns even if *Caronia* and *Amarin* were correctly decided on their facts (which the government disputes), the district court properly rejected this argument.

### C.    Facteau's claim that FDA's "safe harbor" guidance violate the First Amendment fails on plain error review.

Facteau alternatively contends that FDA's issuance of guidance documents identifying circumstances where manufacturer-supported information sharing about

off-label uses will *not* be treated as evidence of intent runs afoul of the First Amendment because it impermissibly discriminates based on content and viewpoint. [WFBr.49-62]. Facteau's challenge to the lawfulness of these guidance documents is somewhat surprising, given that the creation and refinement of these "safe harbors" has been driven in significant part by the requests of industry groups for precisely such clarification. [*See* WFBr.13-14 (citing documents)]. The argument is also unpreserved and, if not waived, fails on plain error review.

### 1. Guidance and arguments presented below.

The defendants introduced, as attachments to their pretrial motions, several draft and final FDA guidance documents that identified and clarified circumstances in which manufacturer involvement in generating or distributing information about unapproved uses would not be considered as evidence of intended use in support of potential violations of the FDCA. These documents included:

- A 2011 draft guidance on responding to unsolicited requests for off-label information about drugs or devices, [JA:196-210];

- A 2009 final and 2014 revised draft guidance on recommended practices for industry distribution of medical journal articles or other publications addressing unapproved new uses of approved drugs or devices, [JA:212-16; 235-54]; and

- A 1997 guidance addressing industry-supported scientific and educational activities, [JA:218-25].

The defendants also introduced, as attachments to motions filed both pre- and post-trial, two citizen petitions filed by industry groups with the FDA. These petitions, filed in 2011 and 2013, emphasized the value of allowing manufacturers to share information in their possession about off-label uses with doctors and others and asking FDA to clarify the circumstances in which doing so would not raise concerns under the FDCA. [*See* JA:264-84 (2013 petition); JA:601-14 (2011 petition); *see also* JA:616-25 (FDA's 2014 written response to the petitions)].

With the exception of the much-earlier 1997 document, the FDA guidance are framed in similar ways. Each states that a manufacturer generally cannot, consistent with the FDCA, introduce a drug or device into interstate commerce for an uncleared or unapproved intended use. [JA:200, 213, 240-41]. Each also acknowledges that drugs and devices may be prescribed by doctors for off-label uses and the value of allowing truthful, non-misleading information about such uses to be shared. [JA:200-01, 213-14, 243]. Each guidance then identifies recommendations for engaging in the specified form of information sharing and states that, if these are followed, the sharing of information would not be treated as evidence of a new intended use for the drug or device.[43] [JA:201-10, 214-16, 243-54].

---

[43] The 1997 guidance was framed as a clarification of the factors FDA considers in evaluating whether an industry-supported activity is "performed by, or on behalf of, the compan[y] that market[s] [a] product[]," and therefore potentially

In their pretrial filings, the defendants cited these documents as evidence of unconstitutional vagueness, [D.185, p.8 (citing all four guidance documents as proof of "the murkiness and uncertainty of the governing legal landscape")]; D.186-1, p.19 n.16 (same)]; evidence that the FDA has previously construed the FDCA to target promotional speech itself, [D.185, p.14 (citing the 2009 guidance)]; evidence of the FDA's purported "change in position" post-*Caronia* regarding its legal theory for misbranding claims, [D.186-1, p.8 (comparing language in the 2009 and 2014 guidance documents)]; and evidence that providing truthful information should not justify finding a new intended use, [D.186-1, p.19].  The sparse references to the documents in defendants' Rule 29 filing were in aid of similar points.  [*See* D.484, pp.21-22 (citing the 2011 guidance and earlier 1994 Federal Register notice in support of a claim of vagueness)].

The defendants did not contend that the post-2000 FDA guidance documents represented impermissible content- or viewpoint-based discrimination by privileging the speech that fell within the safe harbors.  To the extent defendants' motions referred to content- or viewpoint-based discrimination, they did so on the ground that the FDA's purported targeting of promotional speech in general (an

---

subject to regulation by the FDA, or "supported by [the] company[y], [but] otherwise independent," in which case it would not be subject to FDA regulation.  [JA:219]. The document did not purport to identify a "safe harbor."

argument addressed in the proceeding section) represented impermissible discrimination because it applied to promotional speech by manufacturers but not similarly situated non-manufacturers, and because it distinguished positive "promotional" speech from negative "warning" speech.  [D.185, pp.11-12 & n.11; D.484, pp.5-6 (citing motion to dismiss)].

### 2.    Facteau's unpreserved argument is waived.

Because Facteau did not raise his current First Amendment argument in the district court, he must satisfy the requirements of plain error to prevail.  Yet he does not even acknowledge his failure to preserve the issue, much less attempt to establish plain error.  In *United States v. Pabon*, this Court held that a defendant waived a forfeited claim on appeal where "he ha[d] not even attempted to meet his four-part burden for forfeited claims."  819 F.3d 26, 33 (1st Cir. 2016) (quoted with approval in *United States v. Sandoval*, 6 F.4th 63, 93 (1st Cir. 2021)).  The same is true here. The Court should therefore deem this claim waived.

### 3.    Facteau fails to establish a clear or obvious error.

If not waived, Facteau's claim fails, because he has not shown that FDA's position on evidentiary safe harbors for certain firm-supported communications violates the First Amendment, much less that any violation is clear or obvious.

Facteau asserts that a statement by FDA that it does not intend to use certain communications as evidence of intended use constitutes a burden on speech

implicating the First Amendment.  [WFBr.56-57].  But he identifies no precedent

holding so on similar facts, as he must on plain error review.  *See United States v.*

*Grullon*, 996 F.3d 21, 33 (1st Cir. 2021) (plain error will be found only where there

is binding on-point precedent or where appellant's position "is compelled" by a

statute or other legal mandate).  Nor does he address the D.C. Circuit's on-point

decision in *Washington Legal Foundation*, in which the parties and the court

appeared to agree (although the court did not decide the issue) that the First

Amendment was not violated by safe harbors identifying circumstances where firm-

supported communications would not be treated as evidence of intended use.  202

F.3d at 335-36; [*see also* JA:547-49 (discussing decision)].

The cases Facteau cites for the proposition that the guidance documents

impose a cognizable burden under the First Amendment, [*see* WFBr.56-57], are

readily distinguishable.  The statute at issue in *United States v. Playboy*

*Entertainment Group, Inc*., imposed strict limits on how and when sexually explicit

material could be transmitted, requiring either comprehensive scrambling of the

signal or prohibiting the programming except during late night hours.  529 U.S. 803,

806 (2000).  The statute at issue in *Sorrell v. IMS Health* flatly prohibited access to

and use of certain prescription information based on the nature of the group seeking

it and the purpose to which the information would be put.  564 U.S. 552, 571 (2011).

These prohibitions on protected speech either across the board or for large parts of

the day bear no resemblance to a guidance document that does not limit speech, but merely identifies certain circumstances where FDA does not intend to use speech as evidence.[44] These cases thus fail to establish a cognizable First Amendment burden, let alone a plain or obvious constitutional error.[45]

Facteau further asserts that the guidance documents must be construed as discriminating against certain speech *based on its content or viewpoint*, [WFBr.57-58], but again fails to show a clear or obvious error. Facteau contends that the FDA guidance cannot be read as making distinctions based on the evidentiary value of the speech, [WFBr.58], but this argument has no traction with respect to the 2011 guidance on unsolicited communications. Notwithstanding Facteau's protestations,

---

[44] Cases cited in *Sorrell* as state actions short of a ban imposing cognizable burdens are also clearly distinguishable in that they impose direct financial costs based on the content of speech or the speaker. *See Simon & Shuster, Inc. v. Members of N.Y. State Crime Victim's Bd.*, 502 U.S. 105, 116 (1991) (law in question "single[d] out income derived from expressive activity for a burden the State place[d] on no other income, . . . directed only at works with a specified content"); *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 577-79 (1983) (law imposed "use tax" on paper and ink products used in publishing which was then narrowed to apply to only a few publications).

[45] *Virginia v. Black*, 538 U.S. 343 (2003), which Facteau also cites, [WFBr.57], is entirely inapposite. The evidentiary presumption at issue there— which held that burning of a cross would constitute "prima facie evidence of an intent to intimidate"—was found constitutionally objectionable because, by doing away with the requirement that intent be shown by evidence, it rendered the statute's reach overbroad. *Id*. at 363-67. That is not the claim made here.

it is readily apparent that evidence that a firm's representative initiated a conversation about an uncleared use with a doctor is more probative of the firm's intent than evidence that the representative merely answered an unsolicited request. This is particularly true if the response to the unsolicited request conforms to FDA guidance, which requires that the response consist only of "non-biased information or data relating to the particular off-label use that is the subject of the request, including applicable data that are not supportive or that cast doubt on the safety or efficacy of that use." [JA:206].

Facteau similarly fails to show that the 2014 guidance on distributing reprints represents impermissible content- or viewpoint-based discrimination. Review of the guidance makes clear that the great majority of the criteria FDA recommends for distributing a reprint within the safe harbor concern objective standards aimed at ensuring that the materials represent sound science. For example, the portion of the 2014 guidance addressing journal articles states that, to fall within the safe harbor, the article should appear in a journal adhering to established principles of objectivity and independence; the study underlying the article should be peer reviewed; the study should include adequate controls; the study should not be part of a special supplement funded by manufacturers of the product discussed; and the article should not be edited, excerpted, by or at the request of a manufacturer. [JA:244-46]. These recommendations do not represent content-based discrimination.

Where the 2014 guidance does touch more directly on content, moreover, it does so with a self-evident focus on ensuring that information is not presented in a false or misleading way or one that would put patients in danger (*e.g.*, a journal article falls within the safe harbor if it: is not abridged; is not accompanied by false claims about its significance or representativeness; does not recommend a use that is dangerous to public to health; and is accompanied by a representative publication reaching different conclusions); and that any distribution includes appropriate labeling, warnings, and disclosures. [*See* JA:244-47]. Facteau does not point to any case establishing that this represents impermissible content-based, much less viewpoint-based, discrimination.

For all the foregoing reasons, Facteau has not met his burden to show that guidance documents have resulted in a First Amendment violation that is clear and obvious under current law.

### 4.   Facteau cannot show prejudice.

Facteau's First Amendment claim also fails because he has not shown that any remedy of the alleged error would help him. Indeed, he does not meaningfully attempt to do so, further underscoring his waiver. *See United States v. Weadick*, 15 F.4th 1, 10 (1st Cir. 2021) (defendant waived unpreserved evidentiary argument "by offering no explanation at all for how the testimony prejudiced him"). Nor is it apparent what claim of prejudice Facteau could advance.

66

Even assuming that Facteau were correct that aspects of one or more guidance documents raise questions of unequal treatment of protected speech, the question of the appropriate remedy is complicated and case specific. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2355 (2020). Where—as here—the claim is of an unlawful preference, courts must consider, among other things, whether to extend the preference to other speakers or circumstances or to extinguish it. *See id.* (holding that, where a robocall prohibition impermissibly created an exception for debt collection calls, thus unfairly privileging them, the correct solution was to eliminate the exception, so *all* calls were barred). A ruling limiting or eliminating the safe harbors would, of course, be of no help to Facteau. To the contrary, it would mean that the court should have allowed the jury to consider a wider range of evidence against him than it did.[46]

In his brief, Facteau appears to suggest that the appropriate remedy would be to exempt *all* promotional statements (or at least all truthful promotional statements) from being considered evidence of an intended use. [WFBr.60-61]. But he makes no attempt to explain how this extraordinary result follows from the narrow First

---

[46] As set forth below, the district court's instructions incorporated reasoning from the guidance documents, telling the jury that it could not consider Acclarent's provision of truthful, balanced, non-misleading medical or scientific information in response to unsolicited requests as evidence of intent. [27:149].

67

Amendment violations he alleges.  Nor does he address why a remedy more closely tied to the allegations—for example, a ruling that the safe harbor for reprints should encompass a broader range of circumstances—would not suffice.  Under the plain error test, Facteau must "establish a reasonable likelihood that the result would have been different without" the purported error.  *United States v. Saad*, 888 F.3d 561, 570-71 (1st Cir. 2018).  Facteau's asserted right to this drastic remedy—resting on no more than *ipse dixit*—does not come close to meeting that standard.

In fact, given the record in this case, it is doubtful that he could satisfy the "reasonable likelihood" standard even if he *could* prove his entitlement to the First Amendment remedy he seeks.  At trial, the government presented extensive evidence of Stratus's intended use as a drug delivery device that had nothing to do with truthful, non-misleading commercial speech.  Given the cumulative weight of that evidence, it is difficult to see how the jury would have reached a different result even if Facteau were right that the truthful, non-misleading aspects of Acclarent's promotional speech should not have been considered.  In any event, Facteau has not attempted to make such an argument.  He therefore has not established the third and fourth prongs of plain error.  *Weadick*, 15 F.4th at 10.

## III.  FABIAN'S SUFFICIENCY CLAIMS ARE UNAVAILING.

### (Fabian arguments III and IV)

Fabian advances two narrow sufficiency claims.  He argues that the government was required to, but did not, introduce evidence of commercial speech as to each charged Stratus shipment, [PFBr.47-67]; and he argues that the government failed to establish that he personally had a role in the failures to gain regulatory approval that underlay the convictions, [PFBr.68-70].  Both arguments proceed from fundamental misunderstandings of the FDCA violations at issue and the second argument is forfeited, if not waived entirely.  Neither establishes insufficiency in the government's proof.

### A.  __Clarifying the crime charged and proved__.

As set forth above, Fabian and Facteau were convicted of violating 21 U.S.C. §331(a), which prohibits engaging in or "causing" "[t]he introduction or delivery for introduction into interstate commerce of any . . . device . . . that is adulterated or misbranded."  [PFAdd.89].  The indictment alleged, [JA:59], and the jury found, that each of the five charged deliveries of Stratus was "adulterated" pursuant to 21 U.S.C. §351(f)(1)(B), meaning that it was a Class III device that was "required to have in effect an approved application for premarket approval," was not exempt, and such approved application was "not in effect."  [PFAdd.90].  The indictment also alleged, [JA:60], and the jury also found, that each delivery was "misbranded" pursuant to

69

21 U.S.C. §352(o), because "a notice or other information respecting it was not provided as required by . . . section 360(k) of this title."[47]  [PFAdd.90].

As the Supreme Court and this Court have recognized, liability under §331(a) does not require a defendant to engage in the acts making a product adulterated or misbranded.  "[T]he transaction which the statute outlaws" is "to put into the stream of interstate commerce adulterated or misbranded [products]."  *Dotterweich*, 320 U.S. at 284.  Thus, a person violates §331(a) if an article "qualified as 'misbranded' [or 'adulterated']" and "the defendant then undertook the prohibited acts of 'causing . . . [t]he introduction or delivery for introduction into interstate commerce of any' such [article]."  *United States v. Stepanets*, 989 F.3d 88, 95 (1st Cir.), *cert. denied*, 2021 WL 4508918 (Oct. 4, 2021) (quoting 21 U.S.C. §331(a)).

This Court has also made clear that the language of §331(a)—which describes a device that "*is* adulterated or misbranded" (emphasis added)—"looks to a present state . . . at the time of 'introduction or delivery for introduction into interstate commerce.'"  *Penobscot Poultry Co. v. United States*, 244 F.2d 94, 97 (1st Cir. 1957) (quoted with approval in *United States v. Chin*, 15 F.4th 536, 545 (1st Cir. 2021)).

---

[47] Section 360(k), in turn, requires a manufacturer to file a report containing certain information regarding a new device at least 90 days before the device is introduced into interstate commerce.  [PFAdd.91].  Fabian does not dispute that the jury could have found that Acclarent failed to comply with this requirement.

As a result, a violation of §331(a) is complete at the time a misbranded or adulterated article is delivered for introduction into interstate commerce. *Chin*, 15 F.4th at 545.

**B.    Standard of review.**

This Court "review[s] preserved sufficiency challenges de novo." *Id.* at 540. "In undertaking that review, [this Court] must consider the evidence in the record in the light most favorable to the verdict," and "may reverse . . . only if [the Court] conclude[s] that, reading the record as a whole in that light, no rational jury could have found that the government proved the elements of the offense beyond a reasonable doubt." *Id.* at 540-41 (internal quotation marks omitted).

The "heavy burden" of demonstrating insufficiency becomes still greater if a sufficiency argument is unpreserved. *See United States v. Charriez-Rolon*, 923 F.3d 45, 51 (1st Cir.), *cert. denied*, 140 S. Ct. 292 (2019). In that case, this Court's "review is limited to preventing a clear and gross injustice, . . . knowing that there can be no clear and gross injustice unless there has been such an egregious misapplication of legal principles that reversal is required." *Id.* (internal quotation marks omitted). The "clear and gross injustice" standard is a "particularly exacting variant of plain error review." *United States v. Torres Monje*, 989 F.3d 25, 27 (1st Cir. 2021) (quoting *United States v. Freitas*, 904 F.3d 11, 23 (1st Cir. 2018)).

**C.  The government was not required to introduce marketing statements for each shipment.**

Fabian's argument that the government was required to introduce evidence of marketing statements regarding Stratus's use with Kenalog for every shipment was properly rejected by the district court, [PFAdd.45-48], for reasons that should be readily apparent.  To begin with, the argument starts from a premise—that the government had to introduce marketing statements to prove intended use—that is legally incorrect, as set forth in prior sections of this brief.

More fundamentally, Fabian's argument misapprehends the crime the government charged and proved.  The government's theory was that the intended use of Stratus always was—from initial concept to last sale—to be a mechanism for delivering steroids to the sinuses.  Those involved in its development understood at the outset that the device's sole medical and commercial value lay in its ability to deliver steroids and did not have any belief that it would have value or be used as a spacer with saline.  And those involved in its marketing, including Fabian, developed and executed a sales approach that focused solely on inducing doctors to use Stratus as a device for drug delivery.

At trial, the jury heard ample evidence from which it could have concluded that the foregoing was true and, as a result, that *all* sales of Stratus were for an intended use for which Acclarent had no PMA in place and for which it had not filed

a notice under §360(k). [PFAdd.41]. "The sole remaining question [was] whether the defendants introduced the [adulterated and] misbranded device into interstate commerce under 21 U.S.C. §331(a)." [PFAdd.41]. This was shown by Acclarent's Stratus sales to the hospitals on the dates specified, as stipulated at trial. [21:219 ("Each of the Stratus shipments identified in . . . Counts 9 to 18 were introduced into and traveled in interstate commerce.")].

Fabian claims on appeal that this interpretation creates a "thought crime," based on "subjective intent," [PFBr.58-59], but this argument—assuming it has any meaning in the corporate context—has not traction here. The record is replete with evidence of concrete and objective steps Acclarent took, with the knowledge and participation of the defendants, to implement its plan to develop and market a device for drug delivery, a use for which the defendants knew the device was not approved. The Court therefore has no reason to consider whether there is a point at which a company's desire for off-label use is so attenuated from any corporate action that it does not constitute "objective evidence" of an intended use.

Fabian also cites cases in which courts have addressed the degree of relationship necessary to bring statements within the scope of "labeling" under the FDCA. [PFBr.59-63 (citing *Kordel v. United States*, 335 U.S. 345 (1948); *United States v. Articles of Drug for Veterinary Use*, 50 F.3d 497, and *Nature Food Ctrs., Inc. v. United States*, 310 F.2d 67)]. But this was not a case where the government's

73

proof of misbranding relied on the contents of material constituting product labeling, as was true in *Kordel* and *Articles of Drug for Veterinary* use. *See* 335 U.S. at 346; 50 F.3d at 500. Nor was it a case, like *Nature Food Ctrs., Inc*., where the company argued in defense that items that could be considered product labeling satisfied statutory requirements. 310 F.3d at 70. Thus, these cases are inapposite.

Fabian additionally contends that part of the district court's "intended use" instruction implied that the jury had to decide the question of intended use for each shipment, [PFBr.63-67], but the argument misreads the charge. The instruction did no more than tell the jury that truthful, non-misleading responses to unsolicited requests for information about off-label uses were not themselves evidence of a new intended use. [PFBr.64]. The instruction did not state that the issue of intended use should be considered anew for each sale.

Because the jury could rationally have found that Acclarent distributed Stratus at all times with the intended use of steroid delivery, Fabian's recitation of instances in which a doctor may have "opened the door" to a discussion of such use of Stratus, [PFBr.65-67], is of no moment. Fabian was free to argue that conversations taking this form were sufficiently prevalent to undermine the government's theory that Acclarent had marketed Stratus for drug delivery. But once the jury concluded that Acclarent had sold Stratus for the intended use of a drug delivery device, the particular circumstances of a given sale were irrelevant. *Cf. Chin*, 15 F.4th at 545.

74

### D. The government was not required to prove that Fabian had a role in Acclarent's failure to obtain regulatory approvals.

Fabian also argues that the government failed to introduce sufficient evidence to connect him to Acclarent's failure to obtain FDA approvals, [PFBr.68-70], but this claim does not appear to be preserved. Indeed, Fabian seems to realize this, preemptively arguing that the district court identified the absence of needed approvals as the basis for the misdemeanor convictions "for the first time" in denying defendants' post-trial motions. [PFBr.68]. But the indictment itself alleged that Stratus was "adulterated" because it "lacked an FDA-approved pre-market approval" and was "misbranded," because, *inter alia*, "no pre-market notification was provided for the device as required by section 510(k)." [JA:59-60]. Thus, it was clear that the adulteration charge and one theory of misbranding relied on failures to make required filings. Following the verdict, it was clear (because the jury convicted only on that theory) that this was true of *all* counts of conviction.

Because Fabian "fails to even mention the clear-and-gross-injustice standard—much less develop any argument showing why and how it is met," he has waived this argument. *Freitas*, 904 F.3d at 23. But it would be unavailing in any event because the government did not have to connect Fabian to the lack of approvals. A violation of §331(a) occurs when a person causes the introduction of an adulterated or misbranded article into interstate commerce—whether or not that

person took part in making the article adulterated or misbranded. *Stepanets*, 989 F.3d at 95; *accord Dotterweich*, 320 U.S. at 284. Under *Dotterweich*, a defendant in a corporate setting must have a "responsible share in the furtherance of" the *distribution* (*e.g.*, "put[ting] into the stream of interstate commerce adulterated or misbranded [products]"). 320 U.S. at 284. But neither that case nor *United States v. Park*, 421 U.S. 658 (1975), which Fabian cites in his brief, [PFBr.70], are at odds with *Stepanets*' reasoning that no connection between the defendant and the misbranding/adulteration is required.[48]

Unsurprisingly, Fabian makes no attempt to argue that there was insufficient evidence to find that, as Vice President for Sales during the relevant period, he played a responsible role with respect to the introduction of Stratus into interstate commerce—an untenable argument that he has therefore waived. And because the government had no obligation to establish Fabian's connection to or responsibility for the regulatory approvals, its proof was not deficient on that ground.

---

[48] *Park*'s invocation and application of *Dotterweich*'s statement that liability extends to all who "'share 'responsibility in the business process resulting in' a violation," 421 U.S. at 669 (quoting *Dotterweich*, 320 U.S. at 284), arguably establishes that liability would *include* those with a responsible role as to the misbranding or adulteration but does not suggest it would be limited to them.

## IV.  FABIAN IDENTIFIES NO ERROR IN THE DISTRICT COURT'S "INTENDED USE" INSTRUCTION.

### (Fabian argument II)

Fabian also argues the district court erred in instructing the jury on intended use, [PFBr.51-57], but his arguments are unavailing.

### A.    **Procedural history.**

How the jury should be instructed on "intended use" was discussed many times both before and during the trial.  [*See, e.g.*, JA:930-1091, 1057-83; 2:63-64; 16:5-18; 25-13].  The district court circulated multiple drafts of its instructions for comment, [*see, e.g.*, 16:5-6; 17-160; 19-208], and, at the charge conference, adopted some suggestions by both the defendants and the government while declining others. [JA:2270, 2275-81].

The court's final instruction was thorough and balanced.  It described the evidence to be considered in terms that tracked FDA's then-current regulation.  It also incorporated FDA's proposed clarification that knowledge of an off-label use was not alone sufficient, *Caronia*'s holding regarding truthful promotional speech, and the principle from FDA guidance regarding responses to unsolicited requests:

> The term "intended use" refers to the objective intent of the manufacturer or seller of the device.  The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the device.  The objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written

77

statement such persons or their representatives. It may be shown by the circumstances that the device is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised. A device can have more than one intended use.

Mere knowledge that doctors are using a device for purposes other than its labeled use does not give rise to a new intended use. Off-label promotions statements can constitute evidence of an intended use, although truthful, non-misleading speech alone cannot be the basis for a criminal conviction. Neither the First Amendment nor any other law, however, protects false or misleading speech.

In addition, it is permissible to respond to unsolicited requests for information about FDA-regulated medical products by providing truthful, balanced, non-misleading, and non-promotional scientific or medical information that is responsive to the specific request, even if responding to the request requires a manufacturer to provide information on unapproved or uncleared indications or conditions of use. Under these circumstances, such responses may not be considered as evidence of a new or different "intended use."

[27:148-50 (PFAdd.74-75)].

After the district court's instructions, defense counsel made several objections, including that the jury should have been told to look only to external promotional activities and that truthful speech could not be considered as evidence of intended use. [27:184]. Defense counsel did not argue that the court should have given the specific instruction the defense requested.

78

**B.**    **Standard of review.**

"When evaluating preserved challenges [to jury instructions], [this Court] consider[s] de novo whether the district court misstated the law and review[s] for abuse of discretion whether the district court adequately explained the law." *United States v. Cruz-Rivera*, 14 F.4th 32, 54 (1st Cir. 2021). "A district court's refusal to give a particular instruction constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." *Sandoval*, 6 F.4th at 99 (1st Cir. 2021) (internal quotation marks omitted).

To preserve an objection, a defendant must object after the instructions have been given. *United States v. Perez-Rodriguez*, 13 F.4th 1, 16 (1st Cir. 2021). Where a defendant requests a particular instruction but fails to specifically object when it is not given, plain error review applies. *Id.*

**C.**    **Fabian's instructional challenges are unavailing.**

On appeal, Fabian devotes much of his argument to the claim that the district court erred in declining to give the instruction he requested, [PFBr.54-57], but this claim is easily dispatched. The defendants did not object to the court's failure to give their instruction, thus forfeiting this claim. *Perez-Rodriguez*, 13 F.4th at 16. And on appeal, Fabian fails to identify any binding precedent requiring an

instruction like the one he proposed and therefore cannot establish plain error. *Grullon*, 996 F.3d at 33.

To the extent Fabian's brief more generally challenges the district court's refusal to instruct that intended use refers *only* to marketing claims, that argument is unavailing. To begin with, such a reading cannot be squared with the text of the then-existing regulation. While the regulation refers to "labeling claims" and "advertising matter" as "examples" of what can prove "intended use," it starts from a broader premise—that the "objective intent of the persons legally responsible for the labelling of devices" is determined generally "by such persons' expressions or . . . by the circumstances surrounding the distribution of the article." [PFAdd.13]. The sentence that follows the "examples" of labeling and advertising matter confirms this broad meaning, explaining that relevant "circumstances" include "the knowledge of such persons or their representatives" that an article is "offered and used for a purpose for which it is neither labeled nor advertised." [PFAdd.13]. Given the regulation's express inclusion of matters outside of "marketing materials," it cannot plausibly be argued that the language regarding "expressions" and "circumstances" is limited to such materials.

In addition, Fabian's proposed reading is at odds with precedent, including this Court's broad language in *V.E. Irons* and other appellate and district court decisions using similar language and, where appropriate, relying on evidence other

80

than marketing statements to prove an intended use. *See supra*, pp.38-39. Based on this precedent, the district court properly rebuffed defendants' argument that only marketing statements could be evidence of intended use.

## V.    FABIAN'S CHALLENGE TO HIS FINE, IF NOT WAIVED, FAILS TO SHOW PLAIN ERROR.

### (Fabian argument V)

Relying mainly on *United States v. Bajakajian*, 524 U.S. 321 (1998), Fabian argues for the first time on appeal that his $500,000 fine violates the Excessive Fines Clause of the Eighth Amendment. [Br.71-78]. This contention, if not waived, fails on plain error review.

### A.    <u>Procedural history</u>.

Because the district court found that Fabian's total offense level (TOL) was 10, [D.546, pp.8-9], the advisory guidelines called for a fine of between $2,000 and $20,000 per count of conviction. *See* USSG §5E1.2(h)(1) (2018) (requiring use of the 2014 Fine Table "[f]or offenses committed prior to November 1, 2015"); USSG §5E1.2(c)(3) (2014) (Fine Table). The maximum guidelines fine for the ten counts of conviction was thus $200,000.[49] The applicable statutory maximum fine was

---

[49] Fabian concedes by his calculations that the Guidelines fine applies separately to each count and has thus waived any argument to the contrary. *United States v. Mayendia-Blanco*, 905 F.3d 26, 32-33 (1st Cir. 2018) (arguments not presented in opening brief are waived). Fabian incorrectly asserts, however, that his

$100,000 per count of conviction or $1,000,000 total, *see* 18 U.S.C. § 3571(b)(5), as the presentence report ("PSR") stated.  [PSR ¶139].

In his sentencing memorandum, Fabian requested a fine at the "low end" of the guidelines range, [D.526, p.31], while the government recommended a $500,000 fine, [D.529, p.1].  Fabian filed a reply but did not argue that the $500,000 fine the government sought violated the Eighth Amendment.  [D.533].

Just before Fabian was sentenced, the district court imposed the statutory maximum $1,000,000 fine in Facteau's case (a ruling he has not appealed). [G.Add.21-22].  At Fabian's sentencing moments later, the government renewed its request for a $500,000 fine.  [G.Add.24].  Fabian again asked for a low-end-of-the-guidelines fine. [G.Add.25].  He conceded, however, that the district court was free to "depart [to] the statutory maximum" (although briefly adding that a "significant fine" was unnecessary "in terms of deterrence").  [G.Add.25-26].

The district court ultimately agreed with the government that a $500,000 fine was warranted, reasoning in part that "[t]his was a crime about money" and that "in the corporate environment in which we live, I do feel that to accomplish general deterrence, the best way I can do that is by [a] financial penalty."  [G.Add.28-29].

---

TOL was 6, and from that mistaken premise he calculates his guidelines fine range as "between $1,000 and $10,000 per count," for a total guidelines maximum fine of $100,000.  [Br.75-76].  The correct figure is $200,000.

Following this, the court asked if there was anything further. [G.Add.29]. Instead of objecting to the fine or raising Eighth Amendment concerns, defense counsel asked that Fabian's firearms collection be returned to him. [G.Add.29]. After addressing that, the court gave counsel a further chance to address any issues, and defense counsel again said nothing about the fine. [G.Add.30].

## B. <u>Fabian has waived his Eighth Amendment claim.</u>

Fabian's Eighth Amendment claim should be deemed waived for two reasons. As noted above, Fabian did not object to the $500,000 fine on *any* ground below. And far from alerting the district court to the Eighth Amendment problems he now identifies on appeal, he affirmatively embraced the notion that the court could fine him up to the statutory maximum, and merely suggested that a "significant" fine was unnecessary on the facts. [G.Add.25-26]. Fabian's concession that the court could permissibly impose a fine of $1 million constitutes a waiver of his position on appeal that a fine half that was unconstitutional. *See Weadick*, 15 F.4th at 9 (express statement of agreement with court's approach precludes challenge on appeal).

Even assuming Fabian did not waive his argument below, he has clearly forfeited the Eighth Amendment claim so that it may be reviewed only for plain error. *See United States v. Sepúlveda-Hernández*, 752 F.3d 22, 36 (1st Cir. 2014) (plain-error review where defendant did not object on Eighth Amendment grounds to forfeiture order); *United States v. Aguasvivas-Castillo*, 668 F.3d 7, 16 (1st Cir.

2012) (same).[50]  Yet Fabian is entirely silent about the procedural posture of this issue and makes no effort to satisfy the plain error test.  [Br.71-78].  Thus, his Eighth Amendment claim is waived, and the Court's review ends here.  *See Pabon*, 819 F.3d at 33-34; *see also United States v. Cruz-Ramos*, 987 F.3d 27, 40 (1st Cir. 2021).

### C.    Fabian cannot demonstrate plain error.

Should the Court disregard both waivers, it should conclude that the district court did not offend the Eighth Amendment, let alone commit obvious constitutional error.  *Bajakajian* "hold[s] that a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." 524 U.S. at 334.[51]  But *Bajakajian* itself recognizes that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature."  *Id.* at 336.  In light of this, "[w]hen the forfeiture judgment is less than the maximum authorized fine, a defendant who purposes to challenge its constitutionality faces an especially steep uphill climb."  *Sepúlveda-Hernández*, 752 F.3d at 37.  It necessarily follows

---

[50] The fact that the district court's fine decision came at the end of sentencing did not relieve Fabian of his duty to lodge a proper objection, especially since the court gave him two chances to do so.  *See United States v. McCullock*, 991 F.3d 313, 318 (1st Cir. 2021).

[51] Although *Bajakajian* concerned a forfeiture, the Court's decision was premised on its determination that a forfeiture was a "fine" for purposes of the Excessive Fines Clause.  *Id.* at 334.  Given this, it cannot plausibly be disputed that *Bajakajian*'s reasoning applies equally to fines themselves.  In any event, Fabian has not argued to the contrary and therefore waived the issue.

84

that a fine is owed at least that level of deference, if not greater deference, if it falls below the statutory maximum.  Tellingly, Fabian also cites no controlling precedent supporting his position that the fine here was unconstitutional, which itself dooms any claim of "obvious" error.  *See Grullon*, 996 F.3d at 33.

Fabian also fails to cite a single decision of this Court applying *Bajakajian*, and he ignores the three-factor proportionality test that governs in this circuit: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." *United States v. Heldeman*, 402 F.3d 220, 223 (1st Cir. 2005); *see also United States v. Carpenter*, 941 F.3d 1, 11 (1st Cir. 2019) (applying *Heldeman* test); *Sepúlveda-Hernández*, 752 F.3d at 37 (same); *Aguasvivas-Castillo*, 668 F.3d at 17 (same).  While his failure to develop his argument provides yet another reason to find waiver, it is also readily apparent that he cannot show error under this test.

First, there is no question that Fabian falls squarely within the class of persons at whom his statutes of conviction are principally directed.  After all, Fabian was a chief architect of the marketing scheme that led to the distribution of Stratus for its unapproved use as a drug delivery device.

Second, the $500,000 fine is only half the statutory maximum fine, and two and a half times the advisory guidelines maximum.  That is a far cry from *Bajakajian*

85

where the forfeiture exceeded the guidelines maximum fine "by a factor of more than 70." *United States v. Jose*, 499 F.3d 105, 112 (1st Cir. 2007). And it compares very favorably with *Carpenter*, in which this Court affirmed a forfeiture that was about three-quarters the statutory maximum fine and 140 times the guidelines maximum fine. 941 F.3d at 3, 11 & n.8; *see also Jose*, 499 F.3d at 112 (upholding forfeiture that was "less than 4 times the maximum fine allowable under the Guidelines").

Third, although the district court noted that there was no evidence that Fabian's offenses caused patient harm, its sentencing decision was informed by two factors pertinent here: (a) that it "is critically important to protect . . . the integrity of the regulatory process . . . [and] that the public have confidence in what the FDA does"; and (b) that "[t]his was a crime about money" and "in the corporate environment in which we live, I do feel that to accomplish general deterrence, the best way I can do that is by [a] financial penalty." [D.546 at 36-38]; *see, e.g.*, *Aguasvivas-Castillo*, 668 F.3d at 17 (finding it significant in analyzing the third *Heldeman* prong that the crime "occurred for many years" and "was done out of greed by someone in a position of leadership who should have been a role model of proper and right behavior.").

For all these reasons, the district court's fine should be affirmed.

## VI. THE ARGUMENTS OF *AMICI CURIAE* DO NOT SUPPORT REVERSAL.

Fabian's and Facteau's filings in this appeal are supplemented by the briefs of four *amici curiae*: Members of the Medical Information Working Group ("MIWG"); Pharmaceutical Research and Manufacturers of America and Chamber of Commerce of the United of America ("PRMA/COC"); Howard Root ("Root"); and Washington Legal Foundation ("WLF"). Collectively, *amici* seek to further support the above-referenced First Amendment and due process claims while also advancing policy arguments regarding the importance of medical innovation. None of the arguments provides a basis for reversal here.

### A. First Amendment arguments.

The briefs of *amici* PRMA/COC and WLF focus principally on the argument that this prosecution implicates the First Amendment, [*see* PRMA/COC Br.6-27; WLF Br.18-31], a point Root also addresses. [*See* Root Br.7-9]. Their arguments, however, start from a false premise—that the defendants' convictions relied solely on truthful, non-misleading commercial speech, [*see* PRMA/COC Br.4 ("defendants were . . . convicted of misbranding and adulteration based exclusively on those truthful and non-misleading promotional statements"); Root Br.9 ("the government's view [was] that truthful speech about [off-label use] transformed the

lawful sale of the [Stratus] into a crime"), or, in WLF's case, that there was an unreasonable risk that the convictions *may* have so relied. [WLF Br.29-31].

That the government's case against the defendants did not depend solely or even principally on truthful commercial speech should by now be abundantly clear. The government introduced evidence at trial of numerous factors apart from promotional speech to prove Stratus's intended use, including internal communications regarding its purpose, function, and commercial value; testimony and documents describing its functional design and Acclarent's misrepresentation of that design during the regulatory process; and marketing plans and trainings. *See supra*, pp.56-57. The government also introduced evidence from which the jury could have found that much of the promotional speech delivered by Acclarent's representatives was false or misleading. *See supra*, p.57. And the court's instructions expressly and repeatedly stated that the jury could not convict based on truthful, non-misleading speech. [27:147-48].

PRMA/COC and Root seek to skirt the issue by arguing that the jury *must* have relied only on truthful, non-misleading speech because they acquitted the defendants of the counts involving fraud. [PRMA/COC Br.17-18; Root Br. 4]. But this proves nothing. The Supreme Court has long made clear that no such inferences may be drawn from an acquittal, which may be the result of "mistake, compromise, [or] lenity," *United States v. Cianci*, 378 F.3d 71, 91 (1st Cir. 2004) (quoting *United*

88

*States v. Powell*, 469 U.S. 57, 65-67 (1984)), or an indication that the jury found the proof insufficient for other, unrelated reasons.[52]   Indeed, a jury may acquit a defendant on one charge but convict on another based on exactly the same evidence. *Cianci*, 378 F.3d at 92.   *Amici*'s argument also requires the Court to presume, without evidence, that the jury ignored its instructions, but precedent forbids this.[53] *United States v. Padilla-Galarza*, 889 F.3d 60, 81 (1st Cir. 2021) ("[W]e must presume—in the absence of any evidence to the contrary—that the jurors heeded [their instructions].").

PRMA/COC also seeks to imply by clever juxtaposition that the voluminous evidence of internal communications showing Stratus's intended use might fall within the ambit of speech protected by the First Amendment, [PRMA/COC Br. at 18-19], but this is plainly wrong.   *Wine & Spirits*, 418 F.3d at 49 (the form of commercial speech protected by the First Amendment is "the communication of truthful information *to potential customers*" about a transaction) (emphasis added). Moreover, PRMA/COC's claim that the government "offer[ed] no evidence beyond

---

[52] As one example, the fact that the jury did not find that statements were made "*with intent* to defraud or mislead," which PRMA/COC notes in its brief, [PRMA/COC Br.17-18 (emphasis added)], does not equate to a finding that the statements themselves were not false or misleading.

[53] PRMA/COC also suggests that the district court itself found that all the promotional speech was truthful, [PRMA/COC Br.18], but review of its ruling makes clear it was merely characterizing defense arguments.  [PFAdd.33].

protected speech," [PRMA/COC Br. at 19], would still be false even if this were so, since the physical design and operation of Stratus and evidence of Acclarent's conduct provided compelling evidence of intent not grounded in speech. *See Wine & Spirits*, 418 F.3d at 49 (holding that creation of advertising materials and facilitation of their use was non-expressive conduct, not protected speech).

Because the defendants were not prosecuted for, or convicted of, FDCA violations based solely on truthful, non-misleading speech, the First Amendment arguments of PRMA/COC and Root are, by their own terms, irrelevant. [PRMA/COC Br.6 (argument advanced is that "Misbranding and Adulteration Prosecutions that Rest on Truthful, Non-Misleading Speech About Off-Label Uses Violate the First Amendment"); Root Br.4 (asking the Court to "hold that it violates the First Amendment to prosecute someone based on truthful, non-misleading speech about an off-label use").].

WLF takes a different tack, declining to argue that the defendants *were* convicted based on truthful, non-misleading statements but instead arguing that the district court's instructions failed to sufficiently preclude the possibility that they might have been. [WLF Br.17-18, 29-31]. No analogous challenge to the jury instructions appears to have been raised by either defendant on appeal, however, or preserved below. As a result, the issue is not properly before this Court. *See Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 705 n.22 (1st Cir. 1994) ("*[A]mici*

90

cannot usurp the litigants' prerogative and introduce new issues or issues not properly preserved for appeal."). In any event, WLF's assertion that the defendants "most likely were convicted for no more than their truthful, non-misleading off-label promotion and marketing of Stratus," [WLF Br.17-18], thus triggering consideration of the issues that concerned the Second Circuit in *Caronia*, [WLF, pp.18-20], is speculative and lacks force for reasons addressed above.

## B. **Due Process.**

*Amicus* MIWG's brief focuses on defendants' claims of unconstitutional vagueness, [MIWG Br.7-34], and other *amici* also address the issue at least briefly. [PRMA/COC Br.25-27; Root Br.8-9]. Their arguments, however, do not provide any stronger basis than defendants' for reversal on this ground. Indeed, many of the uncertainties they allege have nothing to do with this case.

MIWG begins by seeking to ground its claim of vagueness in proposed and finalized (but never implemented) revisions to the "intended use" regulation between 2015 and 2020 that sought to clarify language in the prior rule suggesting that a manufacturer's knowledge of an off-label use of an approved or cleared product could establish an "intended use." [MIWG Br.12-20]. The government disagrees that these unimplemented rules reflect a recent change in agency position—MIWG concedes that, even before the changes, FDA was careful to state that knowledge of an off-label use alone could *not* be sufficient to establish an intended use. [MIWG

91

Br.13 & n.4].   But even if it did, it is unclear how that could have affected defendants' due process rights.

First, the defendants' actions took place years *before* these proposed changes in the regulation and thus they could not have been confused by the different proposals as to what evidence could prove "intended use" when they committed the acts in question.   Second, the district court expressly instructed the jury that knowledge of an off-label use was not alone sufficient to establish an intended use. [*See* 27:149 ("Mere knowledge that doctors are using a device for purposes other than its labeled use does not give rise to a new intended use.")].   This removed any possibility that the jury might convict based on the regulatory language that these proposed and stayed rules called into question.   *Padilla-Galarza*, 889 F.3d at 81. Third, the regulatory process has now concluded with a final rule that comports with the instructions under which this case was tried—thus, there can be no argument that defendants were disadvantaged.

MIWG next tries to find vagueness in FDA's "safe harbor" guidance documents, [MIWG Br.20-23], but these arguments are even further afield.   MIWG does not suggest that the defendants took any actions based on the guidance documents or attempt to explain how any ambiguity in, say, FDA's recommended approach to distributing reprints is pertinent to anything that happened here.   And once again, the district court's instructions gave the defendants the benefit of the one

potentially applicable guidance—that truthful, non-misleading responses to unsolicited questions are not evidence of intended use. [27:149 ("[I]t is permissible to respond to unsolicited requests for information about FDA-regulated medical products by providing truthful, balanced, non-misleading and non-promotional scientific or medical information that is responsive to the specific request, even if responding to the request requires a manufacturer to provide information on unapproved or uncleared indications or conditions of use. Under these circumstances, such responses may not be considered as evidence of a new or different 'intended use.'")].

MIWG and other *amici* also rehash the argument that decisions in the federal courts differed as to whether evidence other than marketing statements could be considered, [MIWG Br.24-28; *see* PRMA/COC Br.25-27], but, as argued above, this simply is not true. Rather, decades of precedent upheld a broad view of what could be used to prove "intended use" and the instruction in this case was consistent with that precedent. Further, even if some courts had disagreed—which they did not—their disagreement would not mean the statute or regulation was unconstitutionally vague. *Williams*, 442 F.2d at 660; *White*, 328 F.3d at 1368.

### C.    Policy Considerations.

*Amicus* Root, while joining the foregoing claims, focuses on an argument that the existing regulatory structure undermines innovation and chills the ability of

industry to communicate with users of their products when potentially beneficial off-label uses arise.  [Root Br.15-24].  This point is echoed by other *amici*.  [*See* MIWG Br.20, 23, 34; WLF Br.8-11].  Root goes on to posit a conversation in which a CEO of a medical device company becomes aware of an off-label use of a product and is confused about what may be done to avoid legal liability.  [Root Br.22-23].

The suggestion that the situation described would present a significant risk of legal liability is dubious, given FDA's long-standing practice, now codified in regulation, that mere knowledge of a potential unapproved use for an approved product does not create a new intended use.  [G.Add.52].  But in any event, these circumstances, and the others Root posits, bear no resemblance to what happened here.  The government's evidence in this case showed, and the jury could have found, that Acclarent knew at all times that Stratus could only function as a drug delivery device.  The company nonetheless tried to game the approval process by lying about the device's abilities to obtain clearance with a false intended use and then sought clearance for what was always its true intended use.  When the first step in its plan succeeded but the second failed, Acclarent went ahead and marketed the device for the unapproved intended use—and not for the limited, cleared intended use. Discouraging companies and their officers from engaging in such brazen misrepresentations to avoid obtaining needed approvals before they market a

94

medical device intended to be inserted into the human body and release powerful drugs is entirely appropriate.

## **CONCLUSION**

For these reasons, the government respectfully requests that the Court affirm the judgments.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By:    /s/ *Randall E. Kromm*
RANDALL E. KROMM
Assistant U.S. Attorney

# CERTIFICATE OF COMPLIANCE WITH
## Rule 32(a)

### Certificate of Compliance with Type-Volume Limit,
### Typeface Requirements, and Type-Style Requirements

1.    This brief contains **22,659** words.  On November 10, 2021, the undersigned filed a request for leave to file an oversized brief of not more than 25,000 words.  That motion remains pending.  The current brief is significantly shorter than that request (excluding the parts of the brief exempted by Fed. R. App. P. 32(f) (*i.e.*, the corporate disclosure statement, table of contents, table of citations, addendum, and certificates of counsel)) and is being filed with a motion for leave to file the brief instanter.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Microsoft Word version 2016.

 /s/ *Randall E. Kromm*
RANDALL E. KROMM
Assistant U.S. Attorney

Dated:  November 24, 2021

96

## <u>**CERTIFICATE OF SERVICE**</u>

I, Randall E. Kromm, Assistant U.S. Attorney, hereby certify that on November 24, 2021, I electronically served a copy of the foregoing document on the following registered participants of the CM/ECF system:

<u>*Counsel for Defendant William Facteau*</u>
Michael Pineault, Esq.
Anderson & Kreiger LLP
50 Milk Street, 21st Floor
Boston, MA 02109

Reid Weingarten, Esq.
William Hassler, Esq.
Shannen W. Coffin, Esq.
Bruce C. Bishop, Esq.
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

<u>*Counsel for Defendant Patrick Fabian*</u>
Frank A. Libby, Jr., Esq.
Brian J. Sullivan, Esq.
Libby Hoopes Brooks, P.C.
399 Boylston Street
Boston, MA 02116

<u>/s/ *Randall E. Kromm*</u>
RANDALL E. KROMM
Assistant U.S. Attorney

97

**Appeal No. 21-1080**

### UNITED STATES OF AMERICA,
**Appellee**

**v.**

### WILLIAM FACTEAU,
**Defendant-Appellant**
_____

**Appeal No. 21-1082**

### UNITED STATES OF AMERICA,
**Appellee**

**v.**

### PATRICK FABIAN,
**Defendant-Appellant**

## Addendum Table of Contents

1.      June 26, 2006 email from Chan to Oakes *et al.*
        re: 510(k) strategy for Sinus Stent, [Exh.2561] ......................G.Add.1

2.      Pages from FDA review package for October 9, 2007
        "All Sinuses" 510(k), [Exh.2436.1, pp.1 & 29]......................G.Add.3

3.      January 3, 2008 email from Harfe to Barriger
        re: implications of launch w/saline clearance, [Exh.387] ........G.Add.5

4.      March 10, 2008 email from Harfe to Barrigar
        re: Facteau approval to sell at Sinus Forum, [Exh.519]............G.Add.7

5.      December 15, 2008 email from Harfe, Muni to Barrigar
        re: maximum number of Stratus/person, [Exh.1092] ...............G.Add.8

7.      March 2, 2010 email from Facteau to Fabian
        re: Best Practices Notes, [Exh.1818] ......................................G.Add.12

6.      March 12, 2010 email from Vanderkarr to Ohio Valley Sales
        re: Best Practices Notes w/Fabian comments, [Exh.1826] ....G.Add.13

8.      Transcript, January 13, 2021 Sentencing of Facteau
        (pages 1, 41-42) ......................................................................G.Add.20

9.      Transcript, January 13, 2021 Sentencing of Fabian
        (pages 1, 10, 31-32, 36-40) ....................................................G.Add.23

10.     86 Fed. Reg. 41383 (Aug. 2, 2021)
        Regulations Regarding "Intended Use": Final Rule ...............G.Add.32

11.     21 C.F.R. §801.4 (Meaning of intended uses)
        Effective September 1, 2021 ....................................................G.Add.52

**From:**          Randy Chan
**Sent:**          Monday, June 26, 2006 1:02 PM
**To:**            Mark Bishop; Julie Vrany; Wendy Oakes
**Cc:**            Tom Wisted; Hung Ha; John Morriss
**Subject:**       FW: Sinus Stent 510(k) Strategy Meeting Minutes

**Follow Up Flag:**     Follow up
**Flag Status:**        Completed


Fyi on Sinus Stent 510(k) strategy.  We can discuss more at Thursdays Big Team meeting.

Randy


**From:** Jose Lopez Del Toro
**Sent:** Thursday, June 22, 2006 6:14 PM
**To:** Randy Chan
**Subject:** FW: Sinus Stent 510(k) Strategy Meeting Minutes


FYI.

**From:** Jose Lopez Del Toro
**Sent:** Thursday, June 22, 2006 6:13 PM
**To:** Ketan Muni; Su-Mien Chong; Deb Cogan; Antoanela Gomard
**Subject:** Sinus Stent 510(k) Strategy Meeting Minutes

Meeting Time / Date / Location:  10:00 a.m. to 10:45 a.m. / 6-22-06 / La Jolla Conference Room

Attendees:
Su-Mien Chong
Deb Cogan
Antoanela Gomard
Ketan Muni
José A. López Del Toro

- It was agreed upon that the product name would be the **Ethmoid Sinus Stent**.

- Su-Mien requested José to focus in the following two sections of the Ethmoid Sinus Stent Traditional 510(k):

    o  Description of the Device along with the corresponding subsections.
    o  Substantial Equivalency along with the corresponding subsections.

- José will draft these two sections and will send it for review and feedback to Deb Cogan, Su-Mien Chong and Ketan Muni (or Randy Chan).
    o  Target date: next week.

- No bench testing is required and not minimum or maximum balloon holes study is required.

- Deb Cogan clarified that the filing strategy is to present the ethmoid sinus stent as a spacer that would fill the sinus stent.  The balloon would elute saline which will lubricate the sinus area to facilitate an easier removal of the ethmoid sinus stent.  The elution rate is not a factor that would be explained in the filing.  The stent is not intended to remain inflated and it is not intended to treat the sinus as well.  Moreover, the sinus stent would not be used to open the ethmoid sinus, since the balloon pressure is less than 15 psi.  The sinus stent would maintain a patent

1





CONFIDENTIAL: Produced pursuant to 04/26/2012 subpoena

sinus and would lubricate the area to facilitate the removal of the stent.  The stent delivers saline to the ethmoid sinus area to lubricate the area, however the elution rate is not considered a factor of concern.

- o  The sinus stent wings will spread against the bulla , which will allow the saline to lubricate the area that would facilitate an easy removal of the device.

- The filing would be utilizing POC data.

- José will reference the 510(k) number for the needle and sheath in the description of the device.  Su-Mien provided the 510(k) number as K043445, however José will confirm the accuracy of the number from the Regulatory drive.

- José will provide Wendy Oakes a copy of the Rains Frontal Sinus IFU and label.  (Action item completed).

- Su-Mien will provide to José the Releiva Sinus Balloon Catheter Traditional 510(k) in order to use it as a template for the Ethmoid Sinus Stent 510(k).

Please feel free to correct or clarify any statement made above.

Thanks,
José

**G.Add.2**

CONFIDENTIAL: Produced pursuant to 04/26/2012 subpoena                                                ACC-035-0000049

OCT 1 0 2007

*K-3*    *K072891*

Received

Form Approved: OMB No. 0910–511 Expiration Date: January 31, 2010. See Instructions for OMB Statement.

| DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>FOOD AND DRUG ADMINISTRATION<br>**MEDICAL DEVICE USER FEE COVER SHEET** | PAYMENT IDENTIFICATION NUMBER: **MD6032833-956733**<br>Write the Payment Identification number on your check. |
|---|---|

A completed Cover Sheet must accompany each original application or supplement subject to fees. The following actions must be taken to properly submit your application and fee payment:

1. Electronically submits the completed Cover Sheet to the Food and Drug Administration (FDA) before payment is sent.
2. Include printed copy of this completed Cover Sheet with a check made payable to the Food and Drug Administration. Remember that the Payment Identification Number must be written on the check.
3. Mail Check and Cover Sheet to the US Bank Lock Box, FDA Account, P.O. Box 956733, St. Louis, MO 63195-6733. (*Note: In no case should payment be submitted with the application.*)
4. If you prefer to send a check by a courier, the courier may deliver the check and Cover Sheet to: US Bank, Attn: Government Lockbox 956733, 1005 Convention Plaza, St. Louis, MO 63101. (Note: This address is for courier delivery only. Contact the US Bank at 314-418-4821 if you have any questions concerning courier delivery.)
5. For Wire Transfer Payment Procedures, please refer to the MDUFMA Fee Payment Instructions at the following URL: http://www.fda.gov/cdrh/mdufma/faqs.html#3a. You are responsible for paying all fees associated with wire transfer.
6. Include a copy of the complete Cover Sheet in volume one of the application when submitting to the FDA at either the CBER or CDRH Document Mail Center

| 1. COMPANY NAME AND ADDRESS (include name, street address, city state, country, and post office code)<br><br>ACCLARENT INC<br>1525-B O'Brien Drive<br>Menlo Park CA 94025<br>US<br>1.1 EMPLOYER IDENTIFICATION NUMBER (EIN)<br>201772549 | 2. CONTACT NAME<br>Keri Yen<br>2.1 E-MAIL ADDRESS<br>kyen@acclarent.com<br>2.2 TELEPHONE NUMBER (include Area code)<br>650-687-5874<br>2.3 FACSIMILE (FAX) NUMBER (Include Area code)<br>null-null |
|---|---|

3. TYPE OF PREMARKET APPLICATION (Select one of the following in each column; if you are unsure, please refer to the application descriptions at the following web site: http://www.fda.gov/dc/mdufma)

Select an application type:

[X] Premarket notification(510(k)); except for third party
[ ] 513(g) Request for Information
[ ] Biologics License Application (BLA)
[ ] Premarket Approval Application (PMA)
[ ] Modular PMA
[ ] Product Development Protocol (PDP)
[ ] Premarket Report (PMR)
[ ] Annual Fee for Periodic Reporting (APR)
[ ] 30-Day Notice

3.1 Select one of the types below
  [X] Original Application
Supplement Types:
  [ ] Efficacy (BLA)
  [ ] Panel Track (PMA, PMR, PDP)
  [ ] Real-Time (PMA, PMR, PDP)
  [ ] 180-day (PMA, PMR, PDP)

4. ARE YOU A SMALL BUSINESS? (See the instructions for more information on determining this status)
[ ] YES, I meet the small business criteria and have submitted the required     [X] NO, I am not a small business
qualifying documents to FDA
4.1 If Yes, please enter your Small Business Decision Number:

5. IS THIS PREMARKET APPLICATION COVERED BY ANY OF THE FOLLOWING USER FEE EXCEPTIONS? IF SO, CHECK THE APPLICABLE EXCEPTION.
[ ] This application is the first PMA submitted by a qualified small business,     [ ] The sole purpose of the application is to support
including any affiliates, parents, and partner firms     conditions of use for a pediatric population
[ ] This biologics application is submitted under secion 351 of the Public     [ ] The application is submitted by a state or federal
Health Service Act for a product licensed for further manufacturing use only.     government entity for a device that is not to be distributed
    commercially

6. IS THIS A SUPPLEMENT TO A PREMARKET APPLICATION FOR WHICH FEES WERE WAIVED DUE TO SOLE USE IN A PEDIATRIC POPULATION THAT NOW PROPOSES CONDITION OF USE FOR ANY ADULT POPULATION? (If so, the application is subject to the fee that applies for an original premarket approval application (PMA).)

[ ] YES          [X] NO

7. USER FEE PAYMENT AMOUNT SUBMITTED FOR THIS PREMARKET APPLICATION
$3,404.00                                                                05-Oct-2007

Form FDA 3601 (01/2007)

"Close Window"  Print Cover sheet

*SU II*

GOVERNMENT EXHIBIT
2436.1

Acclarent

**Sinus Spacer**

Special 510(k)
CONFIDENTIAL

# SECTION 9: LETTERS TO FILE

In accordance with 21CFR 820.30(i), all design modifications are evaluated to determine the impact of the modification on device safety and efficacy. A representative table of the Letters to File for K062458 is provided below. This table represents all design modifications to date that were determined via risk analysis to be insignificant. Documentation supporting these modifications has been filed in their respective Design History File.

**Table 3. Letters to File for the K062458**

| Product Name | Description | Discussion | Supporting Data | Justification |
|---|---|---|---|---|
| Ethmoid Sinus Spacer | 1. Increase dimension of suture eyelet. <br><br> 2. Increased membrane permeability. | 1. A larger suture eyelet allows for easier threading of a suture. <br><br> 2. Increase moistening of tissue surrounding the spacer. | -Design Verification Testing <br><br> -Sterilization adoption <br><br> -Design Validation Testing | 1. -Design verification testing was completed for dimensions and separation force from the shaft <br><br> -Sterilization data for the previous suture eyelet design was found applicable to the larger dimension <br><br> - Design Validation was conducted in a cadaver model to determine that the larger suture eyelet could be attached. <br><br> 2. - Device permeability was modified to increase the distribution of saline. |
| Ethmoid Sinus Spacer | Expand implantation time from 14 days to up to 28 days. | Provides surgeon with more flexibility on the duration of implantation. | -Clinician Feedback <br><br> -Risk Assessment <br><br> -Biocompatibility Testing | -No new safety or efficacy issues were identified by physicians. <br><br> -A Hazard Analysis was conducted with no new risks identified <br><br> -Biocompatibility testing was conducted for 28 day implant and the device was found to be biocompatible for this duration of implantation. |

**G.Add.4**

109

| | |
|---|---|
| **From:** | Dan Harfe |
| **Sent:** | Thursday, January 03, 2008 11:36 AM |
| **To:** | Fred Barrigar |
| **Subject:** | RE: CONDOR |

Sorry- end of year financial stuff going on over lunch today.

D

---

**From:** Fred Barrigar
**Sent:** Thursday, January 03, 2008 11:07 AM
**To:** Dan Harfe
**Subject:** RE: CONDOR

Thanks for the info.  Hey, you up for lunch today?   I've been meaning to sit down with you and get your feedback on me and also float a few questions by you about getting some experience in the strategic marketing world.

Lemme know if you are free today for lunch.

Fred Barrigar
Program Manager
**Acclarent, Inc.**
*Shaping the Future of ENT Care*

650.687.4446 phone
408.203.3001 cell
650.687.5886 fax

**www.acclarent.com**

This e-mail transmission including any attachments or previous e-mails is intended for the addressee only and may contain information that is **confidential and/or privileged.** Unless you are the addressee (or are authorized to receive this e-mail for the addressee), you may not use, copy, or disclose this e-mail or any information contained in this e-mail. If you have received this e-mail in error, please advise Acclarent, Inc. by return e-mail or telephone (650)687-5888.

---

**From:** Dan Harfe
**Sent:** Thursday, January 03, 2008 10:44 AM
**To:** Fred Barrigar
**Subject:** FW: CONDOR

Fyi- just sent this to Karen so she's aware of what is at risk.

I'll see how far she gets with Bill on this, and may need to have an intervention myself…

D

---

**From:** Dan Harfe
**Sent:** Thursday, January 03, 2008 10:41 AM
**To:** Karen Long
**Subject:** CONDOR

Karen,

1



**G.Add.5**



CONFIDENTIAL: Produced pursuant to 04/26/2012 subpoena

Here's a list of the assumptions that drove the drug program model that might be changing, pending the FDA outcome.  IF the FDA comes back with requirements that we perceive to be quite onerous and cannot secure a drug indication by Sept, here are the assumptions that have changed:

- No drug indication at launch.  Obvious implications here with regards to inability to market/discuss the device.
- FIM is on hold.  Original schedule showed FIM 2 month publication with 30 pts in Q109 and 1yr in Q1 2010.  This is unlikely to happen now.
- Study 2 start Q208.  This is the follow-on study of an additional 50-100 pts (no blood draws) that was to be published Q1 2010.  This is also unlikely.
- 510(k) for frontal indication Q108.  Recall that the drug model is built around both ethmoid and frontal products.  Our frontal program was to begin in earnest in Q308, which also appears at significant risk, as the team will not come off ethmoid as planned.
- FIM frontal publication (6mo) in Q309 is at significant risk now.
- We had assumed spotty (~30%) device reimbursement using miscellaneous codes.  If surgeons choose to use our device off-label and payers review op reports (Jenn D isn't sure about this one) there is no reimbursement available under misc codes.  Some sgns may still code as an ethmoidectomy, but this doesn't recover device-related costs
- Commericial launch of "second therapeutic" (antibiotic?) in Q3 2010 is at significant risk if our understanding of the regulatory path is significantly changed by the upcoming FDA interactions
- The bioresorbable program was not projected to add any revenue in  the model period (through 2012) so no additional issues there

I wanted you to be aware of the specific assumptions in the model, the potential changes that might result from upcoming FDA discussions, and the significant implications for our revenue projections.

D


_____
Acclarent, Inc.
Shaping the Future of ENT Care

408 887 9661 cell
dharfe@acclarent.com

2

# G.Add.6

**From:** Dan Harfe
**Sent:** Monday, March 10, 2008 10:25 AM
**To:** Fred Barrigar
**Subject:** feedback from Bill re: Condor

Lets start selling @ Sinus Forum.  He's all for it.

We'll talk later about how to make this happen.

D

_____

Acclarent, Inc.
Shaping the Future of ENT Care

408 887 9661 cell
dharfe@acclarent.com

1

**G.Add.7**



**From:** Fred Barrigar
**Sent:** Monday, December 15, 2008 1:54 PM
**To:** Dan Harfe; Ketan Muni
**Subject:** RE: Training question

Ketan,

Did we get this communicated to Bill?  The min and max safety factors as you stated?

-Fred

Fred Barrigar
Program Manager
**Acclarent, Inc.**
**Shaping the Future of ENT Care™**

650.687.4446 office phone
408.203.3001 cell phone
650.687.5889 fax


**www.acclarent.com**

*This e-mail transmission including any attachments or previous e-mails is intended for the addressee only and may contain information that
is **confidential and/or privileged.**  Unless you are the addressee (or are authorized to receive this e-mail for the addressee), you may not use, copy, or
disclose this e-mail or any information contained in this e-mail.  If you have received this e-mail in error, please advise Acclarent, Inc. by return e-mail or
telephone (650)687-5888.*

**From:** Dan Harfe
**Sent:** Monday, December 01, 2008 10:08 AM
**To:** Ketan Muni; Fred Barrigar
**Subject:** RE: Training question

Fyi- I have heard Bill state several times in investor presentations that we have a 5X to 10X safety factor.  Either he has
been misled, or forgot.

In either case, we need to update him so he's saying the right stuff.

Volunteers?

D


_____
**Dan Harfe**
**Director, Marketing**
**Acclarent, Inc.**
Shaping the Future of ENT Care™
408.887.9661 cell
650.687.6056 office


**http://www.acclarent.com/**

*This e-mail transmission including any attachments or previous e-mails is intended for the addressee only and may contain information that is **confidential and/or
privileged.**  Unless you are the addressee (or are authorized to receive this e-mail for the addressee), you may not use, copy, or disclose this e-mail or any
information contained in this e-mail.  If you have received this e-mail in error, please advise Acclarent, Inc. by return e-mail or telephone (650)687-5888.*

1

**G.Add.8**



GOVERNMENT
EXHIBIT

**1092**

CONFIDENTIAL: Produced pursuant to 04/26/2012 subpoena

**From:** Ketan Muni
**Sent:** Monday, December 01, 2008 9:58 AM
**To:** Debra Cogan; Fred Barrigar; Heather Pelayo; Dan Harfe; Nick Sherman; Matt Brokaw
**Subject:** RE: Training question

- Each bottle of Nasacort HFA contains **15mg** of TA
- Two spacers (implant)contain **8mg** of TA
- Our current safety margin is approximately **2X**

- **Based on some preliminary testing of explants we may have delivered up to 7mg of TA in the worst case.**

- **Therefore our safety margin would be around 2X.**

- **My recommendation is to limit two spacers at one time.**

---

**From:** Debra Cogan
**Sent:** Monday, December 01, 2008 9:30 AM
**To:** Fred Barrigar; Heather Pelayo; Dan Harfe; Nick Sherman; Matt Brokaw; Ketan Muni
**Subject:** RE: Training question

No because it is Ethmoid only. dc

*Regards,*
*Debbie*

_____

**Debra Cogan**
Tel: 650.687.5857
Fax: 650.687.4449

---

**From:** Fred Barrigar
**Sent:** Monday, December 01, 2008 9:15 AM
**To:** Heather Pelayo; Dan Harfe; Nick Sherman; Matt Brokaw; Ketan Muni
**Cc:** Debra Cogan
**Subject:** RE: Training question

Do we have anything in our OUS IFU referring to the package insert of the associated TA being used?

Fred Barrigar
Program Manager
**Acclarent, Inc.**
**Shaping the Future of ENT Care™**

650.687.4446 office phone
408.203.3001 cell phone
650.687.5889 fax

**www.acclarent.com**

2

# G.Add.9

CONFIDENTIAL: Produced pursuant to 04/26/2012 subpoena                          ACC-028-0043488

*This e-mail transmission including any attachments or previous e-mails is intended for the addressee only and may contain information that is confidential and/or privileged. Unless you are the addressee (or are authorized to receive this e-mail for the addressee), you may not use, copy, or disclose this e-mail or any information contained in this e-mail. If you have received this e-mail in error, please advise Acclarent, Inc. by return e-mail or telephone (650)687-5888.*

**From:** Heather Pelayo
**Sent:** Monday, December 01, 2008 8:34 AM
**To:** Dan Harfe; Nick Sherman; Matt Brokaw; Ketan Muni
**Cc:** Fred Barrigar; Debra Cogan
**Subject:** RE: Training question
**Importance:** High

So this is how I am taking care of this risk mitigation. Deb and I came up with this wording. Is this acceptable to all of you before I route?

"Physician training covers use of Spacers in ethmoids only with saline in the U.S. OUS physicians will be trained to consult the TA package insert for the desired dose and training will provide information on how dose translates into the number of implants."

HP


**Heather Pelayo**
**Clinical Affairs**

**Clinical Research Associate II**

 **Acclarent, Inc.**

**Shaping the Future of ENT Care™**

650.687.4471 phone




**From:** Dan Harfe
**Sent:** Wednesday, November 26, 2008 9:55 PM
**To:** Heather Pelayo; Nick Sherman; Matt Brokaw; Ketan Muni
**Cc:** Fred Barrigar
**Subject:** RE: Training question

We make no such recommendations in training. I'm assuming this is a hazard for OUS only, as US surgeons are directed to put saline in the device.

We've had several conversations about this very topic, and I thought the action was back to Ketan to guide us to safety levels OUS with Kenalog assuming that at some point in the future we'll get a frontal indication there and surgeon decides to implant multiple devices.

D

---

**Dan Harfe**
**Director, Marketing**
**Acclarent, Inc.**
Shaping the Future of ENT Care™
408.887.9661 cell
650.687.6056 office

3

# G.Add.10

CONFIDENTIAL: Produced pursuant to 04/26/2012 subpoena                    ACC-028-0043489

http://www.acclarent.com/

*This e-mail transmission including any attachments or previous e-mails is intended for the addressee only and may contain information that is **confidential and/or privileged**.  Unless you are the addressee (or are authorized to receive this e-mail for the addressee), you may not use, copy, or disclose this e-mail or any information contained in this e-mail.  If you have received this e-mail in error, please advise Acclarent, Inc. by return e-mail or telephone (650)687-5888.*

**From:** Heather Pelayo
**Sent:** Wednesday, November 26, 2008 8:59 AM
**To:** Nick Sherman; Dan Harfe; Matt Brokaw
**Subject:** Training question

Hi all,

I am finishing up the HZA and I have a question with regards to training.  One of our hazards states 'physician chooses to use multiple Spacers in a patient'.  I am trying to add in risk controls and so I was wondering how we train our physicians with regards to this?  Do we make a suggestion as to how many Spacers to implants at a time?  Or maybe rather a number that they shouldn't go over?

Thanks for any help you can give me.

**Heather Pelayo**
**Clinical Affairs**

**Clinical Research Associate II**

 **Acclarent, Inc.**

**Shaping the Future of ENT Care™**

650.687.4471 phone

4

# G.Add.11

                                    ACC-028-0043490

**To:**      Pat Fabian[PFabian@acclarent.com]
**From:**   Bill Facteau
**Sent:**     Tue 3/2/2010 9:20:22 PM
**Subject:**  RE: Best Practice Notes

Good stuff.

**Bill Facteau**
**President & CEO**
Acclarent, Inc.
**Shaping the Future of ENT Care™**
650.687.5840 office
925.683.3258 cellular

**http://www.acclarent.com/**

*This e-mail transmission including any attachments or previous e-mails is intended for the addressee only and may contain information that is **confidential and/or privileged**. Unless you are the addressee (or are authorized to receive this e-mail for the addressee), you may not use, copy, or disclose this e-mail or any information contained in this e-mail. If you have received this e-mail in error, please advise Acclarent, Inc. by return e-mail or telephone (650)687-5888.*

⸺⸺⸺

**From:** Pat Fabian
**Sent:** Tuesday, March 02, 2010 8:55 AM
**To:** Bill Facteau
**Subject:** FW: Best Practice Notes

FYI – doing all we can do to drive additional revenue. These were covered on our monthly sales and training management call yesterday.

**Patrick Fabian**
**Sr. Vice President WW Sales & Training**
Acclarent, Inc.
651-714-9526 office
612-961-8026 cellular

http://www.acclarent.com/

⸺⸺⸺

**From:** Roy O'Hanley
**Sent:** Tuesday, March 02, 2010 7:49 AM
**To:** Sales & Training Management
**Subject:** Best Practice Notes

Management Team:

Here are your bullet points from the Best Practices Discussion last night for use during your regional conference calls…..

Good Selling - Roy

Lee Langford

**G.Add.12**



CONFIDENTIAL: Produced pursuant to 04/26/2012 subpoena

**From:** Mollie Vanderkarr
**Sent:** Friday, March 12, 2010 1:19 PM
**To:** Ohio Valley Sales
**Subject:** FW: Best Practice Notes

Below is a review of last week's mgmt call regarding Best Practices. (the notes highlighted in red are Pat's comments)

We will focus on a of these couple items during our conf call today (3:30EST).

**Mollie Vanderkarr**
**Regional Sales Manager**
**Acclarent, Inc.**
**Shaping the Future of ENT Care™**

847-687-8177 mobile

650.687.5886 Customer Service fax

www.acclarent.com

*This e-mail transmission including any attachments or previous e-mails is intended for the addressee only and may contain information that is **confidential and/or privileged.** Unless you are the addressee (or are authorized to receive this e-mail for the addressee), you may not use, copy, or disclose this e-mail or any information contained in this e-mail. If you have received this e-mail in error, please advise Acclarent, Inc. by return e-mail or telephone (650)687-5888.*

**From:** Pat Fabian
**Sent:** Tuesday, March 02, 2010 10:53 AM
**To:** Roy O'Hanley; Sales & Training Management
**Subject:** RE: Best Practice Notes

Great job team, See questions/comments below in red.

**Patrick Fabian**
**Sr. Vice President WW Sales & Training**
**Acclarent, Inc.**
651-714-9526 office
612-961-8026 cellular

**http://www.acclarent.com/**

**From:** Roy O'Hanley
**Sent:** Tuesday, March 02, 2010 7:49 AM
**To:** Sales & Training Management
**Subject:** Best Practice Notes

Management Team:

# G.Add.13

GOVERNMENT
EXHIBIT

1826

Here are your bullet points from the Best Practices Discussion last night for use during your regional conference calls…..

Good Selling - Roy

Lee Langford

CT in Kids Objection: Very good tips and tricks

As we talk about Adenoids + BSP in PEDs, many doctors who normally do not treat PEDs surgically bring up not wanting to put them through unnecessary CTs.

There are several solutions to this:
"Water's View" (See below for more details) (an x-ray taken at an angle that shows only the sinuses)
"low dose CT" (much like the low dose that we used to use on C-Arm)  Most kids over 4 or 5 can hold still for the 20 seconds needed for many of the new in-office scanners
"less slices on the CT" (instead of 64 slice go with 30)
"scanning only from the orbits to the chin" (since most kids do not have frontals)
"instead of CT use MRI"

1. An x-ray examination is the key to diagnosing sinus problems, such as sinusitis, tumor, or fracture.

- It is a fast, safe, reliable, and economic way to assess abnormalities in sinuses.
- When a sinus X-ray is taken, radiation is momentarily irradiated on the face. X-rays pass through the face to produce an image on film. Structures like bone that are dense and have a high atomic number absorb a lot of X-rays, so less X-rays reach the film and appear white. Fluid, fat, and tumor absorb less X-rays than bone, and appear darker on film. Air in the sinus cavities, which has a low atomic number and density, appears black because most X-rays pass through without being absorbed.
- In the case of sinusitis, the sinuses are filled with inflammatory fluid. It can be detected using X-ray as grayish haziness inside the air-filled black sinuses that are confined in the white bones.
- In spite of the remarkable progress of CT scan or MRI, sinus X-rays continue to provide definitive diagnostic information in many clinical situations, while playing an important role as a simple screening tool in others.
- Conventional sinus X-rays consist of three views:
    1. Waters view -- used to visualize maxillary sinuses

**G.Add.14**

**2.** Caldwell view -- used to visualize frontal and ethmoid sinuses





3. Lateral view

- Additional views:



1.  Rheese view

Ryan Clark Great results, so what is the talk track?

Our region has had a tremendous amount of success recently with our focus on Adenoids + BSP. We left the WWSM with a set of goals and strategies for 2010 and Adenoids + BSP was a top priority.

Goal:

Our goal was to have each ENTC to complete 4 Adenoid + BSP cases in Q1 and then 6 cases in each of the last three quarters.

Background and Initial Result:

Initially, there was a lot of resistance from many of the ENTC's because of their lack of confidence in the message and acceptance of doing unnecessary surgery on children. My first field ride was with Henry Burkhalter and we pre-called a meeting we had with a target for adenoids + BSP. He asked to hear my talk track and I actually ran the call with Dr. Harrison. We left the meeting with a commitment for three adenoid + BSP cases. Henry and I post called and he was very pleased and excited about the call. He was a lot more comfortable at this point with the talk track and realization that doctors were open to this "new" technique.

Results:

- Henry did the cases the following week and secured a commitment for three more cases.
- The partner (an Inactive) of Dr. Harrison committed to do two Adenoid + BSP cases after Henry approached him with the talk track
- Our regional call for February focused on Adenoids + BSP and Henry shared his best practices with updated talk track – This sparked competition as well as the belief that it could be done
- Since the call, Jeff McKeever secured 9 Adenoid + BSP cases when on our field ride – First case today and went great
- Cory Mackey secured 4 cases on our field ride this week with the first one on Monday of next week

While there was some initial hesitancy, the regional conference call really opened up the eyes of our entire team and there is a genuine competition amongst everyone now to get these cases in their territory. We will continue to utilize these strategies and tactics throughout the year.

Matt Cavanaugh good stuff, how are people being successful, what are key's to success?

The SE has adopted the PDP Program as one of our "Best Practices" for the 1st Qtr.

Outcomes:

1) Create Champions through PDP program
    a. Helping with "All Sinuses" and STRATUS implementation
2) Each ENTC has (2) targets and will implement at least initial meeting in 1st Qtr.
3) SE Region has successfully secured Initial Orders and Advanced Training through PDP Program
4) Market Disruption has started to occur and this has created interest in the impacted areas
5) We have been able to secure hospital dollars to help promote Marketing / Education Programs at the hospital level
6) The SE Region has a better understanding on how Activity-Based Targeting helps drive revenue through PDP Program – Not chasing a number
7) PDP Program has been able to open doors that we have not been able to get into before (hospital & surgeon office)
8) PDP Program has enabled us to achieve closer relationship with our surgeons – True "Consultant" relationship
9) PDP Program has helped us sell against competition (Entellus / Medtronic)


Anita Krauss solid process, good stuff!


Sinus Forum Regional Theme " You Want to Be There"
This year's MAJOR SALES EVENT
ENTC's and ENT's should want to be there
Manage ENTC's list actively
Start with 7 – add more as the week progresses
Once a Doc registers, remove from list
If a Doc cannot go due to other obligation, remove from list
As the ENTC's meet with new Docs – add to list
Some Docs had significant problems with registering, follow up with all of them
If they had an issue, get Tiffany or Wendy involved

Holly Deelo  Very nice!

One strategy from the WWSM that has been very impactful is expanding indications through new talk tracks from Dr Hoisington's presentation. His language of treating the "ITIS" of sinusITIS  through the use of stratus has resulted in the following new implants so far;

Need to push on every case

- Expanded stratus indication to ethmoid = 4 docs
- Expanded stratus indication to max = 3 docs
- First time use of stratus = 3 docs

Total 10 new or expanded Docs

Mollie VanderKarr Very nice!

Best practice for the Ohio Valley:
Focus on growing Ethmoid Stratus business

Tools used:
Hoisington 3rd party reference from WWSM
Structural preservation talk track

What can you try between Med Management and Ethmoidectomy that doesn't limit your future options – Partial Ethmoidectomy and stratus

**G.Add.17**

Focus on Docs ballooning Maxillary's – they get the structural preservation aspect already

Result:
Approx $45,000 in new revenue since WWSM

Paul Marini Great results, how do we impact every territory? I don't think Doug can have dinner with everyone!

I will discuss expanding indications for Stratus and in particular the impact of Dr. Hoisington had with Matt Brokaw.  Here's the business situation / outcome:

> ~Dr. Karin was a Stratus every other month customer before NSM
> ~Matt convinced Dr. Karin to consider Stratus for all sinuses when indicated
> ~Matt arranged a peer to peer dinner last week 2/18 with Dr. Hoisington and Dr. Karin
> ~Last week, 8 Stratus Spacers placed in 3 patients including 6 in the maxillary sinuses
> ~Also leveraging the Stratus Registry with this customer

Also ***** Reimbursement doesn't get in the way of many facilities

Tom O'Herron Very nice! Same question as above!

Peer to Peer  in order to derive Stratus acceptance
-    Bruce Hiudkins in Tulsa  - Set as Evolve speaker in OKC
-    We had him come in early to make the rounds.
-    Meet with 3 doc's (not attending the Evolve) who were fence straddlers on Stratus
-    Peer to peer discussion on When, How and Results
-    3 existing BSP Case where stratus was added.
-    2 of the doc committed to a 10 case challenge.
-    Docs and office staff participated in Reimbursement discussions
-    Parlayed into Evolve Training

Neal Balius Look forward to hearing about the results

Peer to Peer

Rural Hospital, Young Champion
Sent an internal Broadcast using the Hospitals regularly scheduled communication format to Family Practitioners
Sent to a total of 55 Docs
(Utilizing Hospital's own "Every Wednesday Regular Broadcast")
Already had several calls – one from 100 miles away.

Chuck Cornish

ASC renegotiation it works!

Las Vegas Facility that had been giving major pushback
Presented Value Proposition to surgeon
Presented Value Proposition to Administration
Utilized Jen Ditlow with coding people
Facility agreed to and is now renegotiating contracts using our slide deck

Jim Jake I like it! A business outcome with every customer facing opportunity!

Focus Products

My Regions theme is ONE Extra thing everyday will lead to big results in the end.

1.   Incorporating Stratus on every call, especially Ethmoid Stratus – Business Outcomes:

- Young Lee has led the country with her Stratus Registry Why?
- Brent Kelley has successfully converted two docs this month to Ethmoid Stratus How?
- Jennifer Vick challenged 3 docs this month to engage in Stratus and has resulted in cases scheduled and Stratus used in Ethmoids and Maxillaries where these docs were Frontal only. Why?

2. Focus Products:  All Reps have successfully converted their customers to Flex Guides and both Jennifer and Brent have made two Airway conversions at Hopkins and UNC. How?
3. PDP Program – The region has started 20 PDP programs without an MDS. How? Market development is everyone's job and you obviously don't need an MDS.
4. Incorporating one more product on every call and in every case to build incremental revenue and business for future months.

My Regions theme is ONE Extra thing everyday will lead to big results in the end.


Great job, thanks for your preparation.

**G.Add.19**



UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,

              Plaintiff,      Criminal Action
                               No. 15-cr-10076-ADB-1

v.

                               January 13, 2021

WILLIAM FACTEAU,

              Defendant.      Pages 1 to 44

_____

TRANSCRIPT OF SENTENCING HEARING
VIA ZOOM CONFERENCE
BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT COURT

JOAN M. DALY, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 5507
Boston, Massachusetts 02210
joanmdaly62@gmail.com

1    the maximum fine that I'm able to sentence him to.  That is a

2    fine of $1 million which is $100,000 on each count.  I'm

3    ordering that the defendant make a lump sum payment of the

4    million dollars, which is due -- I'm going to give him 14

5    days after sentencing.  Mr. Weingarten, you will let me know

6    if he needs any longer.

7         I considered putting him on probation until the

8    fine was paid, but I think under the circumstances and given

9    his financial situation that he can and I'm sure is

10   incentivized to make that lump sum payment as quickly as

11   possible.  I'm going to forgo the probation.

12        So that is the sentence that I am imposing.  Does

13   anyone feel there's anything else I need to say with regards

14   to the sentence?  All right.

15        Mr. Facteau, I really do have every confidence that

16   I won't see you here again.  In many ways you are a lucky,

17   lucky man.  There was no patient harm.  You are smart.

18   You're accomplished.  You have so many people that care about

19   you.  I hope that to the extent that you have a chance to

20   talk to people about what happened that what you tell them is

21   a cautionary tale and not a bitter one.

22        And I think that the sentence I've imposed sort of

23   is true to the jury's verdict here and is appropriate under

24   the circumstances of the case.  You have the right to appeal

25   all aspects of the trial.  You have the right to appeal my

1   sentence.  I'm sure Mr. Weingarten and Mr. Pineault will go

2   over that with you.  But I guess I want to close by, number

3   one, wishing Mr. Facteau the best.  And number two, by once

4   again complimenting all the counsel in this case who truly

5   did an extraordinary job.

6          I guess that's where I'm going to leave it.  Is

7   there anything else that anyone thinks I need to cover today.

8          MR. WEINGARTEN:  No, Your Honor.

9          MS. BLOOM:  No, Your Honor.

10         THE COURT:  Karen is asking, Ms. Victoria, Karen is

11  asking about whether I need to actually say this is a time

12  served sentence or I can just impose the fine.

13         MR. WEINGARTEN:  Time served.

14         THE PROBATION OFFICER:  I think you can say time

15  served with no supervised release to follow.  He did serve

16  one day in custody which was the day of arrest.

17         THE COURT:  So we'll call it a time served

18  sentence.  There's the special assessment and the fine, and

19  that will close this out.  Mr. Weingarten, can he pay within

20  two weeks?

21         MR. WEINGARTEN:  I'll check, Your Honor.  I'm not

22  sure.

23         THE COURT:  I'm happy to extend that if it needs to

24  be extended.  Understand I've forgone probation in

25  anticipation of that being paid promptly.



UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,

                    Plaintiff,          Criminal Action
                                        No. 15-cr-10076-ADB-2
v.
                                        January 13, 2021
PATRICK FABIAN,

                    Defendant.          Pages 1 to 41
_____

TRANSCRIPT OF SENTENCING HEARING
VIA ZOOM CONFERENCE
BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT COURT

JOAN M. DALY, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 5507
Boston, Massachusetts  02210
joanmdaly62@gmail.com

1          THE COURT:  Mr. Callahan, the government's

2      recommendation, please.

3          MR. CALLAHAN:  The government's recommendation is

4      five months of incarceration, five months home confinement, a

5      $500,000 fine and one year supervised release plus the

6      special assessment.

7          Your Honor, we understand the ruling Your Honor set

8      forth moments ago in Mr. Facteau's case.  The government

9      continues to believe that its recommendation is fair and

10     reasonable and necessary to fulfill the sentencing objectives

11     of 3553.

12         Briefly, Your Honor, Mr. Fabian was acquitted of

13     the felony charges, but he stands here convicted of the ten

14     misdemeanor charges of misbranding and adulteration.  Those

15     misdemeanor charges are serious.  The government just wants

16     to take a few minutes to recount some of the evidence to

17     illustrate how serious that was and how serious it was as it

18     pertains to Mr. Fabian.

19         Mr. Fabian ran the show in sales, Your Honor.  And

20     contrary to the theme that runs through some sentencing

21     submissions, Mr. Fabian was not convicted solely because he

22     held the position of vice president of sales at Acclarent.

23     This is not that case plain and simple.  The evidence showed,

24     as Your Honor recognized, that he directly and personally

25     participated in the charged conduct.

1    positions in his career in the medical device industry.

2            So summing up, Your Honor, we agree with Probation

3    Officer Ms. Victoria on base level six.  We've taken our

4    position with respect to -- I know that you have not imposed

5    any abuse of trust, an adjustment we obviously agree.  We

6    disagree on the role in the offense, and we preserved all our

7    objections and arguments thereto included by way of our

8    response filed last night to all of the arguments also raised

9    by Mr. Facteau and his lawyers with respect to that.

10           We want to respectfully ask that you take all of

11   that into consideration and ask likewise that Mr. Fabian be

12   deemed to have served a sentence of time served over the

13   years, a pretrial and post trial probation that he served

14   under throughout, and send him on his way from the federal

15   criminal justice system, which has loomed so very large in

16   his life over these last years.

17           With respect to fine, Your Honor, we do argue that

18   you -- I'm sure you will take into account Mr. Fabian's

19   particular financial situation.  We do argue that any fine

20   should be at the low end of the applicable guideline range.

21   We understand that you can depart the statutory maximum and

22   all that.  But in terms of deterrence, take into account that

23   you need not impose a significant fine on Mr. Fabian.

24           You know for purposes of specific deterrence, he's

25   not coming back.  This is a man who is not coming back.  In

1    general deterrence, nobody would want to sign up for what

2    he's been through over these last several years. We'd ask

3    that you take those respectfully into consideration with

4    respect to assessing a fine. Thank you.

5    THE COURT: Mr. Callahan, any victim impact

6    statements?

7    MR. CALLAHAN: No, Your Honor.

8    THE COURT: Mr. Fabian, you have the right to speak

9    before I sentence you if you want to. It's optional. But

10    you have the right.

11    THE DEFENDANT: With your permission, Your Honor,

12    I'd like to read a portion of my personal statement that's

13    already been submitted to the Court.

14    THE COURT: Yes. That's fine. I've already read

15    it, but please feel free to read as much or as little of it

16    as you want. Thank you.

17    THE DEFENDANT: Thank you. For the past 30 years

18    I've had the privilege of working in the healthcare and

19    medical device industry. The ability to make a positive

20    impact on the world by helping tens of thousands of people --

21    improve their quality of life and at the same time provide a

22    nice life for my family as a blessing.

23    Acclarent was a fast-moving first rate start up

24    company with executives who had a significant amount of big

25    company experience. Legal and compliance was a significant

**G.Add.26**

1    needs to be deterred, whether or not it results in patient

2    harm.  But the fact or the absence of patient harm is

3    relevant to my sentencing decisions even if the charging is

4    appropriate.

5         Again, like Mr. Facteau, I read the letters

6    submitted by Mr. Fabian.  I don't put undue weight on them.

7    But it's hard not to feel that he's a lucky man to have

8    people that care about him and support him and understand him

9    so well.  I have to say, I was particularly appreciative of

10   the letter from his mom who showed a remarkable grace but

11   also the ability to be objective in what is no doubt for her

12   a highly emotional situation.

13        And then the other thing that I feel is critically

14   important to protect is the integrity of the regulatory

15   process.  You can see from my opinion on the motion for new

16   trial that I wrestled with this.  I think that the FDA is

17   important.  I think they try very hard to do what is a very

18   difficult job, and it is important to maintain the integrity

19   of this process for them.

20        And again as I noted before, particularly in the

21   time of COVID, it's become just starkly clear how important

22   it is that the public have confidence in what the FDA does

23   because we need people to take these vaccines.  If people are

24   not confident in the FDA and they don't take these vaccines,

25   it's not good for any of us.

**G.Add.27**

1      But there also is no question that the regulatory

2    environment in this area is difficult.  Like I need to take

3    into account the fact that there was no patient harm, I also

4    need to take into account the fact that Mr. Facteau and

5    Mr. Fabian and the people at Acclarent did not completely

6    blow off the FDA.  They worked with the FDA.  They made

7    efforts to comply with the FDA's regulatory scheme, and that

8    needs to be taken into account as well.

9      Where I ultimately come down on this when I'm

10    thinking about the sentence for Mr. Fabian and Mr. Facteau is

11    that it was a misdemeanor conviction, but there was no

12    patient harm, and there was certainly a difficult regulatory

13    environment.  Those are the things I think about when I am

14    imposing the sentence.

15      So the sentence I'm going to impose, pursuant to

16    the Sentencing Reform Act of 1984 and having considered the

17    sentencing factors enumerated at 18 U.S.C. 3553(a), the

18    judgment of the Court is as follows:  There will be no term

19    of incarceration.  I am not going to place him on probation

20    or supervised release because he's been under court

21    supervision for long enough.  I learned from Mr. Facteau's

22    sentencing that I need to call that a sentence of time

23    served, and I will.  But it is my intention that there be no

24    further incarceration, no probation.

25      This was a crime about money.  And in the corporate

```
 1    environment in which we live, I do feel that to accomplish
 2    general deterrence, the best way I can do that is by
 3    financial penalty.  I'm going to order that the defendant pay
 4    the United States a fine of $500,000 which is $50,000 on each
 5    count.  I'm going to order that it's a lump sum payment that
 6    shall be paid within 14 days of sentencing.
 7             Mr. Libby, you'll let me know if 14 days is not
 8    adequate and we can revisit that.  And the special assessment
 9    of $250, which is $25 on each count.  Anything else on the
10    sentence before I move on?  Ms. Victoria, am I set?
11             THE PROBATION OFFICER:  Yes, Your Honor.
12             THE COURT:  Mr. Callahan, anything, or Mr. Libby?
13             MR. CALLAHAN:  Nothing from the government, Your
14    Honor.
15             MR. LIBBY:  Where this resolves everything here
16    now, there is the matter that with respect to the return of
17    Mr. Fabian's personal firearms.  Small matter but a big
18    matter.  We kicked it to probation.  Probation kicked it back
19    here.  There's absolutely no reason why --
20             THE COURT:  That's correct.  I don't know what the
21    laws of the state are where he lives.  It's a misdemeanor
22    conviction.  I don't love personal firearms, but if the law
23    of Minnesota entitles someone with a misdemeanor conviction
24    to possess firearms, he can have his firearms back.
25             MR. LIBBY:  I think it's a state law that you're
```

**G.Add.29**

1   required to have them [indiscernible].

2           THE COURT:  That may well be.  That's one of the

3   reasons I don't live in Minnesota.  Mr. Fabian, that is your

4   sentence.  You have right to appeal any issue of your trial.

5   You have the right to appeal the sentence.  Your appellate

6   rights are fully intact.  I'm sure Mr. Libby will discuss

7   that with you.

8           I'm glad this is over for you, Mr. Fabian.  Again

9   my apologies for taking so long.  I think that whatever

10  lessons there are to be learned here I'm sure you've learned.

11  I said this to Mr. Facteau, I'm going to say the same thing

12  to you.  I hope as you go forward in life that you are able

13  to think about this in a constructive way as perhaps lessons

14  learned for other people in the industry, not so much with

15  bitterness.  But I have every confidence that I won't see you

16  again, and you'll go on to, I hope, do good things for the

17  world and continue to be the family man that you are.

18          Enough said on that.  Anything from anybody else?

19          MR. LIBBY:  Nothing, Your Honor.

20          THE COURT:  The case is recessed.  Actually before

21  I recess it.  Sorry.  I forget what I've done in one case and

22  what I've done in the other.  I do want to close by once

23  again on this transcript noting how exceptional and competent

24  and professional the advocacy was on both sides throughout

25  this trial.  That has been appreciated.  Mr. Libby, you did

**G.Add.30**

1    Yeoman's work on behalf of your client.  Ms. Bloom,

2    Mr. Callahan, you've ably represented the government's

3    interest here.  Thank you for all of that.  The case is

4    recessed.  Thanks, everyone.

5            (Court recessed at 11:09 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| Body system listings | Current expiration date | Extended expiration date |
|---|---|---|
| Neurological Disorders (11.00 and 111.00) ............................ | September 29, 2021 ............................ | September 29, 2025. |

We continue to revise and update the listings on a regular basis, including those body systems not affected by this final rule.[2] We intend to update the listings affected by this final rule as necessary based on medical advances as quickly as possible, but may not be able to publish final rules revising these listings by the current expiration date. Therefore, we are extending the expiration date listed above.

**Regulatory Procedures**

**Justification for Final Rule**

We follow the Administrative Procedure Act (APA) rulemaking procedures specified in 5 U.S.C. 553 in promulgating regulations. Section 702(a)(5) of the Social Security Act, 42 U.S.C. 902(a)(5). Generally, the APA requires that an agency provides prior notice and opportunity for public comment before issuing a final regulation. The APA provides exceptions to the notice-and-comment requirements when an agency finds there is good cause for dispensing with such procedures as they are impracticable, unnecessary, or contrary to the public interest.

We determined that good cause exists for dispensing with the notice and public comment procedures. 5 U.S.C. 553(b)(B). This final rule only extends the date on which the Neurological Disorders body system listings will no longer be effective. It makes no substantive changes to our rules. Our current regulations[3] provide that we may extend, revise, or promulgate the body system listings again. Therefore, we determined that opportunity for prior comment is unnecessary, and we are issuing this regulation as a final rule.

In addition, for the reasons cited above, we find good cause for dispensing with the 30-day delay in the effective date of this final rule. 5 U.S.C. 553(d)(3). We are not making any substantive changes to the Neurological Disorders body system listing. Without an extension of the expiration date for this listing, we will not have the criteria we need to assess medical impairments in the body system at step three of the sequential evaluation processes. We

therefore find it is unnecessary to delay the effective date of this final rule.

**Executive Order 12866, as Supplemented by Executive Order 13563**

We consulted with the Office of Management and Budget (OMB) and determined that this final rule does not meet the requirements for a significant regulatory action under Executive Order 12866, as supplemented by Executive Order 13563. Therefore, OMB did not review it. We also determined that this final rule meets the plain language requirement of Executive Order 12866.

**Regulatory Flexibility Act**

We certify that this final rule does not have a significant economic impact on a substantial number of small entities because it affects only individuals. Therefore, a regulatory flexibility analysis is not required under the Regulatory Flexibility Act, as amended.

**Paperwork Reduction Act**

These rules do not create any new or affect any existing collections and, therefore, do not require Office of Management and Budget approval under the Paperwork Reduction Act.

(Catalog of Federal Domestic Assistance Program Nos. 96.001, Social Security—Disability Insurance; 96.002, Social Security—Retirement Insurance; 96.004, Social Security—Survivors Insurance; 96.006, Supplemental Security Income)

**List of Subjects in 20 CFR Part 404**

Administrative practice and procedure, Blind, Disability benefits, Old-Age, Survivors and Disability Insurance, Reporting and recordkeeping requirements, Social Security.

The Acting Commissioner of the Social Security Administration, Kilolo Kijakazi, having reviewed and approved this document, is delegating the authority to electronically sign this document to Faye I. Lipsky, who is the primary Federal Register Liaison for SSA, for purposes of publication in the **Federal Register**.

**Faye I. Lipsky,**
*Federal Register Liaison, Office of Legislative and Congressional Affairs, Social Security Administration.*

For the reasons set out in the preamble, we are amending subpart P of part 404 of chapter III of title 20 of the Code of Federal Regulations as set forth below.

**PART 404—FEDERAL OLD-AGE, SURVIVORS AND DISABILITY INSURANCE (1950–   )**

**Subpart P—[Amended]**

■ 1. The authority citation for subpart P of part 404 continues to read as follows:

    **Authority:** Secs. 202, 205(a)–(b) and (d)–(h), 216(i), 221(a) and (h)–(j), 222(c), 223, 225, and 702(a)(5) of the Social Security Act (42 U.S.C. 402, 405(a)–(b) and (d)–(h), 416(i), 421(a) and (h)–(j), 422(c), 423, 425, and 902(a)(5)); sec. 211(b), Pub. L. 104–193, 110 Stat. 2105, 2189; sec. 202, Pub. L. 108–203, 118 Stat. 509 (42 U.S.C. 902 note).

■ 2. Amend appendix 1 to subpart P of part 404 by revising item 12 of the introductory text before Part A to read as follows:

**Appendix 1 to Subpart P of Part 404—Listing of Impairments**

\*    \*    \*    \*    \*

    12. Neurological Disorders (11.00 and 111.00): September 29, 2025.

\*    \*    \*    \*    \*

[FR Doc. 2021–16417 Filed 7–30–21; 8:45 am]
**BILLING CODE 4191–02–P**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**21 CFR Parts 201 and 801**

**[Docket No. FDA–2015–N–2002]**

**RIN 0910–AI47**

**Regulations Regarding "Intended Uses"**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA, the Agency, or we) is issuing a final rule to amend its medical product "intended use" regulations. This final rule amends FDA's regulations describing the types of evidence relevant to determining whether a product is intended for use as a drug or device under the Federal Food, Drug, and Cosmetic Act (FD&C Act), the Public Health Service Act (PHS Act), and FDA's implementing regulations, including whether a medical product that is approved, cleared, granted marketing authorization, or exempted from

---

[2] We last revised the expiration date for the Neurological Disorders body system listings when we updated the body system on July 1, 2016 (81 FR 43038, 43052).

[3] See the first sentence of appendix 1 to subpart P of part 404 of 20 CFR.

premarket notification is intended for a new use. This action also withdraws and replaces the portions of a final rule issued on January 9, 2017, that never became effective.

**DATES:** This rule is effective September 1, 2021.

**ADDRESSES:** For access to the docket to read background documents or comments received, go to *https://www.regulations.gov* and insert the docket number found in brackets in the heading of this final rule into the "Search" box and follow the prompts, and/or go to the Dockets Management Staff, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852, 240–402–7500.

**FOR FURTHER INFORMATION CONTACT:** Kelley Nduom, Center for Drug Evaluation and Research, Food and Drug Administration, 10903 New Hampshire Ave., Silver Spring, MD 20993–0002, 301–796–5400, *kelley.nduom@fda.hhs.gov.*

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Executive Summary
  A. Purpose of the Final Rule
  B. Summary of the Major Provisions of the Final Rule
  C. Legal Authority
  D. Costs and Benefits
II. Meaning of Certain Terms in This Preamble
III. Background
  A. Introduction and History of This Rulemaking
  B. Summary of Comments to the Proposed Rule
IV. Legal Authority
V. Comments on the Proposed Rule and FDA Responses
  A. Introduction
  B. Comments and Responses Regarding Statutory and Regulatory Authority
  C. Comments and Responses Regarding the Design or Composition of an Article
  D. Comments and Responses Regarding the First Amendment
  E. Comments and Responses Regarding the Fifth Amendment
  F. Comments and Responses Regarding Definitions
  G. Comments and Responses Regarding "Safe Harbors"
  H. Comments and Responses Regarding Examples
  I. Comments on Codified Text and FDA Responses
  J. Comments Recommending That FDA Expand the Scope of This Rulemaking
VI. Effective Date
VII. Economic Analysis of Impacts
  A. Introduction and Summary
  B. Final Economic Analysis of Impacts
  C. Final Small Entity Analysis
VIII. Analysis of Environmental Impact
IX. Paperwork Reduction Act of 1995
X. Federalism
XI. Consultation and Coordination With Indian Tribal Governments
XII. References

**I. Executive Summary**

*A. Purpose of the Final Rule*

FDA is taking this action to amend its existing regulations (§§ 201.128 and 801.4 (21 CFR 201.128 and 801.4)) describing the types of evidence relevant to determining a product's intended uses under the FD&C Act, the PHS Act, and FDA's implementing regulations. The amended regulations better reflect the Agency's current practices in evaluating whether a product is intended for use as a drug or device, including whether a medical product that is approved, cleared, granted marketing authorization, or exempted from premarket notification is intended for a new use. This action withdraws the portions of the final rule issued on January 9, 2017 (82 FR 2193), that never became effective, and it finalizes amendments to the intended use regulations for medical products that provide more clarity and direction to regulated industry and other stakeholders regarding the types of evidence relevant to determining a product's intended uses.

*B. Summary of the Major Provisions of the Final Rule*

FDA is finalizing amendments to its intended use regulations for medical products (§§ 201.128 and 801.4) to better reflect the Agency's current practices in evaluating whether a product is intended for use as a drug or device, including whether a medical product that is approved, cleared, granted marketing authorization, or exempted from premarket notification is intended for a new use.

Several comments on the proposed rule raised legal concerns. Some commenters argued that FDA should construe its statutory and regulatory authorities more narrowly, and some asserted that the proposed rule violates the First and Fifth Amendments. These and similar arguments have been raised in comments received during earlier stages of this rulemaking as well as in other rulemaking proceedings, petitions, and litigation involving intended use issues. A number of other comments raised questions about the rule's applicability to certain medical devices, such as devices that are exempt from premarket notification (510(k)) requirements. These comments also criticized the inclusion of language in the regulation clarifying that the design or composition of an article may be relevant to determining its intended use.

The final rule remains largely unchanged from the proposed rule. In response to comments received, we have modified the codified language of the intended use regulation for medical devices to clarify its applicability to devices that are approved, cleared, granted marketing authorization, or exempted from premarket notification. That is the only change from the codified language in the proposed rule.

*C. Legal Authority*

Among the provisions that provide authority for this final rule are sections 201, 403(r), 503(g), and 701(a) of the FD&C Act (21 U.S.C. 321, 343(r), 353(g), 371(a)); section 5(b)(3) of the Orphan Drug Act (21 U.S.C. 360ee(b)(3)); and sections 215, 301, 351(i) and (j), and 361 of the PHS Act (42 U.S.C. 216, 241, 262(i) and (j), and 264).

*D. Costs and Benefits*

The benefit of this final rule is the added clarity and certainty for firms and stakeholders regarding the evidence relevant to establishing whether a product is intended for use as a drug or device, including whether a medical product that is approved, cleared, granted marketing authorization, or exempted from premarket notification is intended for a new use. We do not have evidence that the final rule will impose costs on currently marketed products.

**II. Meaning of Certain Terms in This Preamble**

As used in this rulemaking, the following terms have the meanings noted below.

| Term | Meaning |
|---|---|
| A medical product that is approved, cleared, granted marketing authorization, or exempted from premarket notification. | This term refers to a medical product that may be legally introduced into interstate commerce for at least one use under the FD&C Act or the PHS Act as a result of having satisfied applicable premarket statutory and regulatory requirements. |

| Term | Meaning |
|---|---|
| A medical use that is approved, cleared, granted marketing authorization, or exempted from premarket notification. | This term refers to an intended use included in the required labeling for an FDA-approved medical product, an intended use included in the indications for use statement for a device cleared or granted marketing authorization by FDA, or an intended use of a device that falls within an exemption from premarket notification. |
| Firms ................................................................................ | This term refers to manufacturers, packers, and distributors of FDA-regulated products and all their representatives, including both individuals and corporate entities. |
| Healthcare providers ........................................................ | This term refers to individuals such as physicians, veterinarians, dentists, physician assistants, nurse practitioners, pharmacists, or registered nurses who are licensed or otherwise authorized by the State to prescribe, order, administer, or use medical products in a professional capacity. |
| Medical products .............................................................. | This term refers to drugs and devices, including human biological products. |
| Products unapproved for any medical use .............................. | This term refers to medical products that are not approved, cleared, granted marketing authorization, or exempted from premarket notification (as that phrase is described above) by FDA for any medical use, and which must be approved, cleared, granted marketing authorization, or exempted from premarket notification to be legally marketed for such use. This term also includes products that are marketed for non-medical uses, such as dietary supplements, conventional foods, and cosmetics. |
| Unapproved use of a medical product that is approved, cleared, granted marketing authorization, or exempted from premarket notification. | This term refers to an intended use that is not included in the required labeling of an FDA-approved medical product, an intended use that is not included in the indications for use statement for a device cleared or granted marketing authorization by FDA, or an intended use of a device that does not fall within an exemption from premarket notification. |

## III. Background

### A. Introduction and History of This Rulemaking

The Agency issued a proposed rule in 2015 and a final rule in 2017 revising the language of its medical product intended use regulations, with the intent to conform them to the Agency's current practice in applying the regulations (see final rule, "Clarification of When Products Made or Derived From Tobacco Are Regulated as Drugs, Devices, or Combination Products; Amendments to Regulations Regarding 'Intended Uses'" (82 FR 2193, January 9, 2017)). These amendments did not reflect a change in FDA's approach regarding types of evidence of intended use for drugs and devices. However, after receiving a petition that requested the Agency reconsider these amendments, FDA delayed the effective date of the 2017 final rule and reopened the docket to invite public comment. A number of comments submitted during the reopening raised questions and, on March 16, 2018 (83 FR 11639), FDA delayed the effective date of the intended use amendments until further notice to allow further consideration of the substantive issues raised in the comments received. After considering the issues raised in the petition and comments submitted during the reopening, FDA issued a notice of proposed rulemaking in September 2020

(85 FR 59718, September 23, 2020, the "NPRM") to withdraw the portions of the final rule issued on January 9, 2017, that never became effective and to propose a new rule to provide more clarity regarding the types of evidence that are relevant in determining a product's intended uses.

### B. Summary of Comments to the Proposed Rule

Approximately 15 comments on the proposed rule were submitted to the docket. These comments were submitted by various industry trade organizations, consumer advocacy groups, and individuals. Several comments raised legal concerns with the proposed rule, including arguments to the effect that the rule violates the First and Fifth Amendments. Other comments raised questions and concerns about the rule's applicability to certain medical devices, such as devices that are 510(k)-exempt. These comments also generally objected to the inclusion of language in the regulation clarifying that the design or composition of an article may be relevant to determining its intended use.

## IV. Legal Authority

Among the statutory provisions that provide authority for this final rule are sections 201, 403(r), 503(g), and 701(a) of the FD&C Act, section 5(b)(3) of the Orphan Drug Act, and section 351(i) of

the PHS Act. Section 201 of the FD&C Act defines "drug" (subsection (g)(1)), "device" (subsection (h)), "food" (subsection (f)), "dietary supplement" (subsection (ff)), "cosmetic" (subsection (i)), and "tobacco product" (subsection (rr)(1)); section 5(b)(3) of the Orphan Drug Act defines "medical food"; and section 503(g)(1) of the FD&C Act provides that combination products are those "that constitute a combination of a drug, device, or biological product." Section 351(i) of the PHS Act defines "biological products", and section 351(j) of the PHS Act provides that the requirements of the FD&C Act apply to biological products. Section 403(r) of the FD&C Act establishes the requirements under which certain labeling claims about uses of conventional foods and dietary supplements to reduce the risk of a disease or affect the structure or function of the human body are not evidence of intended use as a drug. Under section 701(a) of the FD&C Act, FDA has authority to issue regulations for the efficient enforcement of the FD&C Act. FDA regulates the manufacture, sale, and distribution of drugs, devices, combination products, tobacco products, foods (including dietary supplements), and cosmetics under the authority of the FD&C Act.

G.Add.34

## V. Comments on the Proposed Rule and FDA Responses

### A. Introduction

We received approximately 15 comment submissions on the proposed rule by the close of the comment period, each containing one or more comments on one or more issues. We describe and respond to the comments in sections B through J of this section. We have numbered each comment to help distinguish between different comments. We have grouped similar comments together under the same number, and, in some cases, we have separated different issues discussed in the same comment and designated them as distinct comments for purposes of our responses. The number assigned to each comment or comment topic is purely for organizational purposes and does not signify the comment's value or importance or the order in which comments were received.

In addition to the comments specific to this rulemaking that we address in the following paragraphs, we received several general comments expressing support for or opposition to the rule. These comments express broad policy views and do not address specific points related to this rulemaking. Therefore, these general comments do not require a response. To the extent that comments expressing opposition to the rule requested that we refrain from finalizing the rule, we decline to do so. In general, comments outside the scope of this rulemaking have not been addressed here. Summaries of the remaining comments, as well as FDA's responses, are included in this document.

### B. Comments and Responses Regarding Statutory and Regulatory Authority

(Comment 1) One comment asserted that under the relevant statutes, legislative history, and case law, evidence of intended use is limited to promotional claims that have been made in the marketplace. The comment argued that the NPRM was wrong in stating that evidence of intended use can be derived from "any relevant source," including "circumstances surrounding distribution." Other comments also encouraged the Agency to focus primarily or only on promotional claims.

(Response) We disagree. Nothing in the statute requires the narrow scope that the comment suggested. Although the first comment mentioned above loosely refers to the statutory and regulatory regime as support for its preferred interpretation, it does not cite any statutory language that dictates an exclusively claims-based approach to intended use. As four justices of the Supreme Court recognized in rejecting the argument that the statute limits evidence of intended use to promotional claims: "The [FD&C Act] . . . does not use the word 'claimed'; it uses the word 'intended' " (*FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 170 (2000) (dissenting opinion) (the majority declined to resolve the issue, *id.* at 131–32)). The fact that intended use can be established through promotional claims does not preclude the possibility that other evidence may be relevant as well.

Nor does the comment cite any legislative history that supports an exclusively claims-based approach to intended use. Indeed, the legislative history supports reliance on evidence of use by healthcare practitioners and consumers as relevant to intended use. The House Report on the Medical Device Amendments of 1976 states that "[t]he Secretary may consider . . . use of a product in determining whether or not it is a device" (see H.R. Rep. 853, 94th Cong., 2d Sess. 14 (1976), reprinted in An Analytical Legislative History of the Medical Device Amendments of 1976, Appendix III (Daniel F. O'Keefe, Jr. and Robert A. Spiegel, eds. 1976)). Similarly, the legislative history of the 1938 Act states expressly that "the use to which the product is to be put will determine the category into which it will fall" (see S. Rep. No. 361, 74th Cong., 1st Sess. 4 (1935), reprinted in 3 Legislative History 660, 663).

Nor does the language of the existing regulation support the commenter's position. "[N]owhere does the regulation state that" evidence of intended use is limited to statements or claims "published to the marketplace" (see *United States* v. *Vascular Solutions, Inc.,* 181 F. Supp. 3d 342, 347 (W.D. Tex. 2016)). Indeed, the existing regulations specifically state that evidence of intended use includes "circumstances surrounding the distribution of the article" and "circumstances that the article . . . is offered or used for a purpose for which it is neither labeled or advertised." This language was included when the regulation was first codified in 1952 (see 17 FR 6818, 6820 (1952) (Ref. 1)).

Furthermore, the case law does not resolve the matter in favor of the position advanced by the commenter. Courts have repeatedly held that intended use is determined by looking to any relevant evidence, including statements and circumstances surrounding the manufacture and distribution of a medical product (see, *e.g., United States* v. *Article of 216 Cartoned Bottles,* "*Sudden Change,*" 409 F.2d 734, 739 (2d Cir. 1969) ("It is well settled that the intended use of a product may be determined from its label, accompanying labeling, promotional material, advertising and any other relevant source.") (citations omitted); *V.E. Irons, Inc.* v. *United States,* 244 F.2d 34, 44 (1st Cir. 1957) (observing that a court is "free to look to all relevant sources in order to ascertain what is the 'intended use' of a drug")). As explained by one court: "Whether a product's intended use makes it a device depends, in part, on the manufacturer's objective intent in promoting and selling the product. All of the circumstances surrounding the promotion and sale of the product constitute the 'intent'. It is not enough for the manufacturer to merely say that he or she did not 'intend' to sell a particular product as a device. Rather, the actual circumstances surrounding the product's sale, such as the identi[t]y of actual customers and their use of the product and labeling claims, determine the 'intended' use of the product as a device under the Act" (*United States* v. *789 Cases, More or Less, of Latex Surgeons' Gloves,* 799 F. Supp. 1275, 1285 (D. Puerto Rico 1992) (internal citations omitted)).

Courts have rejected the commenter's proposition that evidence of intended use is limited to a manufacturer's public claims concerning a device or drug (see *Nat'l Nutritional Foods Ass'n* v. *Matthews,* 557 F.2d 325, 334 (2d Cir. 1977) ("In determining whether an article is a 'drug' because of an intended therapeutic use, the FDA is not bound by the manufacturer's subjective claims of intent but can find actual therapeutic intent on the basis of objective evidence. Such intent also may be derived or inferred from labeling, promotional material, advertising, and any other relevant source.") (internal citation and quotations omitted); *United States* v. *Travia,* 180 F. Supp. 2d 115, 119 (D.D.C. 2001) ("Labeling is not exclusive evidence of the sellers' intent. Rather, . . . 'it is well established that the intended use of a product, within the meaning of the [FD&C Act], is determined from its label, accompanying labeling, promotional claims, advertising, and any other relevant source' . . . even consumer intent could be relevant, so long as it was pertinent to demonstrating the seller's intent . . . [I]f the government's allegations are true, the sellers did not need to label or advertise their product, as the environment provided the necessary information between buyer and seller. In this context, therefore, the

fact that there was no labeling may actually bolster the evidence of an intent to sell a mind-altering article without a prescription-that is, a misbranded drug.'') (citations omitted); *United States* v. *Vascular Solutions, Inc.,* 181 F. Supp. 3d at 347 (the position that evidence of objective intent is limited to statements ''published to the marketplace'' is ''absurd[]''); see also *United States* v. *Storage Spaces Designated Nos. 8 and 49,* 777 F.2d 1363, 1366 n.5 (9th Cir. 1985) (concluding that products innocuously labeled as ''incense'' and ''not for drug use'' were in fact drugs where the ''overall circumstances'' demonstrated vendor's intent that products be used as cocaine substitutes); *United States* v. *An Article of Device Toftness Radiation Detector,* 731 F.2d 1253, 1257 (7th Cir. 1984) (intended use established in part by witness testimony that device had been used to treat patients, together with other evidence regarding a training program and financial arrangements offered by the defendant); *United States* v. *Undetermined Quantities of an Article of Drug Labeled as ''Exachol'',* 716 F. Supp. 787, 791 (S.D.N.Y. 1989) (explaining that ''FDA is not bound by the vendor's subjective claims of intent'' and that ''[a]n article intended to be used as a drug . . . even if the product[']s labelling states that it is not a drug''); *United States* v. *22 Rectangular or Cylindrical Finished Devices,* 714 F. Supp. 1159, 1165 (D. Utah 1989) (''The objective intent referred to in the regulation may be shown not only by a product's labeling claims, advertising or written statements relating to the circumstances of a product's distribution, . . . but also by a product's actual use. See H.R. Rep. No. 853, 94th Cong., 14 (1976). . . . There also can be no dispute that the sterilizer, in its actual use, plays an integral role in the surgical treatment of patients.''); *Hanson* v. *United States,* 417 F. Supp. 30, 35 (D. Minn. 1976) (finding plaintiffs' beliefs that many people will die if they are deprived of the tablets and vials at issue relevant to establishing intended use), *aff'd,* 540 F.2d 947 (8th Cir. 1976); *United States* v. *Device Labeled ''Cameron Spitler Amblyo-Syntonizer'',* 261 F. Supp. 243, 245 (D. Neb. 1966) (''While claimant contends that the machines have not been represented as a cure for any particular eye malfunction, he admits the use of them in the treatment of certain eye maladies. Clearly, the seized machines are each a device within the meaning of § 321(h).'')).

Although one comment cited to several cases that relied only on promotional claims as evidence of intended use, only a very few, if any, cases have actually *excluded* non-claims evidence from consideration as evidence of intended use on the ground that the evidence was not promotional. The presence of claims may be particularly significant in determining intended use where a product, such as honey, does not have a therapeutic benefit or physiological effect (see, *e.g., United States* v. *An Article . . . ''U.S. Fancy Pure Honey'',* 218 F. Supp. 208, 211 (E.D. Mich. 1963) (claim that honey is a panacea for various diseases and ailments established the intended use as a drug), *aff'd,* 344 F.2d 288 (6th Cir. 1965). But the converse is *not* true—the absence of claims on a product that does have a physiological effect will not automatically render the product immune from FDA jurisdiction (see, *e.g., United States* v. *Carlson,* 810 F.3d 544 (8th Cir. 2016) (synthetic drugs, such as synthetic marijuana, labeled as incense, herbal incense, herbal potpourri, bath salts, etc., and that also bore the statement ''not for human consumption,'' found to be subject to FDA's jurisdiction as drugs)).

As FDA has explained, limiting evidence of intended use to only promotional claims would allow manufacturers to circumvent FDA regulation by masking their true intent, either by simply omitting explicit promotional claims or by making claims that are not true (for example, ''not for human use''). See 82 FR 14319 at 14321 through 14322 (March 20, 2017); 82 FR 2193 at 2196 (January 9, 2017); 80 FR 57756 at 57757 (September 25, 2015). As courts have recognized, ''[s]elf-serving labels cannot be allowed to mask the vendor's true intent as indicated by the overall circumstances.'' *United States* v. *Storage Spaces Designated Nos. 8 and 49,* 777 F.2d 1363, 1366 n.5 (9th Cir. 1985)). This is an issue that comes up frequently with respect to products in domestic commerce as well as imported goods and has resulted in FDA-issued warning letters, import refusals, civil injunction actions, and criminal prosecutions. FDA believes it is worth repeating the following previously cited examples, see 82 FR 14319 at 14321 through 14322 (March 20, 2017), of the types of situations in which evidence of intended use has been derived from sources other than explicit promotional claims:

• Persons distributing substances that are known to be used recreationally to achieve a mind-altering effect, such as dextromethorphan (the active ingredient

in some cough suppressants) and nitrous oxide (which is a prescription drug) (see, *e.g., United States* v. *Johnson,* 471 F.3d 764, 765 (7th Cir. 2006); *United States* v. *Schraud,* 2007 U.S. Dist. LEXIS 89231, 3–6 (E.D. Mo. December 4, 2007); *United States* v. *Travia,* 180 F. Supp. 2d 115, 119 (D.D.C. 2001); *United States* v. *LA Rush,* 2:13–cr–00249, First Superseding Information (C.D. Cal. April 3, 2014)).

• Persons distributing synthetic drugs, such as synthetic marijuana, labeled as incense, potpourri, bath salts, and/or bearing the statement ''not for human consumption'' (see, *e.g., United States* v. *Carlson,* 810 F.3d 544 (8th Cir. 2016); *United States* v. *Carlson,* 12–cr–00305–DSD–LIB, Amended Superseding Indictment (D. Minn. Sept. 11, 2013) and Court's Instructions to the Jury, (D. Minn. October 8, 2013); *United States* v. *Bowen,* 14–cr00169–PAB, Indictment (D. Colo. May 5, 2014) and Rule 11(c)(1)(A) and (B) Plea Agreement and Statement of Facts Relevant to Sentencing (D. Colo. January 29, 2015).

• Persons distributing imitation drugs claimed to be incense or dietary supplements, such as imitation cocaine or imitation Ecstasy (see, *e.g., United States* v. *Storage Spaces Designated Nos. ''8'' & ''49'',* 777 F.2d 1363, 1366 (9th Cir. 1985); *United States* v. *Undetermined Quantities of . . . Street Drug Alternatives,* 145 F. Supp. 2d 692 (D. Md. 2001)).

• Persons distributing products containing the active ingredients in prescription drugs, such as VIAGRA, CIALIS, LEVITRA, or BOTOX, as less expensive alternatives to the approved products, with labeling that states that they are ''all natural'' or ''herbal'' supplements or ''for research only'' (see, *e.g., United States* v. *Dessart,* 823 F.3d 395 (7th Cir. 2016); *United States* v. *Zeyid,* 1:14–cr–0197, First Superseding Indictment (N.D. Ga. June 24, 2014) (see also Ref. 2); *United States* v. *Livdahl,* 459 F. Supp. 2d 1255, 1260 (S.D. Fla. 2005)).

Other instances where a person's claims about the intended use of a product are belied by the person's activities or non-promotional statements or by circumstantial evidence (see, *e.g., United States* v. *An Article of Device Toftness Radiation Detector,* 731 F.2d 1253, 1257 (7th Cir. 1984); *United States* v. *789 Cases of Latex Surgeons' Gloves,* 799 F. Supp. 1275, 1294–1295 (D.P.R. 1992)).

In these situations, the evidence relied on to establish intended use has included general knowledge of actual use by customers to achieve a mind-altering effect; the known effects of a product or substance; implied claims

**41388**    **Federal Register** / Vol. 86, No. 145 / Monday, August 2, 2021 / Rules and Regulations

from using names that sound similar to the names of controlled substances; the circumstances surrounding the sale (*e.g.*, a rock concert venue; receiving the product in bulk and repackaging into smaller plastic bags; the use of private email addresses; the absence of labeling; shipping orders, other correspondence, and memoranda relating to marketing and distribution; statements made in training sessions; and admissions.

Evidence other than promotional claims has also been used to establish that products offered for import into the United States without labeling or other claims that identify them as a drug or device are in fact intended for use as a drug or device and are therefore subject to refusal if it appears that they fail to meet certain requirements for importing medical products (see 21 U.S.C. 381(a)(3)). For example, the defendants in *United States* v. *Zeyid*, 1:14-cr-0197, First Superseding Indictment (N.D. Ga. June 24, 2014) (see Ref. 2), imported products containing active ingredients that were the same as those used in prescription drugs but that were labeled as "tea," "coffee," and "beauty products."

(Comment 2) One comment asserted that the position on intended use described by FDA in the NPRM was an "alternative, novel interpretation [] with which FDA has flirted from time to time in the past."

(Response) We disagree. This is not the first time FDA has responded to arguments that its interpretation of the scope of evidence relevant to "intended use" is too broad—those arguments have been raised in comments in earlier stages of this and other rulemaking proceedings, petitions, and litigation involving intended use issues. Contrary to the comment's assertion that the NPRM presented a novel interpretation of intended use, FDA has steadfastly maintained for decades that, in determining a product's intended use, the Agency may look to any relevant source of evidence, including a variety of direct and circumstantial evidence. FDA's position is reflected in the notices issued in this rulemaking over the past 5 years (see, *e.g.*, 85 FR 59718 at 59721 (September 23, 2020); 82 FR 14319 at 14320 (March 20, 2017); 82 FR 2193 at 2206 (January 9, 2017); 80 FR 57756 at 57757 (September 25, 2015)), and has been noted in court decisions (see, *e.g.*, *Spectrum Pharma.* v. *Burwell*, 824 F.3d 1062, 1069 (D.C. Cir. 2016) ("To be sure, FDA recognizes that there may be situations in which it will look beyond just the manufacturer's statements [to determine intended use]."); *United States* v. *Travia*, 180 F.

Supp. 2d 115, 119 (D.D.C. 2001) ("The government argues that the Court should look to the objective intent of the sellers in this case, which would permit the Court to view the totality of the circumstances—namely, the selling of balloons of laughing gas in the parking lot at a rock concert—surrounding the sale of the nitrous oxide here. See, *e.g.*, 21 CFR 201.128.")). This position has also been explained in numerous litigation briefs and other FDA pronouncements, such as in the following excerpts from examples of such documents issued from 2000 to 2017:

• In determining a product's intended uses, "[l]abeling is not [the] exclusive evidence." See *United States* v. *Travia*, 180 F. Supp. 2d 115, 119 (D.D.C. 2001). Instead, "it is well established that the 'intended use' of a product, within the meaning of the Act, is determined from its label, accompanying labeling, promotional claims, advertising, and any other relevant source." *Action on Smoking and Health* v. *Harris*, 655 F.2d 236, 239 (D.C. Cir. 1980) (quotation marks omitted); see also *V.E. Irons, Inc.* v. *United States*, 244 F.2d 34, 44 (1st Cir. 1957) ("[W]e are free to look to all relevant sources in order [to] ascertain what is the 'intended use' of a drug."). Courts have considered "relevant sources" to include, for example, product formulation and method of intake, actual use of the product by consumers and medical practitioners, and circumstances of sale in determining intended use. See, *e.g.*, *United States* v. *Ten Cartons, More or Less, of an Article . . . Ener-B Vitamin B–12*, 72 F.3d 285, 287 (2d Cir. 1995); *United States* v. *Storage Spaces*, 777 F.2d 1363, 1367 (9th Cir. 1985); *United States* v. *An Article of Device . . . Toftness Radiation Detector*, 731 F.2d 1253, 1257–58 (7th Cir. 1984) (Litigation brief (2011), Ref. 3).

• Courts have recognized that intended use may be shown by non-speech evidence that has included, for example, product formulation and method of intake, actual use of the product by consumers and medical practitioners, and circumstances of sale (Litigation brief (2010), Ref. 4 at 8–9 n.5).

• Courts have repeatedly held that, although promotional claims are one source of evidence of intended use, FDA is authorized to rely on any other relevant source of evidence [including] . . . [the product's] method of intake, . . . [how any claims are] understood by a consumer. . ., [suggestive] product names, . . . [and] meta-tags (Litigation brief (2001), Ref. 5 at 20–26).

• [Evidence of intended use to be presented at trial includes:] (1) Defendant intended the nitrous oxide he was offering for sale on his website bongmart.com to be used as a drug, despite his marking the nitrous oxide 'For Food Use Only;' (2) Defendant knew that the nitrous oxide cartridges were commonly used as a drug for getting high; and (3) Defendant's customers actually used the nitrous oxide sold by Defendant as a drug (Litigation brief (2000), Ref. 6 at 6).

• It has been the Agency's longstanding position that in determining a product's intended use, the Agency may look to any relevant source of evidence. . . . To hold accountable firms that attempt to evade FDA drug jurisdiction by avoiding making express claims about their products or disclaiming a particular intended use, courts have relied on a variety of evidence to establish intended use, including general knowledge of actual use by customers to get high or have some other mind-altering effect; the known effects of a product or substance; implied claims from using names that sound similar to controlled substances; the circumstances surrounding the sale (*e.g.*, a rock concert venue; receiving the product in bulk and repackaging into smaller plastic bags; the absence of labeling; shipping orders, other correspondence, and memoranda relating to marketing and distribution; statements made in training sessions; and admissions (Regulatory letter (2017), Ref. 7 at 9–10).

• The manufacturer's intent will necessarily be determined on a case-by-case basis, looking at the totality of the facts and circumstances. . . . The trier of fact will take into account the full body of evidence. If evidence of distribution or sponsorship activity forms part of the basis of FDA's claim, the trier of fact will consider the context of that activity . . . in assessing the manufacturer's objective intent (Regulatory letter (2002), Ref. 8 at 6).[1]

In addition, issues involving the scope of evidence relevant to establishing intended use frequently arise in FDA's day-to-day operations in protecting the public health, including Warning Letters and import determinations (see, *e.g.*, FDA Warning

---

[1] The comment erroneously asserts that FDA's reliance on evidence other than promotional claims to assert jurisdiction over cigarettes in a 1996 final rule was "roundly rejected by the courts." In fact, the Supreme Court's majority opinion declined to address the issue, and the dissent endorsed FDA's analysis (see *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 131–32 (2000); *id.* at 170 (dissenting opinion).

Letter to HelloCig Electronic Technology Co., Ltd (Ref. 9) (relying in part on undeclared active pharmaceutical ingredient as well as implied claims from imagery to determine product's intended use); FDA Warning Letter to Duy Drugs, Inc. (Ref. 10) (relying in part on undeclared sildenafil to establish intended use); Letter from Steven B. Barber, District Director, Cincinnati District, FDA to Marc C. Sanchez, Esq., Mood and Mind, LLC, (Ref. 7 at 9–10) (relying in part on known attributes and common uses of product to establish use; Letter from Daniel Solis, Director, Import Operations Branch, Los Angeles District to Carol A. Pratt, K&L Gates LLP (Ref. 11) (relying in part on information available on the internet reflecting general understanding by consumers of mind-altering properties and purported medical uses of product, as well as pattern of changes to the importer's website and blog to conceal the true intended use of the product by deleting references to the amount of a psychoactive component in the product); FDA Warning Letter to Lifetech Resources Labs Inc. (Ref. 12) (relying in part on "presence of the prostaglandin analog, isopropyl cloprostenate, along with appearance claims" to establish intended use); FDA Warning Letter to INZ Distributors (Ref. 13) (relying in part on presence of analogue of an erectile dysfunction drug to determine product's intended use)). One of the purposes of this rulemaking is to put to rest any dispute about FDA's interpretation of its statute and regulations, and its policy—as embodied in this rule as well as in the precedent cited above—regarding evidence that may be relevant to establishing intended use.

(Comment 3) With respect to the many situations where manufacturers and distributors attempt to evade FDA regulatory oversight by omitting promotional medical product claims, examples of which are provided above, one comment suggested that the Government could use other regulatory tools rather than apply FDA's authorities for premarket review of medical products. Specifically, the comment suggested that FDA employ "a combination of post-market risk mitigation techniques" which would require FDA to engage in the "collection, review, and potential description in labeling" of the risks associated with the "unlabeled use" before taking enforcement action against the product to protect the public health. The same comment suggested that, alternatively, FDA could consider

evidence other than promotional claims, but only to establish that in fact a promotional claim had been made.

(Response) FDA declines this suggestion. The fundamental purpose of the FD&C Act is to help protect "the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection" (*United States* v. *Dotterweich,* 320 U.S. 277, 280 (1943)). ''[R]emedial legislation such as the Food, Drug, and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health'' (*United States* v. *An Article of Drug . . . Bacto Unidisk,* 394 U.S. 784, 798 (1969)). Although FDA generally considers risk as part of its determination whether to take enforcement action, part of the impetus for Congress' development of the premarket review requirements was the determination that exclusive reliance on postmarket remedies, such as enforcement actions for false or misleading labeling, is inadequate because it does not prevent consumers from experiencing harm from unsafe and/or ineffective treatments.

FDA's position regarding evidence relevant to establishing intended use helps protect the public health. To describe more fully one of the examples cited above: In *United States* v. *Johnson,* 471 F.3d 764 (7th Cir. 2006), the defendant imported dextromethorphan hydrobromide (DXM), the active ingredient in some cough suppressants, and distributed it for recreational use. During the 4 months his company was in operation, five customers died. Because DXM is not a controlled substance, no charges were brought under the Controlled Substances Act, but the court found that FDA had jurisdiction under the FD&C Act (id. at 765). Defendant pleaded guilty to three counts of introducing a misbranded drug into interstate commerce and received a 77-month sentence (id.). In upholding that sentence, the Seventh Circuit noted that the defendant ''knew—not merely should have known—that there was a substantial risk that more of his customers would die, and yet he continued to sell DXM for recreational use and failed to warn existing customers, including the two teenagers who died after he learned of the first two deaths'' (id.).

Because FDA's position on intended use helps ensure that it can help curb the distribution of dangerous and fraudulent products, FDA declines to construe intended use more narrowly than the statute provides.

(Comment 4) One comment objected to FDA's statement in the proposed rule

that relying exclusively on firms' claims to determine intended use would adversely affect public health by opening the door to the marketing of products that are unapproved for any medical use. The comment argued that there is no public health need for FDA to rely on evidence other than express claims to determine intended use because the FD&C Act and other statutes provide other authorities that allow FDA to take action against products that contain an active ingredient from an FDA-approved drug, controlled substance, or other pharmacological ingredient. Specifically, the comment recommended that FDA use its dietary supplement and food additive authorities to keep products containing pharmacological ingredients out of dietary supplements and conventional foods, rather than using an intended use analysis to classify and regulate the products as drugs. The specific authorities mentioned in the comment were the definitions of "food" and "dietary supplement" and the corresponding adulteration provisions of the FD&C Act; the premarket notification requirement for certain dietary ingredients not marketed in the United States before October 15, 1994; and the premarket approval requirement for food additives. Similarly, another comment argued that rather than continuing to take the approach to intended use outlined in the NPRM, the Government could apply other provisions of Federal law; and that where there are gaps in existing legal provisions, FDA could seek specific product-based legislative changes.

(Response) We decline the comments' suggestions. Although it is true that the authorities mentioned in the comment enable FDA to keep some products containing pharmacological ingredients out of the food supply and dietary supplement marketplace, the comment overstates the reach of FDA's other authorities and overlooks the fact that simply being outside the dietary supplement or food definition does not make a product unlawful and subject to enforcement action. To establish jurisdiction over a product as a drug and remove it from the marketplace, or require the manufacturer to obtain FDA approval for the product before marketing it, FDA must be able to establish that the product is a drug based on evidence of its intended use. Thus, the regulatory tools the comment recommends are not a substitute for FDA's medical product authorities that include an intended use determination.

As the previous comment response explained, suggestions that FDA use other regulatory tools in place of

intended use would have a significant negative impact on public health. To protect consumers from dangerous products containing pharmacological ingredients like the cough suppressant in *United States* v. *Johnson* that caused several deaths, FDA intends to continue considering the full range of evidence relevant to determining intended use.

(Comment 5) One comment agreed with the NPRM that evidence of intended use could include conduct other than claims, but suggested that the rule clarify that the conduct must be promotional.

(Response) FDA declines this suggestion. FDA believes that the key issue in the intended use analysis is whether the evidence is "relevant," which does not necessarily depend on whether there is evidence of "promotional" activity. The NPRM provided several examples to help inform the assessment of relevance. As the preamble explained, where a firm disseminates additional specific safety and warning information to healthcare providers to minimize the risk to patients receiving the drug for the unapproved use—an example of non-promotional speech—FDA would not consider such evidence to be relevant to intended use (see 85 FR 59718 at 59726). But the preamble provided other examples of evidence that would not necessarily be considered promotional that would still be relevant to intended use—such as designing a stent to be specifically sized for a use that is different from the purported use (see 85 FR 59718 at 59725). As another example, a factfinder might consider, as evidence of a new intended use, a spacer that the manufacturer claims can be used to elute one liquid, but is in fact designed with holes that are sized to elute a more viscous substance that contains a different active ingredient. Accordingly, FDA declines the suggestion to include "promotional" as a limiting principle for non-claims-based evidence that may be relevant to intended use.

This conclusion is consistent with recent case law. The case law describes the standard for determining intended use as "all relevant evidence." This allows the fact finder to evaluate the facts of the specific case, which may involve a variety of situations and circumstances. For example, in *United States* v. *Carlson*, 810 F.3d 544 (8th Cir. 2016), defendants owned and/or worked at the Last Place on Earth, a head shop in Duluth, Minnesota, which sold synthetic drugs, such as synthetic marijuana. The products were labeled as incense, herbal incense, herbal potpourri, bath salts, etc., and also bore

the label statement "not for human consumption," but defendants knew that customers purchased them to consume as drugs (see id. at 549; see also Amended Superseding Indictment, 12–cr–00305–DSD–LIB ¶ 9 (D. Minn. September 11, 2013)). The trial court instructed the jury that the product's intended use "is what a reasonable person would conclude the manufacturer, seller or dispenser of the product intended the product to be used for, based on all of the relevant information" (see The Court's Instructions to the Jury, 12–cr–00305– DSD–LIB at 58 (D. Minn. October 8, 2013)). The court explained that the jury could consider "any and all testimony and evidence," whether or not the manufacturer, seller, or dispenser made contrary claims or no claims (see id. at 58–59). All of the defendants were convicted of distributing misbranded drugs in violation of the FD&C Act (see *Carlson*, 810 F.3d at 550).

In *United States* v. *Dessart*, 823 F.3d 395 (7th Cir. 2016), the defendant used a website to sell products containing human growth hormone ("HGH"), steroids, and the active ingredients in the prescription drugs VIAGRA (sildenafil), CIALIS (tadalafil), and LEVITRA (vardenafil). Id. at 398. The website said that the products were "for research only." Id. The defendant was indicted on 23 counts of violating the FD&C Act. Id. at 399. The court instructed the jury: "[Y]ou should consider what a reasonable person would conclude the manufacturer or seller of the product intended the product to be used for, based on all of the relevant information. . . . You are not bound by any claims or statements made by the manufacturer or seller if there is other evidence concerning the use intended by the manufacturer or seller that conflicts with those claims or statements." Jury Instructions, Case No. 12–CR–85 at 4–5 (E.D. Wis. June 19, 2014). The jury convicted on all counts. *Dessart*, 823 F.3d at 400.

In *United States* v. *789 Cases of Latex Surgeons' Gloves*, 799 F. Supp. 1275, 1294–1295 (D.P.R. 1992), the Government sought condemnation of surgeon's gloves and their components, including cornstarch, stored in a rodent-infested facility. Although the product manufacturer argued that it did not intend for the gloves to be used in medical procedures, the court found that "[t]he circumstances surrounding the manufacture, distribution, and actual use of Plastic Material's gloves present overwhelming evidence that claimant's gloves are intended for use as—and therefore are—devices within the meaning of the Act": *e.g.,* the sole

customer, the United States, purchased gloves only for medical use; and the cornstarch used to store the gloves was of a type used only with gloves intended for medical procedures.

In each of these cases, restricting relevant evidence to promotional claims and conduct could have led the factfinder to conclude that the products were outside of FDA's jurisdiction.

(Comment 6) One comment asserted that the phrase "any relevant evidence" as used in the case law should be understood, under the statutory interpretation principle *ejusdem generis,* to refer only to evidence of promotional claims.

(Response) FDA disagrees. First, most obviously, principles of statutory construction are not typically applied to language in court decisions. Second, throughout this preamble, we have cited numerous examples where courts and FDA have considered evidence other than promotional claims to be relevant to establishing intended use.

*C. Comments and Responses Regarding the Design or Composition of an Article*

(Comment 7) Several comments stated that FDA should reconsider the proposed regulatory text identifying evidence about the "design or composition" of an article as a type of evidence relevant to establishing intended use. Some comments also asserted that the characteristics and design of a medical product that is approved, cleared, granted marketing authorization, or exempted from premarket notification do not determine intended use and that intended use does not depend on the design of the product. Some comments requested that FDA remove this phrase from the codified language describing the types of evidence relevant to determining a product's intended uses.

(Response) We disagree with the comments and decline to remove "design or composition" from the codified language. As explained in the preamble, the revisions to the intended use regulations do not reflect a change in FDA's policies and practices. Rather, the amendments to the intended use regulations are intended to describe the types of evidence relevant to determining a product's intended use based on FDA's current practices. The design and composition of an article are examples of the types of evidence that may be relevant when determining the article's intended use. For example, FDA may consider the design or composition of a product, which includes product characteristics, when determining whether the product is "intended to affect the structure or any

function of the body'' and therefore meets the device definition in section 201(h) of the FD&C Act (21 U.S.C. 321(h)). The addition of the phrase ''design or composition'' to the codified reflects FDA's longstanding and current policy that these are relevant to intended use.

As discussed in the preamble to the NPRM, an example of a situation where design features have been found relevant to intended use include the design of a stent to be specifically sized for a use that is different from the purported use (see 85 FR 59718 at 59725). Another example can be found in *United States* v. *Caputo,* 517 F.3d 935 (7th Cir. 2008), where the Seventh Circuit upheld a conviction for misbranding under the FD&C Act where design features were part of the evidence of intended use. There, the district court recited evidence of the differences in design between two versions of the device that necessitated separate premarket review applications: ''The larger sterilizer had different design and engineering characteristics: a six cubic foot chamber; a 5% peracetic acid mixture; different temperature, pressure, and gas flow rate; and a single, as opposed to multiple, use of the sterilant'' (*United States* v. *Caputo,* 456 F. Supp. 2d 970, 973 (N.D. Ill. 2006), *aff'd in relevant part,* 517 F.3d 935 (7th Cir. 2008)). As another example, a factfinder might consider, as evidence of a new intended use, a spacer that the manufacturer claims can be used to elute one liquid, but is in fact designed with holes that are sized to elute a more viscous substance that contains a different active ingredient.

Another example where composition has been found relevant to intended use is *United States* v. *Undetermined Quantities . . .''Pets Smellfree,''* 22 F.3d 235 (10th Cir. 1994). In that case, the Government had seized and sought to condemn ''Pets Smellfree'' as an adulterated and misbranded drug. The product was promoted as an animal food additive to reduce pet odor when ingested. In determining that the product was a drug, the Tenth Circuit relied heavily on expert testimony about the physiological effects of a pharmacologically active ingredient, chlortetracycline, in reducing the level of bacteria in the animals' digestive systems and oral cavities (see id. at 240). Other examples include *United States* v. *Zeyid,* 1:14-cr-0197, First Superseding Indictment (N.D. Ga. June 24, 2014) (see Ref. 2), where imported products labeled as ''tea,'' ''coffee,'' and ''beauty products'' contained active ingredients that were the same as those used in prescription drugs; FDA Warning Letter

to HelloCig Electronic Technology Co., Ltd. (Ref. 9), where undeclared active pharmaceutical ingredient was considered relevant to intended use; and FDA Warning Letter to INZ Distributors (Ref. 13), where presence of analogue of an erectile dysfunction drug was considered relevant to intended use.

(Comment 8) Some comments suggested that consideration of ''design or composition of the article'' as a type of evidence of intended use may inhibit technological advancements and discourage manufacturers from developing products that, based on their design, may be used for multiple uses.

(Response) FDA disagrees with these comments. We do not believe that considering a product's design or composition to be relevant to the intended use of a product impedes technological advancements or discourages product development. As stated above, the relevance of a product's design and composition to intended use is a part of FDA's longstanding policy and has not hindered such improvements. For example, during premarket review of software, FDA may not always review a software device function that is included in the design but has been locked out, because it is not part of that specific premarket submission by the firm. If, however, the firm wants to unlock the software device function in the future, it must first obtain any necessary premarket clearance, marketing authorization or approval for the product with that function.

(Comment 9) One comment suggested that FDA should not seek enforcement after a product is approved, cleared, or granted marketing authorization solely based on that product's design or characteristics, and another comment suggested that FDA should not assert a new intended use based solely on such features.

(Response) FDA applies applicable premarket and postmarket statutory and regulatory requirements to determine whether a product is legally marketed. FDA examines all relevant evidence in assessing compliance with such requirements. As previously noted, FDA may consider a product's design or composition as one type of evidence relevant to the product's intended use.

### D. Comments and Responses Regarding the First Amendment

(Comment 10) One comment stated that because the rule identifies speech as potentially relevant to establishing intended use, and such speech may be truthful, the rule is ''suspect'' under the First Amendment. The comment

requested that FDA add specific statements to the codified language to address these concerns. Other comments similarly stated that the proposal does not adequately take into account the limitations on FDA's authority to regulate truthful and non-misleading speech.

(Response) We disagree that the rule is vulnerable under the First Amendment. First, as noted in the preamble to the NPRM, we do not believe this rulemaking implicates the First Amendment. The intended use regulations describe evidence that may be relevant to establishing intended use; they do not in themselves directly regulate speech (85 FR 59718 at 59723). Indeed, the changes to the codified language proposed and finalized in this rulemaking do not directly involve speech: Whether, and to what extent, a factfinder may rely on product design, product composition, and knowledge as evidence of intended use, is not itself a First Amendment question, because speech will not typically be involved in such evidence. See 82 FR 2193 at 2207.

Second, in the regulatory regime under the FD&C Act and the PHS Act, intended use helps determine the marketing status for products that are potentially subject to those Acts, which products Congress has directed FDA to regulate in the interest of the public health. Part of the regulatory regime for medical products involves, for example, the review of appropriate labeling in the context of premarket review and postmarket regulatory surveillance. The categorical exclusion of all truthful speech from regulatory review would undermine FDA's ability to promote and protect the public health through premarket review of medical products, including review of proposed labeling, and postmarket regulatory surveillance and actions.

For example, the Government prosecuted a clinic operator under the FD&C Act for injecting liquid silicone into the body to augment tissues such as the buttocks or breasts (Refs. 14 and 15). Silicone when used for industrial purposes would not fall within FDA's jurisdiction. However, in this case, evidence that helped establish the intended use of the products included testimony of victims about the claims made to them by the defendant that the product would enhance the size of their buttocks. Those claims may have been truthful in the sense that they revealed one effect of the product. However, the injection of liquid silicone into the body for tissue augmentation can result in serious adverse health consequences, including hardening of tissue at the injection site, embolization, and even

death. FDA has not approved any liquid silicone products for injection to augment tissues anywhere in the body. Therefore, it was in the interest of public health for FDA to take action against the person responsible for the administration of these products, and such action was well within FDA's jurisdiction and permissible under the First Amendment.

There are many industries whose operations involve some amount of communication with the public. The fact that those communications may be truthful does not shield those industries' operations from Government regulation. "[I]t has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed" (*Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47, 62 (2006) (citation omitted)). And, as the Court recently confirmed, " 'the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech' " (*Barr* v. *Am. Ass'n of Political Consultants,* 140 S. Ct. 2335, 2347 (2020) (quoting *Sorrell* v. *IMS Health Inc.,* 564 U.S. 552, 567 (2011))).

Thus, as we explained in the NPRM, courts have long upheld the premarket review requirements of the FD&C Act and the PHS Act, and the role of intended use within that framework, as necessary to promote and protect the public health and as fully consistent with the First Amendment (see 85 FR 59718 at 59723). More specifically, courts have held that, under the holding of *Wisconsin* v. *Mitchell,* 508 U.S. 476, 489 (1993), the Government's reliance on speech as evidence of intended use under the FD&C Act does not infringe the right of free speech under the First Amendment (see, *e.g., Whitaker* v. *Thompson,* 353 F.3d 947, 953 (D.C. Cir. 2004); *Nicopure Labs, LLC* v. *FDA,* 944 F.3d 267, 283 (D.C. Cir. 2019); *United States* v. *Cole,* 84 F. Supp. 3d 1159, 1166 (D. Or. 2015); *United States* v. *Regenerative Sciences, LLC,* 878 F. Supp. 2d 248, 255–56 (D.D.C. 2012), *aff'd,* 741 F.3d 1314 (D.C. Cir. 2014); *United States* v. *Livdahl,* 459 F. Supp. 2d 1255, 1268 (S.D. Fla. 2005); *United States* v. *Lane Labs-USA, Inc.,* 324 F. Supp. 2d 547, 579–80 (D.N.J. 2004); see also *United States* v. *Article of Drug Designated B-Complex Cholinos Capsules,* 362 F.2d 923, 927 (3d Cir. 1966); *United States* v. *General Nutrition, Inc.,* 638 F. Supp. 556, 562 (W.D.N.Y. 1986)). Indeed, reliance on speech as evidence of intent is common in the law.[2]

Third, as also explained in the NPRM, even if this rulemaking or regulatory regime were appropriately subject to First Amendment review, FDA's consideration of speech as one type of evidence of intended use under its statutory and regulatory framework easily satisfies any applicable test. Under the *Central Hudson* framework, the threshold question is whether the speech is false or inherently or actually misleading or concerns unlawful activity—such speech may be prohibited (see *Central Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n,* 447 U.S. 557 (1980); *In re R.M.J.,* 455 U.S. 191, 203 (1982); *44 Liquormart, Inc.* v. *Rhode Island,* 517 U.S. 484, 497 n.7 (1996); *1–800–411–Pain Referral Serv., LLC* v. *Otto,* 744 F.3d 1045, 1056 (8th Cir. 2014)). When commercial speech relates to an illegal activity, there is no First Amendment interest to weigh against the governmental interest supporting the regulation of commercial activity (*Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U.S. 376, 389 (1973)). Regulated parties cannot be allowed to escape reasonable Government regulations by "bootstrap[ping] themselves into the heightened scrutiny of the First Amendment simply by infusing the prohibited conduct with some element of speech" (*Ford Motor Co.* v. *Tex. DOT,* 264 F.3d 493, 506–507 (5th Cir. Tex. 2001)).

For example, in *United States* v. *Caputo,* 517 F.3d 935 (7th Cir. 2008), the court found that it did not need to resolve the question of whether promotional claims for an approved medical device were protected by the First Amendment because defendants' product was not approved: "[t]here was no lawful activity for speech to promote" (id. at 941). In *United States* v. *Cole,* 84 F. Supp. 3d 1159 (D. Or. 2015), defendants distributed unapproved products with claims that they treated diseases, including Alzheimer's and HIV infection. The court rejected defendants' First

Amendment defense, explaining that, because "[d]efendants' speech concerns an illegal activity—the introduction into interstate commerce of unapproved new drugs[,] . . . the First Amendment is not violated" (id. at 1166–67). In *United States* v. *LeBeau,* 2016 U.S. Dist. LEXIS 13612 (E.D. Wisc. February 3, 2016), the court similarly rejected defendant's First Amendment defense to a charge of distributing an unapproved new drug and explained that, because defendant's speech occurred while promoting and distributing a product that was intended for treatment of diseases and had not been approved by the FDA, his commercial speech did not concern lawful activity and did not pass step (1) of *Central Hudson* (see id. at 29). The Seventh Circuit affirmed, explaining that "[b]ecause LeBeau's statements promoted the unlawful sale of an unapproved drug, they were not entitled to protection" (*United States* v. *LeBeau,* 654 Fed. App'x 826, 831 (7th Cir. 2016)).

Even where the threshold step of *Central Hudson* does not apply, FDA's reliance on speech as evidence of intended use in the context of premarket review directly advances, and is appropriately tailored to achieve, substantial public health interests and therefore satisfies the remaining steps of the *Central Hudson* analysis. The medical products FDA regulates have the potential to adversely impact public health and safety. The premarket review requirements of the FD&C Act and the PHS Act require companies to conduct scientific research to determine the safety and effectiveness of medical products before they are marketed and provide mechanisms to help ensure that protections are in place that will allow the public to obtain the benefits of these products while mitigating the risks. Accordingly, these premarket review provisions "do not ban manufacturers from making accurate claims" but instead "require them to substantiate such claims." *Nicopure Labs, LLC* v. *FDA,* 944 F.3d 267, 285 (D.C. Cir. 2019).

(Comment 11) One comment asserted that the NPRM failed to provide a meaningful explanation of how its consideration of speech as evidence of intended use comports with the *Central Hudson* test, particularly whether there are any less speech-restrictive alternatives with respect to speech regarding unapproved uses of approved products. The comment cites *United States* v. *Caronia,* 703 F.3d 149 (2d Cir. 2012) and criticizes the Government for not providing a sufficient explanation of its consideration of less-restrictive alternatives in the context of that lawsuit. Another commenter similarly

---

[2] See Reference 16 ("This pattern in the law—using intent as the predicate for regulation and then using speech as evidence of intent—is quite common, and not peculiar to pharmaceutical regulation. As early as 1888, the Supreme Court affirmed a state court criminal conviction for someone who manufactured an 'oleaginous substance' otherwise perfectly legal, except that he intended for it to be used as food, and thereby his manufacture of it fell under the purview of a state regulator. Similarly, a hollow piece of glass with a bowl on the end is illegal drug paraphernalia only if intended for such illicit uses. An automobile is not subject to regulation by the Federal Aviation Administration, unless it is 'intended to be used for flight in the air.' ") (citations omitted).

asserted that the NPRM did not adequately justify under *Central Hudson* the Government's policy regarding off-label use/promotion.

(Response) Again, as noted above and in the NPRM, we do not believe this rulemaking implicates the First Amendment, particularly given that the changes to the codified language proposed and finalized in this rulemaking do not directly involve speech. As further explained in the NPRM, "[b]ecause 'intended use' is only one element of an alleged violation of the FD&C Act, this rule does not itself implicate the First Amendment and does not attempt to resolve all First Amendment arguments that might be made by a firm in defending against an enforcement action under the FD&C Act." 85 FR 59798 at 59723 n.5. Nevertheless, in another proceeding, FDA has addressed in detail the issues raised by these comments (see Memorandum: Public Health Interests and First Amendment Considerations Related to Manufacturer Communications Regarding Unapproved Uses of Approved or Cleared Medical Products (January 2017) (Ref. 17)). Rather than repeat that analysis here, we summarize it briefly and incorporate the relevant portions of the document. The memorandum describes in detail the public health interests underlying and advanced by FDA's consideration of communications regarding unapproved uses of medical products that are approved, cleared, granted marketing authorization, or exempted from premarket notification as relevant to the premarket review requirements of the FD&C Act and PHS Act (see Ref. 17 at 3–16). As the memorandum explains, these requirements, among other things, motivate the development of scientific evidence that enables the reliable, population-level determination of the safety and efficacy of medical products for each intended use; require that the evidence be developed and independently reviewed before the products are marketed to the general public for each intended use; and require that the product bear labeling that identifies each medical use of the product that is approved, cleared, granted marketing authorization, or exempted from premarket notification and provides information for healthcare providers and patients on using the product safely and effectively for those uses that are approved, cleared, granted marketing authorization, or exempted from premarket notification. In the memorandum, FDA also examined alternative approaches suggested by the court in *United States* v. *Caronia*, as well as by commentators (see id. at 26–34). FDA explained that, although many of these proposed approaches addressed one or more of the interests served by the premarket review requirements, FDA found that none of them integrated the complex mix of numerous interests at play and thus none of the proposed approaches best advanced those multiple interests (see id.).

(Comment 12) One comment asserted that the right of a manufacturer to convey truthful and non-misleading information is protected under *Thompson* v. *Western States Medical Center*, 535 U.S. 357 (2002).

(Response) We disagree with the suggestion that *Western States* shields truthful and non-misleading speech from Government regulation. In that case, the Court applied the *Central Hudson* test to evaluate the regulation of the speech at issue, 535 U.S. at 368–77. In an analysis that broke no "new ground" (id. at 368), the Court explained that, in general, the Government should not restrict the communication of truthful and non-misleading information for the sole purpose of preventing members of the public from making bad decisions with the information (see id. at 374). However, that rationale is not applicable to this rulemaking because the premarket review requirements of the FD&C Act and PHS Act advance several different Government interests in protecting public health, as discussed above (see also Ref. 17).

(Comment 13) One comment asserted that the First Amendment protects not only the right to speak freely but also the right to hear and receive valuable information, and that this interest is particularly acute for the audience of physicians.

(Response) FDA has recognized that, under certain circumstances, both healthcare providers and patients may be interested in information about unapproved uses of products (see Ref. 17 at 17). In part because of this consideration, FDA has issued guidance documents describing circumstances in which the Agency does not intend to object to a firm's product communications or to view such communications as evidence of a new intended use (see 85 FR 59718 at 59723 & n.7). Nothing in this final rule reflects a change in FDA's policies and practices, as articulated in various guidance documents, regarding the types of firm communications that ordinarily would not, on their own, establish the firm's intent that a medical product that is approved, cleared, granted marketing authorization, or exempted from premarket notification be used for an unapproved use. As discussed elsewhere in this preamble, FDA declines the suggestion to expand the scope of this rulemaking to additional subjects.

(Comment 14) One comment referenced for support a 1999 district court decision in a case brought by Washington Legal Foundation. Another comment referenced the same litigation and asserted that FDA is subject to a permanent injunction curtailing the Agency's authority to bar manufacturers from sharing peer-reviewed medical texts and journal articles about off-label uses of their FDA-approved products.

(Response) We believe these comments have little bearing on the current rulemaking. First, as explained in the NPRM, the proposed revisions to the intended use regulations do not reflect any change in FDA's policies and practices, as articulated in various guidance documents, regarding the types of firm communications to which the Agency does not intend to object to or to view as evidence of a new intended use. Among the guidance documents describing these existing policies are several that relate to the distribution of peer-reviewed medical texts and journal articles (see 85 FR 59718 at 59723 & n.7). Second, with respect to the district court decision referenced in the comments, the D.C. Circuit "vacate[d] the district court's decisions and injunctions insofar as they declare the FDAMA and the CME Guidance unconstitutional" (see *Washington Legal Found.* v. *Henney*, 202 F.3d 331, 337 (D.C. Cir. 2000); see also *Washington Legal Found.* v. *Henney*, 128 F. Supp. 2d 11, 15 (D.D.C. 2000) (holding that "injunction has been wholly vacated by the Court of Appeals"); id. (holding that Court of Appeals "vacated all of this Court's previous constitutional rulings on the matter")); 65 FR 14286 (2000) (describing FDA's understanding of the outcome of the *Washington Legal Found.* litigation); Letter from Margaret M. Dotzel, Assoc. Commissioner for Policy, FDA to Daniel J. Popeo & Richard A. Samp, Wash. Legal Found., Docket No. 01P–0250 (January 28, 2002) (same)).

(Comment 15) Some comments asserted that content-based restrictions on commercial speech are subject to strict scrutiny or heightened scrutiny. One comment argued that *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552 (2011), *Reed* v. *Town of Gilbert*, 135 S. Ct. 2218 (2015), *Matal* v. *Tam*, 137 S. Ct. 1744 (2017), and *Barr* v. *Am. Ass'n of Political Consultants*, 140 S. Ct. 2335 (2020) support the proposition that all content-based speech restrictions, even

those involving commercial speech, are subject to strict scrutiny, effectively overruling the *Central Hudson* and *Wisconsin* v. *Mitchell* lines of cases. Relying primarily on *Sorrell* and mentioning *Barr,* another comment asserted that FDA understated the constitutional limits on its authority in the NPRM. Another comment suggested that heightened scrutiny is warranted under *Sorrell* in the fields of medicine and public health.

(Response) We disagree. As we discussed in the NPRM, the Supreme Court in *Sorrell* suggested that content- and speaker-based restrictions would be subject to "heightened scrutiny," but nevertheless continued to apply the "commercial speech inquiry" as outlined in *Central Hudson* (85 FR 59718 at 59724 n.11). Several courts of appeals have subsequently concluded that *Sorrell* did not overrule or fundamentally alter the *Central Hudson* analysis (see *Retail Digital Network, LLC* v. *Prieto,* 861 F.3d 839, 846 (9th Cir. 2017) (en banc) (*Sorrell* "did not mark a fundamental departure from *Central Hudson's* four factor test, and *Central Hudson* continues to apply" to regulations of commercial speech, regardless of whether they are content based); *Missouri Broad. Ass'n* v. *Lacy,* 846 F.3d 295, 300 n.5 (8th Cir. 2017) ("The upshot [of *Sorrell*] is that when a court determines commercial speech restrictions are content- or speaker-based, it should then assess their constitutionality under *Central Hudson.*") (quotation marks omitted; alteration in original); see also *Vugo, Inc.* v. *City of New York,* 931 F.3d 42, 50 (2d Cir. 2019) ("No Court of Appeals has concluded that *Sorrell* overturned *Central Hudson.* We agree with our sister circuits that have held that *Sorrell* leaves the *Central Hudson* regime in place, and accordingly we assess the constitutionality of the City's ban under the *Central Hudson* standard."), *cert. denied,* 140 S. Ct. 2717 (2020)).

In *Reed* v. *Town of Gilbert,* the Court applied strict scrutiny to content-based restrictions on non-commercial speech in sign ordinances. Although some of the language in the majority opinion in that case is broad, many lower courts have subsequently rejected arguments that *Reed* applies to the regulation of commercial speech (see, e.g., *Vugo, Inc.* v. *City of New York,* 931 F.3d 42, 49–50 & n.6 (2d Cir. 2019) (holding that *Central Hudson* still applies to commercial speech after *Reed* and *Sorrell*), *cert. denied,* 140 S. Ct. 2717 (2020); *Nationwide Biweekly Admin., Inc.* v. *Owen,* 873 F.3d 716, 732 (9th Cir. 2017) ("*Reed* did not relate to commercial speech . . . and therefore

did not have occasion to consider th[at] doctrine[.]")). Indeed, as one comment noted, in *Matal* v. *Tam,* a decision regarding content-based commercial speech issued after *Reed,* only *one* Justice advocated overruling *Central Hudson* in favor of strict scrutiny (137 S. Ct. 1744, 1769 (2017) (Thomas, J., concurring in part and concurring in the judgment)). No other Justice joined that opinion. While no First Amendment analysis garnered five votes in *Matal,* one four-Justice opinion applied *Central Hudson* (id. at 1764); the other four-Justice opinion stated that heightened scrutiny should be applied to *viewpoint* discrimination, but explained that viewpoint discrimination is an "egregious" subcategory of content-based regulation, and further noted that regulations regarding product labeling or consumer protection may be evaluated differently from the trademark matter at issue in that case (id. at 1766, 1768).

There was similarly no majority First Amendment analysis in *Barr* v. *Am. Ass'n of Political Consultants,* 140 S. Ct. 2335 (2020). There, the plurality opinion explained that strict scrutiny should be applied to a law that singled out a specific subject matter for differential treatment—permitting robocalls for collecting money owed to the Government while prohibiting robocalls for all other purposes (see id. at 2346). Similarly, Justice Gorsuch's opinion emphasized that the statute under review favored certain voices while punishing others (see id. at 2364) (Gorsuch, concurring in the judgment in part and dissenting in part). In addition, the plurality opinion further circumscribed the scope of its holding: "The issue before us concerns only robocalls to cell phones. . . . Our decision is not intended to expand existing First Amendment doctrine or to otherwise affect traditional or ordinary economic regulation of commercial activity" (see id. at 2347; see also *Am. Hosp. Ass'n* v. *Azar,* 983 F.3d 528, 542 (D.C. Cir. 2020) (in upholding an HHS rule challenged in part on First Amendment grounds, the court distinguished *Barr* on the grounds that the restrictions in *Barr* involved political speech and the regulation at issue in *Am. Hosp. Ass'n* involved ordinary regulation of commercial activity)).

Accordingly, given that the Supreme Court has not overruled *Central Hudson* or *Wisconsin* v. *Mitchell* and given that the laws being reviewed in the cited cases were quite different from the premarket review provisions of the FD&C Act, we believe it would be wrong to conclude that the Supreme Court has

implicitly but sweepingly reversed these long-standing precedents to invalidate the regulatory regime under the FD&C Act. And even if some form of heightened scrutiny were applicable to reliance on speech as evidence of intended use, FDA believes that the public health necessity of the premarket review provisions discussed in this preamble, including its references, justifies and necessitates this regime under any standard.

(Comment 16) One comment asserted that scientific speech has been recognized as core speech that merits the highest degree of constitutional protection, citing *Washington Legal Foundation* v. *Friedman,* 13 F. Supp. 2d 51, 62 (D.D.C. 1998).

(Response) FDA agrees that, in certain contexts, scientific speech merits the highest degree of constitutional protection. However, the comment failed to note that the cited opinion determined that scientific speech will be evaluated under the First Amendment as commercial speech when a commercial entity seeks to distribute it in order to increase its sales of the product (see id. at 64–65).

(Comment 17) One comment urged FDA to follow the Sixth Circuit's decision in *Int'l Outdoor, Inc.* v. *City of Troy,* 974 F.3d 690 (6th Cir. 2020), which the comment claimed held that all content-based speech restrictions are subject to strict scrutiny, even when the restrictions concern commercial speech.

(Response) FDA declines that suggestion for several reasons. First, *Int'l Outdoor*—like *Reed*—involved review of a sign ordinance, which does not raise the same complex regulatory and public health issues as premarket review under the FD&C Act and PHS Act. Second, a holding that strict scrutiny applies to all content-based commercial speech would run contrary to the weight of circuit court authority discussed above, including the Second Circuit's recent decision in *Vugo, Inc.* confirming that *Central Hudson* continues to govern review of commercial speech (see 931 F.3d at 50). Third, the Sixth Circuit in *Int'l Outdoor* did not actually hold that strict scrutiny applies to all content-based commercial speech; the Sixth Circuit distinguished *Vugo* on the ground that the Second Circuit case involved only commercial speech, where *Int'l Outdoor* involved both core and commercial speech (see 974 F.3d at 705).

(Comment 18) One comment asserted that FDA should not continue to rely on *Wisconsin* v. *Mitchell* and its progeny because the district court in *Amarin Pharma, Inc.* v. *FDA,* 119 F. Supp. 3d 196 (S.D.N.Y. 2015) construed *United*

*States* v. *Caronia,* 703 F.3d 149 (2d Cir. 2012) to foreclose that position. Another comment similarly argued that the NPRM understated the meaning and impact of *Caronia.*

(Response) We disagree. As we explained in the NPRM, the Second Circuit has explicitly confirmed—contrary to the cited conclusion in *Amarin*—that *Caronia* "left open the government's ability to prove misbranding on a theory that promotional speech provides evidence that a drug is intended for a use that is not included on the drug's FDA-approved label." *United States ex rel. Polansky* v. *Pfizer, Inc.,* 822 F.3d 613 n.2 (2d Cir. 2016). And the Second Circuit has more generally confirmed the continued viability of the *Wisconsin* v. *Mitchell* theory after *Caronia,* finding a First Amendment challenge to reliance on speech to show an element of violation "meritless" because "the speech is not 'itself the proscribed conduct.'" *United States* v. *Pierce,* 785 F.3d 832, 841 (2d Cir. 2015) (quoting *Caronia,* 703 F.3d at 161). It is also noteworthy that the first comment did not cite any case other than *Amarin,* a district court decision on a motion for a preliminary injunction, in support of its position limiting the application of *Wisconsin* v. *Mitchell.* Indeed, decisions from other circuits issued after *Caronia* have upheld the application of *Wisconsin* v. *Mitchell* in the context of the premarket review requirements of the FD&C Act (see *Nicopure Labs, LLC* v. *FDA,* 944 F.3d 267, 283 (D.C. Cir. 2019); *United States* v. *Lebeau,* 654 Fed. App'x 826, 830–31 (7th Cir. 2016); *United States* v. *Facteau,* 2020 U.S. Dist. LEXIS 167169 (D. Mass. September 14, 2020); *United States* v. *Cole,* 84 F. Supp. 3d 1159, 1166 (D. Or. 2015)).

*E. Comments and Responses Regarding the Fifth Amendment*

(Comment 19) Some comments questioned the constitutionality of the intended use regulations and asserted that the Fifth Amendment requires that the boundaries between permissible and impermissible communications be clearly drawn, particularly with respect to matters involving speech. One comment criticized FDA's reliance on guidance documents to describe its enforcement policies in this regard.

(Response) While FDA agrees that laws must give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited," "meticulous specificity" is not required (see *Grayned* v. *City of Rockford,* 408 U.S. 104, 110 (1972)). The Supreme Court has recognized that laws may embody "flexibility and reasonable breadth" (see

id.) and officials implementing them may "exercise considerable discretion" (see *Ward* v. *Rock Against Racism,* 491 U.S. 781, 794 (1989)), without the laws being declared unconstitutionally vague.

More specifically, the Supreme Court has held that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity" (see *Ward,* 491 U.S. at 794 (citations omitted)). It is also well established that the use of an intent standard does not render a statute unconstitutionally vague (see *United States* v. *Williams,* 553 U.S. 285, 306 (2008); *Nat'l Ass'n of Manufacturers* v. *Taylor,* 582 F.3d 1, 26 (D.C. Cir. 2009) ("an intent standard is not per se vague, even in a statute regulating speech")). Indeed, "absent special circumstances not present here, there is no reason to conclude that the 'every day' task of assessing intent is inherently vague [even] when protected speech is involved" (see *Taylor,* 582 F.3d at 27).

Moreover, courts have repeatedly rejected due process challenges to the FD&C Act as unconstitutionally vague or ambiguous. In *United States* v. *Hohensee,* 243 F.2d 367 (3d Cir. 1957), the Third Circuit rejected an unconstitutional vagueness challenge to provisions of the FD&C Act, which included the determination of intended use. In upholding the provisions, the court relied in part on the Supreme Court determination that the FD&C Act should "be given a liberal interpretation to effectuate its high purpose of protecting unwary consumers in vital matters of health" (see id. at 370; see also *United States* v. *Sullivan,* 332 U.S. 689, 695 (1948) (rejecting due process challenge to FD&C Act and finding no ambiguity in the misbranding language); *United States* v. *Caputo,* 517 F.3d 935, 941 (7th Cir. 2008) (rejecting argument that line between new and modified devices is too vague to be enforceable); *V.E. Irons* v. *United States,* 244 F.2d 34, 45 (First Cir. 1957) (rejecting as "untenable" the claim that the FD&C Act's misdemeanor misbranding provisions are unconstitutionally vague and upholding misbranding conviction for distribution of vitamin and mineral products shown to be intended for use as drugs.); *United States* v. *General Nutrition, Inc.,* 638 F. Supp. 556, 564 (W.D.N.Y. 1986) ("The Act on numerous occasions has been upheld against vagueness challenges . . . and this Court is unaware of any case holding any provision of the Act void for vagueness in any circumstance.") (citations omitted).

The first FDA regulation describing how "intended use" is determined was

issued in 1952 (see 17 FR 6818, 6820 (1952) (Ref. 1)), and there have been only minor amendments since that time, including those being made through this rulemaking. Over nearly seven decades, medical product manufacturers have shown little difficulty in understanding how the regulations are applied. And, as noted in the NPRM, FDA has issued several guidance documents that describe circumstances in which the Agency does not intend to object to a firm's product communications or to view such communications as evidence of a new intended use (85 FR 59718 at 59723). FDA issues these guidance documents to better inform stakeholders regarding its policies, and feedback from stakeholders has generally been positive. The NPRM also goes further than previous rulemakings related to these regulations in providing illustrative examples of types of evidence that would and would not be relevant to establishing intended use. Accordingly, we do not believe that the intended use regulations are unconstitutionally vague.

*F. Comments and Responses Regarding Definitions*

(Comment 20) Some comments suggested clarifying and defining the terms "intended use" and "indications for use" as these terms are used for devices in § 801.4. One comment suggested defining these terms by adopting definitions used in other FDA regulations and guidance documents. The comment also suggested clarifying the definitions of "intended use" and "indications for use" as part of a substantial equivalence determination for a device and distinguishing these terms from the intended use regulations for drugs.

(Response) FDA disagrees with these comments. The intended use regulations, including § 801.4, describe the types of evidence relevant to determining a product's intended uses under the FD&C Act, the PHS Act, and FDA's implementing regulations. The term "indications for use" is not used in this rulemaking and as such, FDA does not believe there is a need to define the term here. Further, FDA's substantial equivalence determination during its review of a premarket notification is beyond the scope of this rulemaking.

(Comment 21) Several comments suggested revising § 801.4 to expressly include devices that are legally marketed without approval or clearance, such as devices exempt from premarket notification and granted marketing authorization. Some comments asserted that the terms "approved or cleared medical products" and "approved or

cleared medical uses'' do not include such legally marketed devices and asked FDA to modify these terms to include 510(k)-exempt devices. One comment also suggested that FDA recognize how its review of drug and device labeling differ.

(Response) FDA agrees with adding language to § 801.4 to clarify that the regulation applies to devices that are exempt from premarket notification and devices that are granted marketing authorization through De Novo classification. We are adding the phrase ''granted marketing authorization, or exempt from premarket notification'' to the fourth sentence of § 801.4 to make this clarification.

FDA declines to compare FDA's review of drug and device labeling because such comparison is beyond the scope of this rulemaking.

(Comment 22) Some comments suggested defining the terms ''unapproved new use for an approved or cleared'' and ''unapproved use of an approved product'' in the codified. Another comment asserted that these terms were not consistently used throughout the preamble.

(Response) We have included related terms and phrases in the definitions section of the preamble above to help clarify our use of these and similar phrases. We do not believe that it is necessary to include these definitions in the codified language.

(Comment 23) Some comments requested FDA expressly include laboratorians in the definition of ''healthcare providers.''

(Response) The term ''healthcare provider'' includes a non-exhaustive list of individuals who are licensed or otherwise authorized by the State to prescribe, order, administer, or use medical products in a professional capacity. In some cases, this may include such licensed or otherwise State-authorized individuals with certain roles in a laboratory.

### G. Comments and Responses Regarding ''Safe Harbors''

(Comment 24) A number of comments suggested modifications to FDA policies that the comments sometimes refer to as ''safe harbors'' for certain kinds of medical product communications. Some comments suggested the establishment of a ''safe harbor'' for scientific exchange, whereby scientific exchange would be excluded from determinations of intended use. Other comments suggested the creation of ''safe harbors'' for other types of communications, including discussions with healthcare providers about investigational uses, discussions held in the course of

providing training or demonstrations to healthcare providers, market research about unapproved uses, and communications related to the collection of postmarket data. Another comment urged that FDA ''codify in binding regulations its policies regarding manufacturer communication of scientific and medical information,'' noting that guidance documents are not binding on enforcement authorities including the Department of Justice.

(Response) FDA welcomes and will continue to consider these comments related to ''safe harbors.'' However, the recommendations made in these comments go beyond the scope of this rulemaking, which is ''to conform §§ 201.128 and 801.4 to reflect how the Agency currently applies them to drugs and devices,'' 80 FR 57756 (2015). This rule, as proposed and as finalized, does not reflect a change in FDA's policies and practices regarding the types of firm communications that ordinarily would not, on their own, establish a new intended use. Expanding the scope of this rule to codify FDA's acknowledged ''safe harbors'' or to acknowledge additional ''safe harbors,'' as suggested in these comments, might warrant reproposing the rule to solicit additional input, unduly delaying the Agency's clarification of its regulations on intended use. Therefore, while FDA will continue to consider the issues raised by these comments, the Agency declines the present suggestions to modify its acknowledged ''safe harbors'' or codify them in the intended use regulation.

With regard to the suggestion that the Agency establish a ''safe harbor'' for scientific exchange, whereby scientific exchange would be excluded from determinations of intended use: the Agency notes that if all scientific exchange were excluded from determinations of intended use, companies might have an incentive to create and promote new intended uses for marketed products based on incomplete or otherwise flawed data. That outcome would not serve the public health. At the same time, FDA recognizes the importance of scientific exchange, including information regarding unapproved uses of products that healthcare providers may choose to take into account when making professional judgments regarding the use of medical products that are approved, cleared, granted marketing authorization, or exempted from premarket notification. Balancing these public health considerations, some of which are in tension with each other, is a complex and important task. FDA believes this rulemaking, the purpose of which is to finalize amendments to the

intended use regulations, is not the appropriate forum to resolve separate questions relating to scientific exchange. As noted in the NPRM, FDA has issued several guidance documents that describe circumstances in which the Agency does not intend to object to a firm's medical product communications or to view such communications as evidence of a new intended use. See 85 FR 59718 at 59723 n.7. This final rule does not disturb any of FDA's acknowledged ''safe harbors,'' including those that encompass various types of scientific exchange. In addition, as discussed in the preamble to the proposed rule, a firm's knowledge of off-label use plus safe-harbored communication would not, without more, be determinative of a new intended use. See 85 FR 59718 at 59725.

### H. Comments and Responses Regarding Examples

(Comment 25) One comment requests that FDA clarify, consistent with the Government's brief filed in *Par Pharmaceutical Inc.* v. *United States,* 1:11-cv-01820 (D.D.C.), that the example of ''repeated proactive detailing'' in the preamble to the proposed rule would not create a new intended use if the firm's communications with the healthcare professionals are consistent with the approved labeling.

(Response) FDA declines the suggestion because FDA does not believe the proposed clarification is warranted. As explained in the preamble, the revisions to the intended use regulations do not reflect a change in FDA's policies and practices, including as articulated in various guidance documents, regarding the types of firm communications that ordinarily would not, on their own, establish the firm's intent that a medical product is approved, cleared, granted marketing authorization, or exempted from premarket notification be used for an unapproved use (see 85 FR 59718 at 59723). The NPRM references guidance documents including FDA Guidance for Industry, ''Medical Product Communications That Are Consistent With the FDA-Required Labeling—Questions and Answers,'' June 2018 (see id. Ref. 5). As explained in that guidance, FDA does not intend to rely exclusively on a firm's communication of information that is consistent with a medical product's FDA-required labeling to establish a new intended use. The example in the NPRM, however, describes a circumstance involving a patient population that does not fall within the product's approved population (see 85 FR 59718 at 59725) and, to the extent

the communication relates to a patient population outside the approved patient population reflected in the FDA-required labeling, the communication may not be considered consistent with the approved labeling. The *Par* brief cited in the comment confirms that a manufacturer's communication of information regarding an *approved use* to a physician whose patients do not fall within the product's approved population would not by itself establish a new intended use, but may be relevant together with other evidence in establishing the manufacturer's intent to distribute the product for an unapproved use (Ref. 3 at 17–18).

(Comment 26) Several comments requested modification to or clarification of the examples provided in section V.C. of the preamble to the proposed rule.

(Response) We decline to make the requested modifications to the examples. These examples were provided to illustrate evidence that, standing alone, would not be determinative of intended use, and they remain illustrative of that point. Although one comment suggested that the examples caused further confusion, most commenters indicated that the examples were helpful and encouraged FDA to offer additional examples. We continue to believe the examples provided in the preamble to the NPRM are helpful, and we are providing additional examples below. The list of examples in the proposed rule is not intended to be comprehensive or restrictive. Each scenario described in the preamble is fact-specific, and, under other circumstances or in other contexts, similar material may be evaluated differently.

(Comment 27) Several comments requested that FDA describe the intended use framework from the device industry perspective and provide additional device-specific examples.

(Response) The examples FDA provided in the preamble to the proposed rule were provided for illustrative purposes only and were not intended to be comprehensive or restrictive. In our responses to comments 7, 8, and 9 in this final rule preamble, we have provided additional examples of types of evidence [3] related

---

[3] As described in the preamble to the proposed rule, these types of evidence include express claims and representations; implied claims; product characteristics and design; and the circumstances of the product's sale or distribution (see 85 FR 59718 at 59725). In fulfilling its mission to protect the public health, FDA will evaluate the individual and unique circumstances of each case in determining a product's intended use. In some cases, a single piece of evidence may be dispositive of a product's

to product design and composition that may be relevant when determining a medical device's intended use. Those examples describe evidence that *may be relevant*, but is not necessarily determinative, to establishing intended use.

To further clarify this regulation as it applies to devices, we are providing here additional device-specific examples of types of evidence that may be relevant, but are not necessarily determinative, to establishing intended use. As with the examples in the preamble to the proposed rule, the following examples are fact-specific and are provided for illustrative purposes only.

• Marketing a medical device with a name that implies a use to affect a particular organ or system of the body. Example: "CardioCalm."

• Designing a non-vascular stent with a coating clinically known to change calcification of blood vessels.

• Marketing a device that uses ultrasonic waves as a therapeutic massager, despite the fact that ultrasonic waves do not physically massage tissue but rather affect the underlying tissue through a sonic mechanism.

### *I. Comments on Codified Text and FDA Responses*

(Comment 28) In the NPRM, FDA proposed to amend §§ 201.128 and 801.4 to provide that a firm would not be regarded as intending an unapproved new use for an approved drug or for a device approved, cleared, granted marketing authorization, or exempted from premarket notification based solely on that firm's knowledge that such drug or device was being prescribed or used by healthcare providers for such use. One commenter argued that FDA should delete "solely" from the regulations on intended use because this phrasing suggests that a firm's knowledge of unapproved use could be used in combination with other factors to determine the intended use of a product. Another commenter suggested that FDA should replace "solely" with a term that would clarify that such knowledge would be relevant only if such use is widespread and if a company's promotional activities are a primary reason for this widespread off-label use. This commenter also maintained that the final rule should be clear that only activities that are, at their core, promotional should be relevant for determining intended use.

(Response) FDA disagrees with these comments. The use of the word "solely"

---

intended use. In others, several elements combined may establish a product's intended use.

in §§ 201.128 and 801.4 is intended to convey that FDA does not intend to consider a firm's knowledge that a healthcare provider has used or prescribed the firm's medical product that has been approved, cleared, granted marketing authorization, or is exempt from 510(k) for an unapproved use, *by itself,* as sufficient to establish intended use. The removal of the word "solely" from the regulation and the suggestion that FDA consider only activities that are fundamentally promotional in determining intended use would be inconsistent with the Agency's longstanding position that determining a product's intended use is a fact-specific inquiry and that FDA may consider all relevant sources of evidence. These sources of evidence may include a firm's knowledge that a healthcare provider has used or prescribed the firm's medical product that is approved, cleared, granted marketing authorization, or exempted from premarket notification for an unapproved use, and may include activities that are not strictly promotional in nature. In short, direct promotion of the use is not necessary to establish intended use.

(Comment 29) One comment asked FDA to change "article" to "device" throughout § 801.4.

(Response) FDA disagrees with this suggestion. The use of the term "article" in §§ 201.128 and 801.4 is consistent with the use of that term in section 201 of the FD&C Act.

(Comment 30) A comment suggested deleting the phrase "or used" from the fourth sentence of § 801.4, asserting that a healthcare provider's use is not "under the control of the firm."

(Response) FDA disagrees with the comment's suggestion because, although the healthcare provider's use is not under the firm's control, what may be relevant to intended use is the firm's knowledge that the article is being used by the healthcare provider. As discussed above, both legislative history and the case law support reliance on actual use by healthcare providers as relevant to intended use. See, *e.g., United States* v. *An Article of Device Toftness Radiation Detector,* 731 F.2d 1253, 1257 (7th Cir. 1984); *United States* v. *22 Rectangular or Cylindrical Finished Devices,* 714 F. Supp. 1159, 1165 (D. Utah 1989); *United States* v. *Device Labeled "Cameron Spitler Amblyo-Syntonizer,"* 261 F. Supp. 243, 245 (D. Neb. 1966); H.R. Rep. No. 853, 94th Cong., 2d Sess. 14 (1976). However, a firm's knowledge that healthcare providers are prescribing or using its product that has been approved, cleared, granted marketing authorization, or is 510(k)-exempt for an

unapproved use would not, by itself, automatically trigger an obligation to provide labeling for that unapproved use.

(Comment 31) One comment suggested that FDA explain how § 801.4 applies to modifications of 510(k)-cleared devices.

(Response) FDA declines to adopt this suggestion because it is beyond the scope of this rulemaking.

(Comment 32) One comment stated that section 513(i)(1)(E) of the FD&C Act (21 U.S.C. 360c(i)(1)(E)) constrains how FDA "responds to an intended use not reflected in device labeling when reviewing a 510(k)" and that FDA "cannot require that the company obtain clearance or approval of another potential unapproved use." The comment also suggested FDA disassociate intended use regulations for devices from drugs and add a reference to section 513(i)(1)(E) of the FD&C Act in the codified text of § 801.4.

(Response) FDA's application of section 513(i)(1)(E) of the FD&C Act is beyond the scope of this rulemaking.

*J. Comments Recommending That FDA Expand the Scope of This Rulemaking*

(Comment 33) A number of comments urged FDA to expand this rulemaking beyond the scope of the proposed rule. For example, one comment urged FDA to "complete its long-promised 'comprehensive review' of regulations to assess alignment with constitutional and statutory requirements." Another comment proposed that FDA adopt a regulatory approach to manufacturer speech consistent with the "Principles on Responsible Sharing of Truthful and NonMisleading Information About Medicines with Health Care Professionals and Payers" developed by Pharmaceutical Research and Manufacturers of America and the Biotechnology Innovation Organization.

(Response) Although FDA welcomes the submission of ideas regarding a broader list of suggested policy changes, we decline to adopt the suggestions in these comments because they are beyond the scope of this rulemaking. Expanding the scope of this rule as suggested in these comments would potentially delay FDA's clarification of its regulations on intended use. FDA has been engaged in a continuing review of regulations and policies regarding communications with healthcare providers and payors (and other similar entities with knowledge and expertise in healthcare economic analysis) regarding medical products, and has taken other initiatives as part of that effort.

(Comment 34) One comment contended that the regulatory requirements for premarket approval and authorization are too burdensome so that it is unreasonable to require that manufacturers conduct studies and submit applications for every intended use.

(Response) This comment also raises issues that are different from and beyond the scope of this rulemaking. To the extent this comment is suggesting that the best way to address complex questions concerning premarket authorization is through limiting the scope of intended use, we disagree that this is an appropriate tool.

(Comment 35) One comment requested that FDA acknowledge that healthcare providers may prescribe and use approved/cleared medical products for unapproved uses when they judge that the unapproved use is medically appropriate for their patients and that manufacturers are not required to confirm the nature of a healthcare provider's planned use for an approved medical product before distributing such product to the healthcare provider.

(Response) Healthcare providers prescribe or use medical products that are approved, cleared, granted marketing authorization, or exempted from premarket notification for unapproved uses based on their medical judgment regarding any potential benefits and risks of the unapproved use for their individual patients.[4] In these limited circumstances, FDA's longstanding position is that the Agency does not consider a firm's knowledge that a healthcare provider has used or prescribed its medical product that is approved, cleared, granted marketing authorization, or exempted from premarket notification for an unapproved use, by itself, as sufficient to establish the intended use element of a prohibited act based on failing to meet applicable premarket requirements for that use or failing to provide adequate directions for use.[5]

---

[4] FDA generally does not seek to interfere with the exercise of the professional judgment of healthcare providers in prescribing or using, for unapproved uses for individual patients, most legally marketed medical products. This longstanding position has been codified with respect to devices (see 21 U.S.C. 396). Although FDA generally does not seek to interfere with the exercise of the professional judgment of veterinarians, certain unapproved uses of drugs in animals are not permitted (see section 512(a)(4) and (5)) of the FD&C Act (21 U.S.C. 360b(a)(4) and (5) and 21 CFR part 530) and result in the drug being deemed "unsafe" and therefore adulterated under sections 512 and 501(a)(5) (21 U.S.C. 351(a)(5)) of the FD&C Act.

[5] See 21 U.S.C. 331(d), 351(f), 352(f)(1), 355(a). The position described in the text does not apply to products that are not already legally marketed as

## VI. Effective Date

This final rule will become effective 30 days after the date of its publication in the **Federal Register**.

## VII. Economic Analysis of Impacts

*A. Introduction and Summary*

1. Introduction

We have examined the impacts of the final rule under Executive Order 12866, Executive Order 13563, the Regulatory Flexibility Act (5 U.S.C. 601–612), and the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4). Executive Orders 12866 and 13563 direct us to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity). This final rule is not a significant regulatory action as defined by Executive Order 12866.

The Regulatory Flexibility Act requires us to analyze regulatory options that would minimize any significant impact of a rule on small entities. We cannot predict how many companies may revise labeling, advertising, or other materials, or otherwise modify their behavior, following issuance of this rule. However, this rule would merely clarify, but not change, the types of evidence relevant to determining manufacturers' intended use of products. Because the rule would not extend FDA's authority to additional products or impose any additional requirements on currently regulated products, we expect the rule will impose negligible costs, if any. As a result, we certify that the final rule will not have a significant economic impact on a substantial number of small entities.

The Unfunded Mandates Reform Act of 1995 (section 202(a)) requires us to prepare a written statement, which includes an assessment of anticipated costs and benefits, before proposing "any rule that includes any Federal

---

medical products for at least one use. Similarly, nothing in this regulation or preamble is intended to impact the application of 21 U.S.C. 333(e), which, subject to limited exceptions, penalizes anyone who "knowingly distributes, or possesses with intent to distribute, human growth hormone for any use in humans other than the treatment of disease or other recognized medical conditions, where such use has been authorized by the Secretary of Health and Human Services under section 505 and pursuant to the order of a physician." Further, Congress or the Agency could promulgate other provisions regarding specific products or classes of medical products that recognize knowledge as sufficient evidence of a particular element of a prohibited act.

mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any one year.'' The current threshold after adjustment for inflation is $158 million, using the most current (2020) Implicit Price Deflator for the Gross Domestic Product. This final rule would not result in an expenditure in any year that meets or exceeds this amount.

2. Summary of Costs and Benefits

The final rule clarifies but does not change FDA's interpretation and application of existing intended use regulations for medical products.

The benefits of this rule are additional clarity and certainty for manufacturers and stakeholders regarding evidence that is relevant in evaluating whether an article is intended for use as a drug or device.

This final rule is not expected to impose any significant additional costs on firms. Although this rule may impact firms' future marketing, product development, and communication strategies, firms are not required to make any changes to labeling, marketing materials, or operating procedures. Additionally, this rule does not extend FDA's jurisdiction to any new products.

TABLE 1—SUMMARY OF BENEFITS, COSTS, AND DISTRIBUTIONAL EFFECTS OF FINAL RULE

| Category | Primary estimate | Low estimate | High estimate | Units | | | Notes |
| | | | | Year dollars | Discount rate (%) | Period covered | |
|---|---|---|---|---|---|---|---|
| Benefits: | | | | | | | |
| Annualized Monetized $millions/year ......... | .............. | .............. | .............. | .............. | 7 | .............. | |
| | .............. | .............. | .............. | .............. | 3 | .............. | |
| Annualized Quantified ......... | .............. | .............. | .............. | .............. | 7 | .............. | |
| | .............. | .............. | .............. | .............. | 3 | .............. | |
| Qualitative ......... | Clarification of intended use interpretation and application | | | | | | |
| Costs: | | | | | | | |
| Annualized Monetized $millions/year ......... | .............. | .............. | .............. | .............. | 7 | .............. | |
| | .............. | .............. | .............. | .............. | 3 | .............. | |
| Annualized Quantified ......... | .............. | .............. | .............. | .............. | 7 | .............. | |
| | .............. | .............. | .............. | .............. | 3 | .............. | |
| Qualitative ......... | Negligible costs, if any | | | | | | |
| Transfers: | | | | | | | |
| Federal Annualized Monetized $millions/year ......... | .............. | .............. | .............. | .............. | 7 | .............. | |
| | .............. | .............. | .............. | .............. | 3 | .............. | |
| From/To | From: | | | To: | | | |
| Other Annualized Monetized $millions/year ......... | .............. | .............. | .............. | .............. | 7 | .............. | |
| | .............. | .............. | .............. | .............. | 3 | .............. | |
| From/To | From: | | | To: | | | |

Effects:
State, Local or Tribal Government: None.
Small Business: None.
Wages: None.
Growth: None.

3. Comments on the Preliminary Economic Analysis of Impacts and Our Response

We did not receive any comments on the Preliminary Economic Analysis of Impacts.

4. Summary of Changes

We have made no significant changes from the Preliminary Economic Analysis of Impacts.

*B. Final Economic Analysis of Impacts*

1. Background

This rule clarifies FDA's longstanding position that the intended use of a drug or device product can be based on any relevant source of evidence by describing types of evidence relevant to the intended use of a product and types

of evidence that, standing alone, are not determinative of intended use.

One important clarification involves a manufacturer's knowledge of unapproved uses of its approved product. Current versions of §§ 201.128 and 801.4 specify that a manufacturer of a drug (§ 201.128) or device (§ 801.4) must include adequate labeling if it knows its product is used for an unapproved purpose. The September 2015 proposed rule (80 FR 57756 at 57764) removed the sentence regarding the requirement to provide adequate labeling if a firm knows its product is being used for an unapproved use. The amended January 2017 final rule (82 FR 2193 at 2217) was intended to clarify FDA's position by requiring manufacturers to include adequate labeling ''if the totality of the evidence

establishes that a manufacturer objectively intends that a drug introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than ones for which it is approved (if any).''

In the **Federal Register** of February 7, 2017 (82 FR 9501), FDA delayed the effective date of the January 2017 final rule until March 2017. In February 2017, various industry organizations filed a petition raising concerns with the January 2017 final rule, requesting reconsideration and a stay. The petition requested that FDA reconsider the amendments to the ''intended use'' regulations and issue a new final rule that, with respect to the intended use regulations at §§ 201.128 and 801.4, reverted to the language of the September 2015 proposed rule. The

petition also requested that FDA indefinitely stay the rule because petitioners argued that the final rule was issued in violation of the fair notice requirement under the Administrative Procedure Act and that the "totality of the evidence" language in the 2017 final rule was a new and unsupported legal standard.

In the **Federal Register** of March 20, 2017 (82 FR 14319), FDA further delayed the effective date of the final rule until March 2018 and opened the docket for additional public comment. Following some comments supporting the delay and proposing specific changes to the language in §§ 201.128 and 801.4, on March 16, 2018 (83 FR 11639), FDA delayed the amendments to §§ 201.128 and 801.4 until further notice. This final rule adopts the general approach set forth in the September 2015 proposed rule by deleting the final sentence; the final rule also clarifies FDA's interpretation and application of evidence relevant to determining intended use.

### 2. Benefits of the Final Rule

The final rule clarifies FDA's existing interpretation of the determination of the intended use of drugs and devices. This clarification should reduce manufacturer and stakeholder uncertainty regarding the scenarios in which specific types of evidence may or

may not show a product is intended for a drug or device use. The removal of the final sentence in §§ 201.128 and 801.4 and the inclusion of new clarifying clauses ("provided, however, that a firm would not be regarded as intending an unapproved new use for [a medical product that is approved, cleared, granted marketing authorization, or exempted from premarket notification] based solely on that firm's knowledge that such [product] was being prescribed or used by health care providers for such use") resolve questions about whether manufacturers need to think about developing an action plan or strategy related to a potential new intended use of their medical products that are approved, cleared, granted marketing authorization, or exempted from premarket notification simply because a manufacturer has knowledge of unapproved uses of these products by third parties. We believe this clarification is the benefit of the final rule.

### 3. Costs of the Final Rule

The final rule is not expected to impose significant additional costs on manufacturers and distributors of FDA-regulated products. The final rule does not extend FDA's regulatory authority to any new or additional products, nor

does the rule change the current approach to evaluating intended use or impose any additional requirements on manufacturers or distributors. We do not have any reason to believe firms will change their marketing or operating procedures as a result of this rule. We do not have evidence that this final rule would impose costs on currently marketed products.

### C. Final Small Entity Analysis

In table 2, we describe the Small Business Administration's size thresholds for industries affected by the final rule. Based on U.S. Census data, at least 22.9 percent of businesses in NAICS code 21323 (Tobacco Manufacturing) are considered small; at least 17.5 percent of businesses in NAICS code 32541 (Pharmaceutical and Medicine Manufacturing) are considered small; and at least 32.6 percent of businesses in NAICS code 33911 (Medical Equipment and Supplies Manufacturing) are considered small. Because the final rule is not expected to impose costs on manufacturers or distributors of FDA-regulated products, the final rule is also not expected to impose costs on small entities. Therefore, we certify that the final rule will not have a significant economic impact on a substantial number of small entities.

TABLE 2—SMALL BUSINESS ADMINISTRATION SIZE STANDARDS FOR AFFECTED INDUSTRIES

| NAICS code | Industry description | Small business threshold |
|---|---|---|
| 312230 .............. | Tobacco Manufacturing ...................................... | Fewer than 1,500 Employees. |
| 325411 .............. | Medicinal and Botanical Manufacturing .............. | Fewer than 1,000 Employees. |
| 325412 .............. | Pharmaceutical Preparation Manufacturing ...... | Fewer than 1,250 Employees. |
| 325413 .............. | In-vitro Diagnostic Substance Manufacturing ...... | Fewer than 1,250 Employees. |
| 325414 .............. | Biological Product (except Diagnostic) Manufacturing. | Fewer than 1,250 Employees. |
| 339112 .............. | Surgical and Medical Instrument Manufacturing | Fewer than 1,000 Employees. |
| 339113 .............. | Surgical Appliance and Supplies Manufacturing | Fewer than 750 Employees. |
| 339114 .............. | Dental Equipment and Supplies Manufacturing | Fewer than 750 Employees. |
| 339115 .............. | Ophthalmic Goods Manufacturing ...................... | Fewer than 1,000 Employees. |
| 339116 .............. | Dental Laboratories .......................................... | Fewer than 500 Employees. |

### VIII. Analysis of Environmental Impact

We have determined under 21 CFR 25.30(h), (i), and (k) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

### IX. Paperwork Reduction Act of 1995

This final rule contains no collection of information. Therefore, clearance by the Office of Management and Budget under the Paperwork Reduction Act of 1995 is not required.

### X. Federalism

We have analyzed this final rule in accordance with the principles set forth in Executive Order 13132. FDA has determined that the rule does not contain policies that have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Accordingly, we conclude that the rule does not contain policies that have federalism implications as defined in the Executive

order and, consequently, a federalism summary impact statement is not required.

### XI. Consultation and Coordination With Indian Tribal Governments

We have analyzed this rule in accordance with the principles set forth in Executive Order 13175. We have determined that the rule does not contain policies that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal

Government and Indian Tribes. Accordingly, we conclude that the rule does not contain policies that have tribal implications as defined in the Executive Order and, consequently, a tribal summary impact statement is not required.

## XII. References

The following references are on display at the Dockets Management Staff (see **ADDRESSES**) and are available for viewing by interested persons between 9 a.m. and 4 p.m., Monday through Friday; they are also available electronically at *https:// www.regulations.gov*. FDA has verified the website addresses, as of the date this document publishes in the **Federal Register**, but websites are subject to change over time.

1. Regulations for the Enforcement of the Federal Food, Drug, and Cosmetic Act, 17 FR 6818, 6820 (1952).
2. U.S. Department of Justice, U.S. Attorney's Office, Northern District of Georgia, "Five Defendants Charged With Illegally Importing Male Enhancement Products," May 29, 2014 (available at *https:// www.justice.gov/usao-ndga/pr/five- defendants-charged-illegally-importing- male-enhancement-products*).
3. Defendants' Memorandum in Support of Motion to Dismiss or for Summary Judgment and in Opposition to Motion for Preliminary Injunction at 8, *Par Pharmaceutical Inc.* v. *United States,* 1:11–cv–01820 (D.D.C. December 23, 2011).
4. Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss or for Summary Judgment at 8–9 n.5, *Allergan Inc.* v. *United States,* 1:09–cv–01879–JDB, (D.D.C. January 11, 2010).
5. Plaintiff's Motion for Summary Judgment at 20–26, *United States* v. *Undetermined Quantities of Articles of Drug, Street Drug Alternatives, Identified in Attachment A, et al.,* Civil No. AW–00– 1687 (D. Md. January 12, 2001).
6. Government Trial Memorandum at 6, *United States* v. *Teiman,* Criminal No: 7:00CR00054 (W.D. Va. September 29, 2000).
7. Letter from Steven B. Barber, District Director, Cincinnati District, FDA to Marc C. Sanchez, Esq., Mood and Mind, LLC, at 9–10 (April 6, 2017).
8. Letter from Margaret M. Dotzel, Assoc. Commissioner for Policy, FDA to Daniel J. Popeo and Richard A. Samp, Wash. Legal Found., at 6, Docket No. 01P–0250 (January 28, 2002).
9. Letter from Ann Simoneau, J.D., Director, Office of Compliance and Enforcement, Center for Tobacco Products and Donald D. Ashley, J.D., Director, Office of Compliance, Center for Drug Evaluation and Research, FDA to HelloCig Electronic Technology Co., Ltd (October 11, 2018).
10. Letter from Ramon A. Hernandez, Director, San Juan District Office and Program Division Director, Office of Human and Animal Food Operations, Division IV East, FDA, to Ricardo Mayo- Alvarez, Duy Drugs, Inc. (August 28, 2019).
11. Letter from Daniel Solis, Director, Import Operations Branch, Los Angeles District to Carol A. Pratt, K&L Gates LLP (December 3, 2012).
12. Letter from Alonza E. Cruse, District Director, Los Angeles District, FDA to Richard Carieri, Lifetech Resources Labs Inc. (April 18, 2011).
13. Letter from Ronald M. Pace, District Director, New York District, FDA to Peter Erlikh, INZ Distributors, Inc. (August 23, 2010).
14. U.S. Department of Justice, "December 2, 2016: Woman Arrested for Injecting Adulter[at]ed Liquid Silicone," accessed December 23, 2020, *https:// www.justice.gov/usao-pr/pr/woman- arrested-injecting-adultered-liquid- silicone.*
15. U.S. Department of Justice, 2018, "March 2, 2018: Woman Sentenced for Injecting Adulterated Liquid Silicone," accessed December 23, 2020, *https:// www.justice.gov/usao-pr/pr/woman- sentenced-injecting-adulterated-liquid- silicone.*
16. Robertson, C.T. "When Truth Cannot be Presumed: The Regulation of Drug Promotion Under An Expanding First Amendment," 94 B.U.L. REV. 545, 549– 50 (2014).
17. Memorandum: Public Health Interests and First Amendment Considerations Related to Manufacturer Communications Regarding Unapproved Uses of Approved or Cleared Medical Products (January 2017) (available at *https://www.regulations.gov/ document?D=FDA-2016-N-1149-0040*).

## List of Subjects

### 21 CFR Part 201

Drugs, Labeling, Reporting and recordkeeping requirements.

### 21 CFR Part 801

Labeling, Medical devices, Reporting and recordkeeping requirements.

Therefore, under the Federal Food, Drug, and Cosmetic Act, 21 CFR parts 201 and 801 are amended as follows:

## PART 201—LABELING

■ 1. The authority citation for part 201 is revised to read as follows:

**Authority:** 21 U.S.C. 321, 331, 343, 351, 352, 353, 355, 358, 360, 360b, 360ccc, 360ccc–1, 360ee, 360gg–360ss, 371, 374, 379e; 42 U.S.C. 216, 241, 262, 264.

■ 2. Revise § 201.128 to read as follows:

### § 201.128 Meaning of intended uses.

The words *intended uses* or words of similar import in §§ 201.5, 201.115, 201.117, 201.119, 201.120, 201.122, and 1100.5 of this chapter refer to the objective intent of the persons legally responsible for the labeling of an article (or their representatives). The intent may be shown by such persons' expressions, the design or composition of the article, or by the circumstances surrounding the distribution of the article. This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. Objective intent may be shown, for example, by circumstances in which the article is, with the knowledge of such persons or their representatives, offered or used for a purpose for which it is neither labeled nor advertised; provided, however, that a firm would not be regarded as intending an unapproved new use for an approved drug based solely on that firm's knowledge that such drug was being prescribed or used by health care providers for such use. The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer. If, for example, a packer, distributor, or seller intends an article for different uses than those intended by the person from whom he or she received the article, such packer, distributor, or seller is required to supply adequate labeling in accordance with the new intended uses.

## PART 801—LABELING

■ 3. The authority citation for part 801 continues to read as follows:

**Authority:** 21 U.S.C. 321, 331, 351, 352, 360d, 360i, 360j, 371, 374.

■ 4. Revise § 801.4 to read as follows:

### § 801.4 Meaning of intended uses.

The words *intended uses* or words of similar import in §§ 801.5, 801.119, 801.122, and 1100.5 of this chapter refer to the objective intent of the persons legally responsible for the labeling of an article (or their representatives). The intent may be shown by such persons' expressions, the design or composition of the article, or by the circumstances surrounding the distribution of the article. This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. Objective intent may be shown, for example, by circumstances in which the article is, with the knowledge of such persons or their representatives, offered or used for a purpose for which it is neither labeled nor advertised; provided, however, that a firm would not be regarded as intending an unapproved new use for a device approved, cleared, granted marketing authorization, or exempted from premarket notification based solely

**41402**    **Federal Register** / Vol. 86, No. 145 / Monday, August 2, 2021 / Rules and Regulations

on that firm's knowledge that such device was being prescribed or used by health care providers for such use. The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer. If, for example, a packer, distributor, or seller intends an article for different uses than those intended by the person from whom he or she received the article, such packer, distributor, or seller is required to supply adequate labeling in accordance with the new intended uses.

Dated: July 14, 2021.

**Janet Woodcock,**

*Acting Commissioner of Food and Drugs.*

Dated: July 22, 2021.

**Xavier Becerra,**

*Secretary, Department of Health and Human Services.*

[FR Doc. 2021–15980 Filed 7–30–21; 8:45 am]

**BILLING CODE 4164–01–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Coast Guard**

**33 CFR Part 165**

**[Docket Number USCG–2021–0480]**

**RIN 1625–AA00**

**Safety Zone; Lake of the Ozarks, Mile Markers 7, 10.5, 13, 16, 22, 26, 34, and 42, Lake of the Ozarks, MO**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Temporary final rule.

**SUMMARY:** The Coast Guard is establishing temporary safety zones in all navigable waters extending 420 feet in all directions around fireworks barges at eight different locations on the Lake of the Ozarks. These safety zones are needed to protect personnel, vessels, and the marine environment from potential hazards created by the fireworks displays. Entry of vessels or persons into these zones is prohibited unless specifically authorized by the Captain of the Port Sector Upper Mississippi River or a designated representative.

**DATES:** This rule is effective on August 10, 2021 at 10 p.m. to 10:30 p.m.

**ADDRESSES:** To view documents mentioned in this preamble as being available in the docket, go to *https://www.regulations.gov*, type USCG–2021–0480 in the search box and click "Search." Next, in the Document Type column, select "Supporting & Related Material."

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this rule, call or email Lieutenant Commander Stephanie Moore, Sector Upper Mississippi River Waterways Management Division, U.S. Coast Guard; telephone 314–269–2560, email *Stephanie.R.Moore@uscg.mil*.

**SUPPLEMENTARY INFORMATION:**

**I. Table of Abbreviations**

CFR   Code of Federal Regulations
DHS   Department of Homeland Security
FR   Federal Register
NPRM   Notice of proposed rulemaking
§   Section
U.S.C.   United States Code

**II. Background Information and Regulatory History**

The Coast Guard is issuing this temporary rule without prior notice and opportunity to comment pursuant to authority under section 4(a) of the Administrative Procedure Act (APA) (5 U.S.C. 553(b)). This provision authorizes an agency to issue a rule without prior notice and opportunity to comment when the agency for good cause finds that those procedures are "impracticable, unnecessary, or contrary to the public interest." Under 5 U.S.C. 553(b)(B), the Coast Guard finds that good cause exists for not publishing a notice of proposed rulemaking (NPRM) with respect to this rule because it is impracticable. We must establish this safety zone by August 10, 2021 and lack sufficient time to provide a reasonable comment period and then consider those comments before issuing the rule.

Under 5 U.S.C. 553(d)(3), the Coast Guard finds that good cause exists for making this rule effective less than 30 days after publication in the **Federal Register**. Delaying the effective date of this rule would be contrary to the public interest because immediate action is needed to respond to the potential safety hazards associated with the fireworks displays on August 10, 2021.

**III. Legal Authority and Need for Rule**

The Coast Guard is issuing this rule under authority in 46 U.S.C. 70034 (previously 33 U.S.C. 1231). The Captain of the Port Sector Upper Mississippi River (COTP) has determined that potential hazards associated with the fireworks displays on August 10, 2021 will be a safety concern for anyone on the Lake of the Ozarks at the designated launch locations. This rule resulted from a marine event notification stating that there will be fireworks displays to celebrate a bicentennial birthday on the Lake of the Ozarks. This rule is needed to protect personnel, vessels, and the marine environment in the navigable

waters within the safety zone before, during, and after the fireworks display.

**IV. Discussion of the Rule**

This rule establishes safety zones on August 10, 2021 from 10 p.m. until 10:30 p.m. The safety zones will be located on all navigable waters extending 420 feet in all directions around fireworks barges at the following locations on the Lake of the Ozarks at (1) mile marker 7 (38 12′35.20″ N 92 45′02.57″ W), (2) mile marker 10.5 (38 01′21.93″ N 92 47′38.93″ W), (3) mile marker 13 (38 11′01.86″ N 92 41′19.32″ W), (4) mile marker 16 (38 08′54.89″ N 92 38′29.53″ W), (5) mile marker 22 (38 08′54.89″ N 92 41′18.95″ W), (6) mile marker 26 (38 07′25.22″ N 92 42′58.65″ W), (7) mile marker 34 (38 07′25.22″ N 92 47′34.59″ W) and (8) mile marker 42 (38 08′55″ N 92 52′23.30″ W). The duration of these zones is intended to protect personnel, vessels, and the marine environment in these navigable waters before, during, and after the fireworks displays. No vessel or person will be permitted to enter the safety zones without obtaining permission from the COTP or a designated representative. A designated representative is a commissioned, warrant, or petty officer of the U.S. Coast Guard assigned to units under the operational control of USCG Sector Upper Mississippi River. The COTP or a designated representative will inform the public of the enforcement date and times for these safety zones, as well as any emergent safety concerns that may delay the enforcement of the zones.

**V. Regulatory Analyses**

We developed this rule after considering numerous statutes and Executive orders related to rulemaking. Below we summarize our analyses based on a number of these statutes and Executive orders, and we discuss First Amendment rights of protestors.

*A. Regulatory Planning and Review*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits. This rule has not been designated a "significant regulatory action," under Executive Order 12866. Accordingly, this rule has not been reviewed by the Office of Management and Budget (OMB).

This regulatory action determination is based on size, location, and duration of the temporary safety zones. This action involves fireworks displays at multiple designated locations on the

Code of Federal Regulations
  Title 21. Food and Drugs
    Chapter I. Food and Drug Administration, Department of Health and Human Services (Refs & Annos)
      Subchapter H. Medical Devices
        Part 801. Labeling (Refs & Annos)
          Subpart A. General Labeling Provisions

21 C.F.R. § 801.4

§ 801.4 Meaning of intended uses.

Effective: September 1, 2021
Currentness

The words intended uses or words of similar import in §§ 801.5, 801.119, 801.122, and 1100.5 of this chapter refer to the objective intent of the persons legally responsible for the labeling of an article (or their representatives). The intent may be shown by such persons' expressions, the design or composition of the article, or by the circumstances surrounding the distribution of the article. This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. Objective intent may be shown, for example, by circumstances in which the article is, with the knowledge of such persons or their representatives, offered or used for a purpose for which it is neither labeled nor advertised; provided, however, that a firm would not be regarded as intending an unapproved new use for a device approved, cleared, granted marketing authorization, or exempted from premarket notification based solely on that firm's knowledge that such device was being prescribed or used by health care providers for such use. The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer. If, for example, a packer, distributor, or seller intends an article for different uses than those intended by the person from whom he or she received the article, such packer, distributor, or seller is required to supply adequate labeling in accordance with the new intended uses.

**Credits**

[82 FR 2217, Jan. 9, 2017; 82 FR 9501, Feb. 7, 2017; 82 FR 14319, March 20, 2017; 83 FR 11639, March 16, 2018; 86 FR 41401, Aug. 2, 2021]

SOURCE: 41 FR 6896, Feb. 13, 1976; 50 FR 30154, July 24, 1985; 54 FR 39640, Sept. 27, 1989; 62 FR 51519, Oct. 1, 1997; 64 FR 404, Jan. 5, 1999; 81 FR 38930, June 15, 2016, unless otherwise noted.

AUTHORITY: 21 U.S.C. 321, 331, 351, 352, 360d, 360i, 360j, 371, 374.

Notes of Decisions (25)

Current through November 18, 2021; 86 FR 64407.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.  G.Add.52    1